EXXON CORPORATION AND AFFILIATED COMPANIES, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Exxon Corp. v. Commissioner
Docket Nos. 18618-89, 24855-89, 18432-90
United States Tax Court
T.C. Memo 1993-616; 1993 Tax Ct. Memo LEXIS 629; 66 T.C.M. (CCH) 1707; December 22, 1993, Filed *629 Held: A Saudi crude oil resale pricing restriction in effect during a period in which Saudi crude was priced below other comparable crudes prohibited the sale of Saudi crude oil for an amount in excess of the Saudi official selling price, and petitioners complied with the restriction; consequently, respondent is precluded from allocating profits purportedly attributable to such excess from petitioners' refining subsidiaries to petitioners' offtakers pursuant to either sec. 61, I.R.C., or sec. 482, I.R.C.Commissioner v. First Security Bank, 405 U.S. 394 (1972); Procter & Gamble Co. v. Commissioner, 95 T.C. 323 (1990), affd. 961 F.2d 1255 (6th Cir. 1992), followed. For petitioners in docket Nos. 18618-89 and 18432-90: Robert L. Moore, II, Jay L. Carlson, John B. Magee, Gerald Goldman, Thomas D. Johnston, Joseph O. Luby, Bradford J. Anwyll, Kevin L. Kenworthy, Brian P. Thomas, and Craig D. Miller. For petitioners in docket No. 24855-89: Buford P. Berry, Emily Ann Parker, Dennis J. Grindinger, George V. Larsen, Joseph M. Incorvaia, David R. Wheat, Mary A. McNulty, and Bradley D. Spevak. For respondent: Raymond L. Collins, Ana G. Cummings, Bernard *630 B. Nelson, Avery B. Cousins, III, John F. Eiman, Allan E. Lang, Alan Summers, William B. Lowrance, David A. Alavarez, James H. W. Insley, Roger Osburn, Emron M. Pratt, David J. Mungo, David P. Monson, Carol Bingham McClure, David E. Whitcomb, Mark Barnes, and Joyce E. Britt. WHITAKER
WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent, in a statutory notice of deficiency dated June 29, 1989, determined a deficiency in the 1979 Federal income taxes of Exxon Corp. and Affiliated Companies (docket No. 18618-89) in the amount of $ 268,721,294. In another notice of deficiency dated July 16, 1990, issued to Exxon Corp. and Affiliated Companies (docket No. 18432-90) for the years 1980, 1981 and 1982, respondent determined deficiencies in Federal income taxes in the following amounts: Year
Deficiency
1980
$ 2,898,174,073
1981
2,037,809,876
1982
1,599,495,218
In a notice of deficiency dated July 21, 1989, issued to Texaco, Inc., and Subsidiaries (docket No. 24855-89) for the years 1979, 1980, 1981, and 1982, respondent determined deficiencies in Federal income taxes in the following amounts: Year
Deficiency
1979
$ 230,193,303
1980
925,040,885
1981
420,056,007
1982
579,861
*631 Only the deficiencies for 1979 through 1981 are at issue herein. This Court's Order, dated January 7, 1991, indicated that the issues presently before the Court involved the purchase by petitioners' offtakers [2] *633 of crude oil from Saudi Arabia at a below-market purchase price, commonly referred to as the "Aramco Advantage". Specifically, we ordered that the issues involved herein were limited to the following questions: (1) Whether the transfer price of Saudi Arabian crude oil paid by petitioners' offtakers was below the prices charged for non-Saudi crude oil of similar grade or quality; (2) if the answer to question (1) is in the affirmative, whether the transfer price charged by the offtakers to the other subsidiaries of each petitioner or to unrelated third parties was below the price charged for non-Saudi crude oil of similar grade or quality; (3) if the answers to questions (1) and (2) are in the affirmative, whether the reduced price was caused by the restrictions imposed by Saudi Arabia which petitioners, their offtakers, and other subsidiaries were required to observe in order to have continued access to Saudi Arabian oil; (4) whether the consuming country governments *632 monitored the offtakers' sales of Saudi crude oil into their countries to assure that such sales were not in excess of the prices established by Saudi Arabia, increased only by costs incurred in transporting the crude oil; (5) whether the Saudi Arabian pricing restrictions required petitioners and their offtakers to reflect the pricing restrictions in the transfer price of sales of Saudi crude oil from petitioners' offtakers to unrelated entities which purchased the Saudi crude oil for refining; (6) whether in fact the crude oil pricing restrictions imposed by Saudi Arabia was/were observed by petitioners and their offtakers; (7) if a crude oil pricing restrictions existed and petitioners and their offtakers observed the restrictions, whether or not the pricing restrictions precludes or preclude a section 482[3] or section 61 adjustment to petitioners' income.
The parties have stipulated that the answer to the first questionis in the affirmative. The ultimate question to be addressed in question (7) arises under the rule of law presented in Commissioner v. First security Bank, 405 U.S. 394 (1972), and its progeny. essentially the issues are: (1) Whether the Saudi Arabian Government (SAG) imposed a price restriction prohibiting the sale of Saudi crude oil for an amount in excess of the Saudi official selling price; (2) is so, whether petitioners complied with this restriction; and (3) if so, whether the restriction and petitioners' compliance with it preclude respondent's proposed allocaiton of profits from petitioner's refing subsidiaries to petitioners' offtakers pursuant to either section 61 or section 482. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and attached exhibits are *634 incorporated herein by this reference. We also incorporate by reference the facts contained in our earlier opinion in these cases on evidentiary matters, Exxon Corp. v. Commissioner, T.C. Memo. 1992-92, although some of the facts contained therein will be repeated here for convenience. Petitioner Exxon Corp. (Exxon) had its principal place of business in New York when the petitions in its cases were filed. Exxon is the common parent corporation of an affiliated group of corporations that includes all of petitioners in docket Nos. 18618-89 and 18432-90 (which collectively will be referred to as the Exxon petitioners). At all relevant times the Exxon petitioners were engaged in the business of producing, refining, and marketing crude oil and petroleum products in the United States and numerous other countries around the world. Petitioner Texaco, Inc. (Texaco), had its principal place of business in Texas when the petition in its case was filed. Texaco is the common parent corporation of an affiliated group of corporations that includes all of the petitioners in docket No. 24855-89 (which collectively will be referred to as the Texaco petitioners). *635 The Texaco petitioners at all relevant times were engaged in the production, refining, transportation, and marketing of crude oil and refined products in the United States and foreign countries. Formation of Aramco and the Offtakers
After centuries of upheaval, in September 1932, King Abd al-Aziz ibn Abd al-Rahman Al Saud (King Abd al-Aziz) proclaimed the formation of a new state, the Kingdom of Saudi Arabia. From its very inception, the law of Islam was the paramount law of the Saudi State, and the role of the King was paramount in temporal matters, although he too was subject to the higher authority of Islamic law. In May 1933, the SAG signed a concession agreement (the Concession Agreement) with Standard Oil of California (Socal, now Chevron Corp. (Chevron)). Subsequently, the concession was assigned to the California-Arabian Standard Oil Co. (CASOC), which in 1944 changed its name to Aramco. Under the terms of the Concession Agreement (as subsequently modified), Socal was permitted to extract petroleum from Saudi Arabia, subject to the payment of taxes and royalties to the SAG. By the end of November 1948, and continuing through the years at issue, all of the capital *636 stock of Aramco was held directly or indirectly by four U.S. corporations: Exxon, Texaco, Chevron, and Mobil Oil Corp. (Mobil) or their predecessor corporations. Through January 1979 the Mediterranean Standard Oil Co., Inc. (MEDSTAN), a wholly owned subsidiary of Exxon incorporated in the United States, acquired crude oil from Saudi Arabia via Aramco. [4] Thereafter, the Exxon International Trading Co., Inc. (EITCO), another wholly owned subsidiary of Exxon incorporated in the United States, performed this function. In January 1981 Exxon International Saudi Arabia, Inc. (EISAI), another wholly owned subsidiary of Exxon incorporated in the United States, began to purchase Saudi crude oil from the Saudi Arabian national oil company. These purchases occurred pursuant to an oil incentive contract executed in December 1980 under which Exxon became entitled to buy additional Saudi crude oil as a result of its investment in a chemical facility in Saudi Arabia. MEDSTAN, EITCO, and EISAI are referred to hereafter as the Exxon offtakers. *637 Saudi crude oil was Exxon's largest crude oil source throughout the period 1977 through 1981. It constituted approximately 50 percent of Exxon's international crude supply. [5] *638 During the period 1979 through 1981 (the period at issue), [6] the Exxon offtakers acquired 2,273 million barrels of Saudi crude oil, of which 2,207 million barrels (or over 97 percent) were acquired via Aramco by MEDSTAN in January 1979 and by EITCO from February 1979 through December 1981. The dispositions of Saudi crude by the Exxon offtakers during the years 1979 through 1981 are summarized as follows: Exxon Offtakers
Percentage of Dispositions
Barrels
Total Dispositions
Sales to Exxon refining/
marketing affiliates 1,816,000,000
79.9%
Sales to
unrelated parties 261,000,000
11.5 "War Relief" sales to
unrelated parties 61,000,000
2.7 Crude oil exchanges with
unrelated parties 132,000,000
5.8 Crude oil losses and
inventory changes 3,000,000
.1 Total Saudi crude
oil dispositions (1979-81) 2,273,000,000
100.0%
Exxon had refining affiliates located in Denmark, the Federal Republic of Germany, Australia, Belgium, Italy, Ivory Coast, Kenya, Malaysia, the Netherlands, Greece, the United Kingdom, Japan, Singapore, Argentina, France, Ireland, Thailand, Canada, Norway, and the United States, which purchased Saudi crude from at least one of the Exxon offtakers during the years 1979-81. In pricing crude oil to its affiliates, the Exxon offtakers from the mid-1970s used interaffiliate billing prices (IABP's) that were based upon the official selling prices (OSP's) of the producing governments, regardless *639 of the source or actual cost of the crude. The philosophy behind this IABP practice was that uniformity was necessary for two reasons: (1) It would be readily defensible to the consuming countries in their monitoring of Exxon affiliate crude import prices; and (2) it would be defensible to the Exxon offtakers' affiliates, since the financial performance of the refining affiliates depended to a significant degree upon the cost of the crude they refined and marketed. The Exxon offtakers continued this IABP practice throughout the years at issue, and, with one exception to be discussed later, all invoices in connection with the Exxon offtakers' transfers of Saudi crude to Exxon affiliates indicated that Saudi crude was sold at Saudi OSP. In their sales to unrelated parties, the Exxon offtakers also consistently invoiced Saudi crude at Saudi OSP during the years 1979-81. At least some of the Exxon offtakers' crude oil sales contracts with unrelated purchasers had "price reopener clauses", whereby the Exxon offtaker would have been able under the terms of those contracts to renegotiate the price of the crude sold. Prior to October 1, 1978, Saudi crude oil received by Texaco via Aramco *640 was acquired and disposed of by two wholly owned Delaware subsidiaries, Texaco Operations (Europe) Ltd. (TOE) and Texaco Export, Inc. (Texport). Texport obtained crude oil via Aramco and sold crude oil directly to either (1) certain Texaco affiliates or (2) TOE generally for resale to Texaco's European affiliates. Additionally, Texport and TOE each processed certain volumes of Saudi crude oil for their accounts during the 1973-78 period. Texport was merged into TOE on October 1, 1978, and its corporate name was changed to Texaco International Trader, Inc. (Textrad). During the years at issue, Textrad was a wholly owned Delaware subsidiary of Texaco. Textrad (and its predecessors in interest) operated as the international crude trading company for Texaco. Most of the crude oil traded internationally by Texaco during the period 1979-81 was traded by Textrad. Caltex Petroleum Corp. (CPC) is a corporation owned 50 percent by Texaco, Inc., and 50 percent by Chevron. CPC and its controlled foreign corporations will hereafter be referred to as Caltex. Saudi crude constituted approximately 78 percent of Texaco's international crude supply. [7] During the period January 1, 1979, through *641 June 30, 1981, Textrad purchased a total of 1,872,198,217 barrels of Saudi crude via Aramco. The dispositions [8] of Saudi crude during the years 1979 through 1981 by Textrad are summarized as follows: Textrad Percentage of Dispositions
Barrels
Total Dispositions
Sales to Texaco Refining/
Marketing Affiliates
780,000,000
34.2%
Sales to
Unrelated Parties
367,000,000
16.1 "War Relief" Sales to
Unrelated Parties
77,000,000
3.4 Sales to Caltex
494,000,000
21.7 Crude Oil Exchanges with
Unrelated Parties
345,000,000
15.2 Transfers to Affiliated
Entities Pursuant to
Processing Agreements
213,000,000
9.4 Total Saudi Crude Oil
Dispositions (1979-81)
2,276,000,000
100.0%
During the period at issue, in addition to several refineries in the United States, Texaco owned refining subsidiaries in the United Kingdom, Belgium, the *642 Federal Republic of Germany, the Netherlands, six Latin American countries, and four Canadian provinces. Texaco also had equity interests in refineries located in the Federal Republic of Germany, Ireland, Italy, Sweden, Switzerland, and five Latin American countries, and Caltex had equity interests in refineries located in Australia, Bahrain, Japan, Kenya, South Korea, Lebanon, New Zealand, Pakistan, the Philippines, Singapore, and South Africa. Organization and Operation of the Saudi Arabian Government
After the death of King Abd al-Aziz in November 1953, his son Saud became King and another son, Faisal, became Crown Prince. In 1962, King Saud established the state-owned General Organization for Petroleum and Minerals (Petromin) to take over petroleum distribution operations within Saudi Arabia from Aramco. In November 1964, Crown Prince Faisal became King. Prince Khalid, another son of King Abd al-Aziz, became Crown Prince. Since the reign of King Faisal, the King's formal titles, in addition to that of King, have included President of the Council of Ministers (or Prime Minister) and Commander in Chief of the Saudi Arabian armed forces. In March 1975 King Faisal was *643 assassinated, and Crown Prince Khalid became King. Prince Fahd and Prince Abd Allah, both sons of King Abd al-Aziz, were named Crown Prince and second deputy prime minister, respectively. After King Khalid's death in June 1982, Crown Prince Fahd became King and Prince Abd Allah became Crown Prince. The King, members of the Council of Ministers, and all citizens of Saudi Arabia are subject to Islamic law. Islamic law is based upon the Koran, which is the Holy Book of all Moslems, and the Sunna, which is the recorded account of the Prophet Muhammad's views of life and society. The King is the most prominent figure in the legal hierarchy of, and possesses the ultimate legal authority in, Saudi Arabia. He has the ultimate duty of ensuring that Islamic law is observed. The senior princes were the main drivers of policy in the years leading up to and during the years at issue. Crown Prince Fahd had been mandated by King Khalid with executive authority for affairs of state prior to the years at issue. During the period at issue, Crown Prince Fahd was perceived to be ultimately responsible for matters pertaining to national policy and was a key policymaker on Saudi oil matters. *644 In 1953, the King established a Saudi Council of Ministers composed of the King, the Crown Prince, a Second Vice President, the heads of the various ministries, and several ministers of state. The Council of ministers later was constituted under the Council of Ministers' Regulations and was invested with regulatory, executive, and administrative authority. Notwithstanding a certain amount of government organization, the ultimate authority of the Saudi State still rested with the King. All powers enjoyed by government officers stemmed from a delegation, either formally or informally, of those powers from the King. The Ministry of Petroleum and Mineral Resources (Petroleum Ministry) was established in 1960 and was the executive agency that converted the oil policies established by the King and Crown Prince into specific actions and ensured implementation of those policies. The Petroleum Ministry was the sole Saudi Government agency responsible for supervising the oil-related affairs of Aramco and its four shareholders and often communicated its official government positions and directives to them by letter. Ministerial directives came into effect upon issuance by the Petroleum *645 Ministry pursuant to the authority granted by the King as Sovereign or President of the Council of Ministers and were considered to be binding unless overridden by a Royal decree, order, or a resolution by the Council of Ministers. In March 1962, King Saud had appointed Sheikh Ahmed Zaki Yamani (Minister Yamani) to be the Minister of the Petroleum Ministry. Minister Yamani served as Petroleum Minister until October 1986. Although Crown Prince Fahd occasionally participated in press interviews or dealt with foreign dignitaries on Saudi oil policy matters, throughout Minister Yamani's tenure as Petroleum Minister, he was most commonly seen as the spokesperson for the SAG with respect to oil-related issues. Only rarely did the King or Crown Prince make a personal statement on oil policy. Minister Yamani was the SAG official responsible for consulting with the King or Crown Prince on oil- related matters, and there was a widely held understanding that such consultations occurred and that Minister Yamani regularly received instructions on Petroleum Ministry matters. He was perceived to be -- and held himself out as -- the authoritative spokesperson for Saudi Arabia on oil policy *646 matters. At important meetings such as the Conference on International Economic Cooperation held in 1976-77, Minister Yamani was the Saudi representative. He participated in negotiations with petitioners' representatives over the years as the Saudi representative and was perceived by them as having the full authority to engage in these negotiations. He also participated in discussions with representatives of other countries on behalf of the SAG. Many government and industry officials believed that Minister Yamani spoke for the SAG on policy matters and would not implement a policy unless it was approved by the SAG leadership. The Saudi legal system had a judicial body called the Board of Grievances during the period at issue, which had jurisdiction over disputes between private parties and the SAG. It is unclear whether from a legal standpoint Minister Yamini's ministerial actions were capable of review by this Board. However, from a practical standpoint, in the absence of a clear violation of an existing contract or law, an adjudication of his actions in such a forum or otherwise probably would have been futile. Formation of OPEC
Prior to 1960, multinational oil companies *647 essentially controlled the production and pricing of crude oil from Middle Eastern and other oil exporting countries. In 1959 and again in 1960 the major international oil companies unilaterally reduced the posted prices for crude oils, which were the prices on which the oil companies' royalty and tax obligations to foreign governments were based. In reaction to the oil companies' 1959 and 1960 posted price reductions, Saudi Arabia, Iran, Iraq, Kuwait, and Venezuela met in Iraq from September 10-14, 1960, and formed the Organization of Petroleum Exporting Countries (OPEC). The SAG had the largest supply of crude of all the OPEC countries and was a prominent player in OPEC. Eight other oil exporting countries subsequently joined OPEC: Qatar in 1961, Indonesia and Libya in 1962, Abu Dhabi in 1967, Algeria in 1969, Nigeria in 1971, Ecuador in 1973, and Gabon in 1973 as an associate member and in 1975 as a full member. When Abu Dhabi joined other countries in forming the United Arab Emirates in 1971, the United Arab Emirates replaced Abu Dhabi as a member of OPEC. By 1977, OPEC consisted of 13 countries, which as a group produced between 50 and 55 percent of the world's crude oil, *648 held approximately 68 percent of the world's crude oil reserves, and exported more than 80 percent of all crude oil exports. Saudi Arabia alone had approximately 24 percent of the world's proven oil reserves, and from 1975 to 1981 it produced about 17 percent of the world's crude oil and was the world's largest exporter of crude oil. The Takeover of Pricing Decisions and Oil-Producing Operations by Producing Countries
In June 1968, OPEC adopted a "Declaratory Statement of Petroleum Policy in Member Countries", and as sovereign powers they invoked the doctrine of "changing circumstances", which asserted a country's legal right to alter concession agreements to include a government ownership share if there were substantial changes in the circumstances that prevailed when the concession agreements were entered into. During the 1970s the OPEC member countries and other Middle East and North African countries began to modify concessionary terms to capture for themselves a greater share of oil-producing profits and to secure a greater role in the ownership and management of the oil companies' producing operations. From 1967 to 1971, Algeria nationalized the operations of all *649 non-French foreign oil companies and assumed a 51-percent interest in the operations of the French oil companies. With regard to the pricing of crude oil, in December 1970, the OPEC countries met in Caracas, Venezuela, and resolved that negotiations would begin with the international oil companies regarding crude oil prices and other matters. Representatives of OPEC's Persian Gulf member countries and the international oil companies met in Tehran, Iran, in February 1971 and executed an agreement with respect to posted prices that was designed to govern prices for a 5-year period. The international oil companies subsequently reached agreements with Libya, Iraq, and Nigeria regarding posted prices. Negotiations 6 weeks later led to another agreement between the Libyan Government and 15 oil companies, which also was intended to last 5 years. Comparable agreements with Iraq and Nigeria followed in the ensuing weeks. On September 22, 1971, OPEC called for increasing the effective "participation" of the producing countries in the producing operations of the oil companies located within their respective countries. Shortly thereafter, participation talks commenced between the oil-producing *650 countries and the oil companies. Certain OPEC countries took a less conciliatory route. In early June 1972, Iraq nationalized the oil companies' (including Exxon's) interests in the Iraq Petroleum Co. In July 1973, the Iranian Government, through the state-owned National Iranian Oil Co., formally took over all operating responsibility within the concession areas covered by a 1954 agreement between Iran and a consortium of international oil companies, including Exxon and Texaco. In the fall of 1973, Libya demanded a 51-percent participation interest in the Libyan operations of a number of the major oil companies operating in Libya. Libyan subsidiaries of Exxon and Mobil acceded to the Libyan Government's demands in 1974. Shell, Socal, Texaco, and Atlantic Richfield refused to accept Libya's demand for a 51-percent participation interest and had their operations completely nationalized. In late 1973, Iraq nationalized the Exxon, Mobil, and Partex interests and the Dutch portion of the Royal Dutch/Shell interest in the Basrah Petroleum Co. By the end of 1975, Iraq had nationalized the remaining companies' interests in the Basrah Petroleum Co. In 1974, Kuwait acquired a 60 percent *651 participation interest in the Kuwait Oil Co., a partnership of British Petroleum and Gulf Oil. By 1976, Kuwait had increased its participation interest to 100 percent. In 1973, Qatar acquired a 25-percent participation interest in the operations of the country's two producing companies, in one of which Exxon had an interest. In 1974, Qatar increased its participation interest in the two companies' operations to 60 percent. By 1977, Qatar had increased its participation interest in the two companies to 100 percent. In August 1975, Venezuela passed a law nationalizing the operations of foreign-owned oil companies (including a subsidiary of Exxon). Through increased participation (both actual and anticipated), nationalization, or expropriation, producer country ownership of OPEC oil increased from about 2 percent of production in 1970 to almost 60 percent of production by the end of 1974, and to approximately 80 percent by the end of 1980. In 1973, the national oil companies of OPEC member countries directly had sold about 5 percent of their countries' exports. By the end of 1980, this figure had increased to between 50 and 55 percent of the OPEC countries' oil exports. The *652 Saudi relationship with Aramco developed on a parallel, but somewhat more moderate course, whereby the Saudis pursued a policy of "participation" rather than outright nationalization. In a speech at the American University in Lebanon in 1968, Minister Yamani discussed the Saudi goal of accomplishing change in a stable context. He indicated that, although Aramco originally resisted the notion of Saudi participation, Minister Yamani had ways to pressure Aramco into going along with Saudi participation. The original Concession Agreement between the SAG and Aramco continued until the early 1970s when the other producing countries began nationalizing their oil interests. Early in 1972, participation negotiations between the Aramco companies and Minister Yamani on behalf of the SAG commenced. It subsequently was publicized that, in the course of these 1972 negotiations, the King had instructed Minister Yamani to warn the Aramco company negotiators that implementation of participation was "imperative" and that the Aramco companies should not require the SAG to "take measures" to put participation into effect. Although there was significant resistance to participation by the companies, *653 by early October 1972 a draft agreement, called the "General Agreement on Participation" (General Agreement), was reached and later signed by the SAG and two other Gulf States, whereby the SAG purchased a 25-percent initial government participation interest in Aramco's production operations, which was gradually to increase to 51 percent in 1982. The Aramco companies were to be compensated for unrecovered investments on the basis of book value adjusted for inflation. The implementing agreements called for in the General Agreement were never executed. The gradual phasing in of the Saudi share was intended to give Petromin time to gain experience in marketing, and Petromin gradually engaged in more and more direct marketing activities after the General Agreement was signed. During the 1970s and 1980s, Petromin's role in the international marketing of crude oil continued to increase. It was the intention of the Aramco companies to hold onto as much equity ownership as possible, but after the rapidly changing events in the Middle East in the early 1970s, including the Arab oil embargo and dramatic crude price increases, as well as nationalizations by the more radical OPEC members, *654 the Aramco companies were notified in 1974 that the SAG participation was to be speeded up. Extensive negotiations occurred over the next few years. Dr. James Schlesinger (Dr. Schlesinger), who was the U.S. Energy Secretary until August 1979, perceived the SAG takeover of Aramco to be a "lopsided" negotiation whereby the companies did not wish to be taken over but they had no choice because they were "negotiating" with a sovereign power. In late 1976 or early 1977, the SAG and the Aramco companies agreed upon the so-called New Arrangements. Under the New Arrangements, the SAG assumed 100 percent ownership of Aramco, and the (now former) shareholders provided services to the SAG's oil business in exchange for stated fees. Many of the financial aspects of the New Arrangements were implemented in a draft crude oil sales agreement (COSA), but the New Arrangements and the draft COSA were never signed. The Arab Oil Embargo and the First Oil Crisis
The following series of events constituted what has come to be called the "first oil crisis". On October 7, 1973, the Arab-Israeli war broke out in the Middle East. On October 8, 1973, representatives of the oil companies and the *655 oil ministers of OPEC's Persian Gulf member countries met in Vienna, Austria, to discuss revising established prices, which already had been revised upwards twice by the Geneva Agreements of January 1972 and June 1973 to reflect changes in currency exchange rates and inflation. On October 9, 1973, oil industry representatives proposed a 15-percent increase in posted prices and offered to negotiate an inflation index provision. No agreement was reached, and discussions were broken off shortly thereafter. On October 16, 1973, OPEC unilaterally announced an immediate 70-percent increase in posted prices. This raised the posted price from $ 3.01 per barrel to $ 5.12 per barrel for Saudi Arabian Light marker crude. [9] On October 17, 1973, the Organization of Arab Petroleum Exporting Countries (which had been created in January 1968 and whose members included the Arab member states of OPEC) agreed to impose monthly decreases in crude oil production of 5 percent. In the following 2 weeks, the individual Arab states, including Saudi Arabia, implemented this agreement by reducing production between 5 and 10 percent. OPEC members also announced an embargo on exports to the United States *656 and the Netherlands. At a meeting in December 1973, the OPEC member countries agreed to increase prices again, resulting in a fourfold increase in crude oil prices since the beginning of October 1973. The OPEC price increases during the last quarter of 1973 substantially increased the oil import costs of the consuming countries. By early 1974, the OPEC countries had taken control over crude oil pricing and production decisions from the multinational oil companies operating in their countries, and OPEC had established a unified pricing system for its members' crude oil. The posted price for Saudi Arabian Light marker crude was increased to $ 11.65 per barrel in January 1974, and then later decreased to $ 11.25 per barrel in November 1974. At *657 the September 1975 OPEC meeting in Vienna, Austria, the OPEC members again agreed to increase prices by 10 percent, effective October 1, 1975. Two-Tier Pricing and the 1977 Saudi Restriction
When an OPEC meeting opened in December 1976 in Doha, Qatar (Doha meeting), Saudi Arabian Light marker crude was at $ 11.51. At the meeting, 11 members of OPEC voted to raise the price by $ 1.19, or approximately 10 percent, effective January 1, 1977, to be followed by an additional 5-percent increase on July 1, 1977. These countries also planned to add additional fees, or premia, to certain grades of crude. The SAG and the United Arab Emirates, in an effort to moderate crude prices, refused to go along with the other 11 OPEC members, which resulted in a two-tier pricing structure. The SAG decided that it would raise the prices of Arabian Light and Arabian Berri by only 5 percent (to $ 12.09 and $ 12.48, respectively), that it would raise the prices of Arabian Medium by 3.6 percent (to $ 11.69), and that it would raise the price of Arabian Heavy by 3 percent (to $ 11.37), all to remain in effect for the entire year. The SAG also increased production available to Aramco at this time *658 in an effort to force the other OPEC countries to moderate their prices. A Saudi official was quoted in the Middle East Economic Survey, a widely read weekly news source, on December 26, 1976, as saying: We shall ensure that the companies concerned keep their prices to all customers at the official government levels. If these companies increase their prices for Saudi crudes above the government levels, we will consider this a hostile act against Saudi Arabia, and they will be held to be working against the interests of the Kingdom.
This official Saudi statement was known to U.S. officials. Shortly thereafter, Minister Yamani was quoted in the January 10, 1977, issue of the Middle East Economic Survey as having participated in an interview in Germany on January 3, 1977, a portion of which is as follows: Q: We would like to return to the split in oil prices. How can this system really work? A: We will make sure that the oil companies do not take one cent from the cheap Saudi crude and put it in their own pockets. We want the lowest price for the benefit of the consumers. On this we will stand firm. Q: How do you intend to do that? A: First, we have ways *659 and means to do it. The oil companies need Saudi Arabia. And they know they will be punished if they do not behave as we expect. Secondly, the consumers are not stupid. They will be aware that they can make use of this situation. In any case, supply and demand will decide what happens. Not in January, not in February, but at any time in the future.
In conjunction with these efforts toward price moderation, the SAG instituted pricing and reporting requirements to ensure that its lower price was adhered to when the Saudi crude was sold by the Aramco shareholders. Minister Yamani sent identical letters in English to petitioners dated January 10, 1977, which stated: This is to inform you that the following conditions will apply to the additional volumes of crude oil which become available for export as a result of the Government's decision to permit Aramco to increase production. You should take appropriate steps to assure compliance with these conditions: 1. The prices charged to the consuming countries for Saudi Arabian Crude Oil will not be higher than the FOB Ras-Tanura prices as conveyed to Aramco plus transportation cost to the particular countries concerned. *660 2. Such condition will apply also to the buyers of Saudi Crude Oil through your company. 3. An audit certificate from a certified public accountant should be made available to us to prove compliance with the conditions (1 & 2) above.
Furthermore, it should be understood that the same conditions apply to all the Crude Oil lifted by your company from Saudi Arabia which is expected to flow into its historical international markets, to buyers-users and without the utilization of brokers. Hence, an audit certificates in accordance with the abovementioned conditions is also required. With best regards. Ahmed Zaki Yamani Minister of Petroleum and Mineral Resources
The provisions of these letters will hereafter be referred to as the source of the 1977 restriction. The Saudi Petroleum Ministry statement in connection with the 1977 restriction was published in the Middle East Economic Survey on January 10, 1977. The statement read in part: The Government of Saudi Arabia, in its desire to pass on the low prices which it set for its oil to the final consumer, solicits the cooperation of the governments of the consumer countries in checking through strict *661 auditing measures the prices at which Saudi crude oil is sold in their countries and ensuring that no party other than the final consumer benefits from the low prices.
Exxon interpreted paragraph 3 of the 1977 restriction to require that audit certifications encompassing all sales of Saudi oil had to be supplied to the Saudis, including those to affiliates and to unrelated third parties. The audit certificates supplied by Exxon under the requirements of the 1977 restriction covered all sales of Saudi oil by Exxon to affiliates and unrelated entities. However, Exxon's independent auditor, Price Waterhouse & Co., apparently having received only partial information from purchasers of Saudi oil, had not submitted certificates for all sales. The SAG characteristically came forward and drew attention to matters that were not in conformity with Saudi policies. As a consequence, the SAG initially requested from Exxon more complete information and more detailed reports. Texaco guidelines indicated that sales of all Saudi oil were covered by the 1977 restriction. However, Texaco initially appears to have supplied audit information only with respect to the "additional volumes" referred *662 to in the letter containing the 1977 restriction. Minister Yamani asked for information regarding all sales of Saudi oil as soon as possible. Subsequently, Texaco apparently did not supply all of the information that the SAG had indicated that it expected "in compliance with H.E. The Minister's instructions", for the SAG in January 1978 supplied Texaco with lists of crude oil shipments for which no audit certifications had been received and a request for expedited response. Texaco complied with the SAG requirement for additional information, with the possible exception of 18 shipments for which it could not locate the appropriate information. Texaco viewed the 1977 restriction and the audit requirements in connection therewith as mandatory and took them very seriously. Submissions of the certifications by petitioners to the SAG continued for the duration of the 1977 two-tier pricing period, which ended in July 1977 when, following a June 1977 OPEC meeting, Saudi Arabia and the United Arab Emirates imposed a 5-percent price increase. No agreement to increase crude oil prices was reached at the December 1977 OPEC meeting in Caracas, Venezuela. The Iran Crisis; Rising Prices
*663 In October 1978, oil workers in Iran went on strike. Although oil field workers in Iran returned to work in November following military intervention, strikes resumed in early December in response to the urging of Ayatollah Khomeini, the Iranian opposition leader then in exile in Paris. Iranian crude oil production averaged approximately 3.8 million barrels per day over the last quarter of 1978, as compared to an average of approximately 5.7 million barrels per day over the first 9 months of 1978. Iranian exports of crude oil ceased completely by the end of December 1978 and did not resume again until March 1979, and then at a reduced level. The bulk of lost Iranian production was Iranian Light, which was one of the lighter types of crude. In response to the Iranian takeover of the U.S. Embassy in Tehran on November 4, 1979, President Carter announced a trade embargo of Iran, including the importation of Iranian crude oil. In response to the Iranian shortfall, the SAG increased its crude production from 7.75 million barrels a day (the average for the first 9 months of 1978) to 10.4 million barrels a day by December 1978. Despite the increase in Saudi production, there was a *664 perception of a shortage in 1979-80. The SAG briefly reduced crude oil production in early 1979. The Iranian shutdown in 1979, and the uncertainties of supply, were significant causes of the perception of a shortage at this time. The Iranian losses were felt directly, but they also were indirectly felt by Exxon, which had a long term contract with the British Petroleum Co. (BP) whereby BP sold between 325,000 and 350,000 barrels per day of Iranian crude to Exxon. When the Iranian supplies were cut off to BP, this significant source of supply to Exxon was suspended as well. As a result of the Iranian situation overall, Exxon lost more than 10 percent of its crude oil supply. A large amount of panic trading and stockpiling of inventories occurred at this time. Texaco lost approximately 230,000-250,000 barrels a day because of the Iranian shutdown. Texaco's dependence upon Saudi oil went from approximately 75 percent of its liftings [10] prior to the Iranian shutdown to as high as approximately 78 or 79 percent of its liftings after the shutdown. *665 Multitier Pricing and the 1979 Restriction
The next series of events has come to be known as the "second oil crisis", a period in which world crude prices almost tripled, and OPEC members individually established higher and higher prices for their oil. OPEC members met in Abu Dhabi on December 16-17, 1978, and announced that they were raising prices by an average of 10 percent for the year 1979 (the Abu Dhabi announcement). The 10-percent average price hike was to be accomplished through four quarterly price increases beginning with a 5-percent increase in the first quarter and ending with a 13.79-percent increase in the last quarter. Under the announced increase, the base price of Saudi Arabian Light marker crude was expected to rise from $ 13.34 per barrel on January 1, 1979, to $ 13.85 on April 1, 1979, to $ 14.55 a barrel on October 1, 1979, which would have been an increase of slightly more than 9 percent. [11] While this announcement applied to all OPEC members, a broad array of prices resulted, because individual member countries were free to impose additional premia or surcharges as they wished. After the Abu Dhabi announcement, the SAG announced that it would reduce *666 production again and return to its 8.5 million barrels a day production ceiling. Minister Yamani called a meeting with Aramco representatives in Riyadh on January 15 and 16, 1979. Because they were experiencing shortages, representatives of petitioners urged the SAG at this meeting to increase production from the 8.5 million barrels a day production ceiling to make up to some extent for the Iranian shutdown. At the same time the U.S. Government also was urging the SAG to increase production. There was some discussion concerning pricing at this meeting, during which Minister Yamani apparently was unmoved by petitioners' arguments against his determination to use fourth quarter 1979 prices on the increased production. Shortly after the meeting with Aramco representatives, Minister Yamani issued a directive indicating that the SAG would increase production but *667 on the increased production the fourth quarter 1979 prices would apply. The directive also required that the SAG efforts toward price moderation be carried through to subsequent crude purchasers. The directive was issued by means of a letter in Arabic dated January 23, 1979, to Aramco's Chairman of the Board, which was translated (the record does not indicate by whom) as follows: Kingdom of Saudi Arabia Ministry of Petroleum and Mineral Resources Office of the Minister
25 Safar 1399 (23 January 1979) No. 103/Z
Chairman of the Board Arabian American Oil Company
Dhahran
Dear Sir: Further to our letter No. 197/Z, dated 24 Safar 1399 [22 January 1979], you are instructed to implement the following: 1 - The Kingdom's production of crude oil for the first quarter of the year 1979 shall be at the rate of nine million five hundred thousand barrels per day. You should see to it that the monthly production does not exceed this rate in any of the said three months. Further, the ratios imposed by the State on the kind of oil to be produced (65 percent [of lighter crudes] and 35 percent [of heavier crudes]) should be observed. 2 - For purposes of this letter *668 only, the oil which the companies are entitled to transport shall be fixed at a daily rate of seven million barrels at the prices communicated to you by this Ministry's letter No. 8/SS, dated 1 Safar 1399 [30 December 1978]. 3 - For anything in excess of the first seven million barrels of the daily production rate, the prices of the fourth quarter of the year 1979 shall apply. These are as follows: Kind of Oil
Gravity
Price in Dollars
Arabian Light Oil
34
14.5460
Arabian Medium Oil
31
14.0520
Arabian Heavy Oil
27
13.6434
Berri Oil
39
15.3321
4 - The oil transporting companies should see that the oil reaches the areas which have been harmed as a result of the stoppage of Iranian oil, to the exclusion of areas which are banned from having access to Saudi oil. 5 - The companies are to pledge that they will not sell to a third party at prices in excess of what we have specified herein. With kind regards. Minister of Petroleum and Mineral Resources (Sgd) Ahmed Zaki Yamani (Tpd) AHMED ZAKI YAMANI This letter generally will hereafter be referred to as Letter 103/Z. Item 5 of Letter 103/Z constitutes the source of the restriction at issue in this case as *669 it applied to petitioners' offtakers and will hereafter be referred to as the 1979 restriction. Resale pricing restrictions similar to the 1979 restriction occurred in other crude oil sales relationships during the period at issue, but in most cases they were contained in contracts between producing countries and private companies. Similar resale restrictions sometimes also occurred in contracts between two private entities. There was a perception on the part of several government officials of the consuming countries during the period at issue that the 1979 restriction was imposed by the SAG to ensure that Saudi crude reached the oil consuming countries at the lower Saudi price as part of the SAG's crude oil price moderation policy. In February 1979, various producing countries began imposing surcharges (or premia) of $ 1.20 per barrel or more over the prices agreed to in the Abu Dhabi announcement. The SAG, in its efforts toward moderation, did not impose such surcharges and thus maintained prices below those of the other OPEC members with their differing levels of surcharges. In March 1979, the OPEC countries met in Geneva and accelerated the scheduled fourth quarter 1979 *670 price increase to be effective for the second quarter and sanctioned additional surcharges. The SAG once again refused to impose such surcharges, indicating that it would follow each barrel of crude to the refinery gate, ensuring that its official price was adhered to. Minister Yamani often used his public interviews, which were disseminated through the press, as a means by which he communicated a Saudi position. The following interchange was quoted in the Middle East Economic Survey on April 2, 1979, representing a press interview with Minister Yamani after the Geneva OPEC conference: Q: There is the question that since the offtakers in Saudi Arabia will be lifting oil at a lower price than in other countries owing to the absence of a surcharge in Saudi Arabia, they might be in a better competitive position than other companies. Are you thinking of any measures to deal with this situation? A: Yes the measure we will apply is to follow the barrel of Saudi crude until it lands at a certain refinery and we know that it is sold at our price through an auditor's certificate. Q: Is this already in force? A: We enforced this in 1977 when we had the two-tier pricing system, *671 and we have asked for it again this time. But I cannot do anything after that if Exxon, Mobil or any of the four sell their refined products in the market at the market price which enables them to realize a higher rate of profit than is usually realized by other refiners. That is in their pocket; I cannot interfere. Q: In other words you can deal with the crude but not with the products? A: Right. Q: Have you put this measure back into application this time or are you about to? A: Well we have told them to sell it at our price, but the measures will be in application.
In the second quarter of 1979, Saudi production reverted to its 8.5 million barrels a day level as Iranian production began to rise slightly. The Deputy Minister of Petroleum and Mineral Resources sent a subsequent letter in Arabic dated April 1, 1979, to Aramco's Chairman of the Board, which was translated as follows: Reference is made to [Letter 103/Z] * * * and the provision in item 5 thereof to the effect that the companies shall pledge not to sell to any third party at prices in excess of those fixed by the Government. Please notify the companies transporting Saudi oil of the necessity of *672 submitting certificates from auditors confirming the adherence of the companies to the instructions of the State as of the beginning of this year. We also request that every company furnish us with a list of the contracts concluded between it and the developing countries and the quantities of Saudi oil committed for the year 1979.
This letter constitutes the source of the audit requirement imposed by the SAG in connection with the 1979 restriction. In June 1979, Minister Yamani sent to Aramco's Chairman of the Board the following letter: I wish to inform you that we have received a complaint from the Republic of South Korea to the effect that Caltex, which has a contract with it for the supply of crude oil, has reduced the contracted quantities. Therefore, please urge Caltex to insure that the Republic of South Korea is supplied with all the contracted quantities and see that sales to it are made, just like other sales, at the prices set for you by the state.
Also in June 1979, the OPEC members met and announced another round of significant price increases. A press conference with Minister Yamani after the OPEC meeting was published in the Middle East Economic Survey *673 on July 2, 1979, in which the following question and answer appeared: Q: How can you be sure that oil from Saudi Arabia is not sold at more than official prices? A: [Minister Yamani] The only thing we can do - as we are doing - is to ask for an audited account to show that the Saudi barrel is supplied to a refinery or sold to a third party at our price. But the oil companies are definitely making much higher profits in the downstream by refining Saudi crude and selling the products at higher prices. This we cannot control. It is the consumers' responsibility.
In early July, after repeated requests from the U.S. Government to do so, the SAG again increased production to 9.5 million barrels a day. This level of production continued beyond the end of 1979. In December 1979, the SAG, in an attempt to unify OPEC prices, unilaterally raised its crude prices, but at a meeting of the OPEC members in Caracas, Venezuela, on December 17-19, 1979, OPEC members again failed to reach an agreement on a unified price structure, and the more aggressive OPEC members simply raised their prices further, resulting in continued multitier pricing. In early 1980, the SAG maintained its *674 9.5 million barrels a day production level for the first quarter. Petitioners' Responses to Letter 103/Z
There was a widely held understanding that the Crown Prince and Minister Yamani consulted on a regular basis and that Minister Yamani would not have issued the 1979 restriction without royal approval. To those of petitioners' employees who were involved at the time, the substance of the 1979 restriction was a replay of the 1977 restriction. Nevertheless, there apparently were differing interpretations among the Aramco shareholders concerning the scope of both the 1979 restriction and the audit requirement in connection therewith. This was at least in part because the translation of Item 5 of Letter 103/Z refers to a pricing requirement in sales to "a third party". The transliteration of the original language in Letter 103/Z that was indicated to be a "third party" in the translation is the Arabic phrase "taraf thalith", which, although commonly understood to mean "third party" more precisely means "any other natural or juridical person that exists". Thus the phrase "taraf thalith" actually used in the Arabic version of Letter 103/Z connotes a meaning that is very different *675 from the meaning of the term "third party" to the English-speaking corporate world. The term "third party" suggested to some of petitioners' employees the narrower notion of an unrelated or unaffiliated purchaser, and there was some initial confusion as to the scope of the 1979 restriction on the part of Exxon officials from the use of this "third party" language in the translation of Letter 103/Z. After he received Letter 103/Z, Exxon chief executive officer and chairman, Clifton Garvin, Jr., realized that the "third party" language in the translation was confusing, because his understanding of the typical interpretation of the term "third party" was that it referred to an unaffiliated party, and only approximately 15 percent of Exxon's sales were to unaffiliated entities; thus he felt that limiting the application of the term to only unaffiliated entities would not have made sense. Therefore, he telephoned Minister Yamani and asked for clarification of the directive. After that conversation, Mr. Garvin believed that the restriction applied to all oil that Exxon purchased from the SAG, whether it was sold to unaffiliated entities or affiliates, used in exchanges, or otherwise. *676 Several other pieces of correspondence from the SAG to Aramco subsequent to the letters containing the 1979 restriction and the audit requirement do not refer to "third parties" and contain language indicating broader application of the 1979 restriction than merely to sales of Saudi crude to unaffiliated parties. As a result of these or other subsequent communications with the Saudis, Exxon and Texaco officials came to understand that the 1979 restriction applied to all sales of Saudi oil, including those to affiliates as well as those to unaffiliated entities. The stated objective in both petitioners' audit certificates was to certify compliance with the restriction in sales to "third parties", excluding affiliates from the definition of this term. Despite the apparent initial confusion among Exxon employees concerning the interpretation of the "third party" language of Letter 103/Z, Exxon's response to the audit requirement for the first quarter of 1979 was to submit figures on the number of barrels of Saudi crude oil received and sold to affiliates as well as to unaffiliated entities. The other three Aramco shareholders reported only figures in connection with sales to parties *677 less than 50 percent owned by them (unaffiliated entities). However, Texaco executives understood the 1979 restriction to apply to all sales. The SAG did not ask Texaco for material on affiliate sales. Although they continued to perform audit activities, petitioners did not submit, and the SAG did not require them to submit, any audit certificates to the Petroleum Ministry after the first quarter of 1979. During the rest of 1979, petitioners continued to monitor compliance with the restriction, so that audit certificates could be compiled if the SAG asked for them. Later, when internal reporting was felt to be no longer required, Exxon explicitly advised its personnel that this was not intended to signal a departure from the pricing practices previously followed. There is no evidence that the audit submissions in connection with the 1979 restriction were considered by the SAG to be inadequate. Unlike the series of communications between petitioners and the SAG in connection with the 1977 audit requirement, which are described earlier in this opinion, there is no evidence indicating dissatisfaction on the part of the SAG with petitioners' submission of audit materials in 1979 *678 or their subsequent failure to submit audit certificates. Mandatory Nature of the 1979 Restriction
There is evidence that there would have been potentially serious consequences if petitioners had violated the 1979 restriction. Continued access to Saudi crude was critical to petitioners during the period at issue, because it was their largest internationally traded crude oil source, representing about 50 percent of Exxon's and 78 percent of Texaco's crude oil supply (excluding indigenous production, or crude produced by petitioners themselves). As indicated earlier, Minister Yamani in April 1979 was quoted in the Middle East Economic Survey as saying in a press conference that the SAG had "enforced [the 1977 restriction] in 1977 when we had the two-tier pricing system, and we have asked for it again this time." In May 1980, Minister Yamani participated in another press conference, and the following question and Minister Yamani's answer were quoted in the Middle East Economic Survey on May 19, 1980: Q: How will OPEC deal with the situation arising from the sale by the oil companies of their OPEC oil purchases at well above OPEC official prices, when at the same time the *679 consumer governments continue to blame inflated oil prices on the OPEC countries? A: There is little that OPEC can do about this problem. The most it can do is what Saudi Arabia is already doing which is to ensure that the barrel of Saudi oil is sold at Saudi prices until the oil is delivered to the refineries. After that stage the oil companies are in a position to make large profits, and these do not fall within the jurisdiction of OPEC.
The "refineries" referred to in Minister Yamani's answer are appropriately interpreted to include all refineries, including petitioners' affiliated refineries. The mandatory nature of the restriction also was noted in a book published in 1980 by Ian Seymour, an editor of the Middle East Economic Survey, when he stated what was "very common knowledge at the time" as follows: The Saudis can, and do, oblige the Aramco companies to sell the crude (which mostly goes to their own affiliates) at the cheaper Saudi official price; and they can police these transactions right up [to] the entrance to the refinery. But once the oil is processed and marketed as products, the profit to be gained from having access to cheaper crude supplies than *680 one's competitors will end up in the pockets of the US majors which participate in Aramco, and there is nothing Saudi Arabia can do about it.
The similarity between the 1977 and 1979 restrictions and the Saudi expectation of compliance was echoed in a letter dated August 8, 1990, submitted to the Court by petitioners during trial, from the Minister of Petroleum and Mineral Resources in 1990, stating as follows: No. 71/H
18 Muharram 1411 (8 August 1990) Mr. Jack Clarke Vice President, Exxon I hereby confirm to you that the Government of the Kingdom of Saudi Arabia issued directives to Aramco, by letter No. 103/Z, dated 25 Safar 1399 (23 January 1979), concerning prices in the year 1979, that required oil offtakers of Aramco shareholder companies to sell Saudi crude oil obtained from Aramco at the Government-established prices. As in the case of similar pricing directives issued in 1977, the 1979 directive applied to all Saudi crude oil sales of offtakers whether related to said parties or otherwise. The Government expected oil offtakers to continue their normal operations, including barter deals, using the prices established by the Government of the Kingdom *681 of Saudi Arabia for Saudi crude oil. The Government required Petromin also to sell Saudi crude oil at the Government-established prices. The Government monitored the oil offtakers' activities in an attempt to assure compliance with pricing directives. Minister of Petroleum and Mineral Resources (Signature) Hisham Mohiuddin Nazer [12]
The provisions of this letter will hereafter be referred to as the first Nazer letter. Minister Nazer was the Acting Minister of Petroleum when Minister Yamani was absent from Saudi Arabia during the years at issue and became the Minister of Petroleum in 1986. Minister Nazer subsequently confirmed in another letter (which will hereafter be referred to as the second Nazer letter) that the first *682 Nazer letter was written on the basis of my knowledge of the policy of the Government of the Kingdom of Saudi Arabia in my capacity as a member of the Council of Ministers and after conducting a thorough examination of the Ministry of Petroleum & Mineral Resources documents during the relevant periods.
These statements of Saudi intent in the above-quoted documents were borne out by the Saudi actions. As described above, the SAG had notified petitioners when it had felt that its requirements in connection with the 1977 restriction were not adequately followed, and the SAG drew attention immediately to matters that incorrectly attributed something to one of its officers. In addition, by a series of directives beginning in April 1979, the SAG instructed Aramco and its shareholders to maintain their deliveries of Saudi crude to customers in less developed countries (LDC's) at 100 percent of the quantities contracted for with these countries. Although there was a United Nations definition of LDC's, the SAG defined the list of the countries subject to the Saudi LDC requirement. In April and May 1979, Aramco was asked by Minister Yamani to furnish the SAG with a list of contracts *683 concluded between the Aramco companies and companies located in LDC's. In a letter to Aramco dated May 8, 1979, concerning the LDC requested lists, Minister Yamani indicated: "Of course, the selling prices of said quantities are to be the same as other sales made at the prices fixed for you by the State." In response, Exxon sent a letter to the SAG dated May 10, 1979, listing the LDC's to which it was supplying Saudi oil. It also explained that, because of the disruption in Iran it was experiencing a crude oil shortage and therefore was forced to reduce quantities sold to all its customers, including those in LDC's. Minister Yamani responded on June 6, 1979, by instructing Mr. Garvin that the Aramco companies were to continue to guarantee to LDC's the quantities of Saudi crude they had contractually committed to "at the prices set out by the Saudi Arabian Government", and to advise the SAG of its compliance. A similar letter was sent to Texaco. Minister Yamani also indicated that "strict" compliance with the Saudi LDC requirement was "a very important matter" and that "necessary measures" would be taken "to remedy any deviation from these instructions." Exxon advised the SAG *684 shortly thereafter that it would do so. Rather than violate these clear Saudi requirements, in July 1979 an Exxon manager suggested attempting to narrow the list of LDC's during 1979 in order to increase Exxon's flexibility in cutting back supplies in times of shortage. Taiwan and Spain were considered as suggested countries to be excluded. Although listed as an LDC under the United Nations definition, Spain subsequently was excluded from the list of LDC countries by Minister Yamani. There is no evidence explaining the Saudi reasons for this exclusion. Minister Yamani subsequently sent another similar letter dated December 10, 1979, to Aramco's Chairman of the Board, which indicated that all companies transporting Saudi oil were to continue supplying LDC's with their contracted allotments so that, according to the translation, "we will not be compelled to reduce the quantity of Saudi oil supplied to any company not observing this strictly by the amount of contracted oil withheld from any developing country." Exxon responded once again that it would continue to do so. The implications of noncompliance with the Saudi LDC requirements were perceived by an Exxon executive as being *685 "uncertain" and very likely to be "adverse for Exxon". There was concern about the possible reduction in Exxon's volumes by more than its LDC volumes, and "other ways to penalize Exxon for noncompliance". A legal adviser to the Petroleum Ministry concluded that the SAG was acting in its sovereign capacity when it set prices of crude oil during the period at issue. Petitioners were required to follow the crude pricing requirements of the SAG if they were to continue to have access to Saudi oil. Mr. Garvin felt that petitioners were always aware that they were dealing with a sovereign entity that could make decisions at will, without regard to economics or the marketplace. Alfred DeCrane, Texaco's executive vice president during the years at issue, believed that the most logical sanction the SAG would have used if Texaco had failed to comply with the restriction would have been reduction of the amount of crude available to Texaco. In several other instances the SAG took a strong stance in connection with its requirements. For example, just prior to 1979 a U.S. Senate investigative committee subpoenaed materials from Exxon concerning Saudi production capabilities. The Saudi Minister *686 of Petroleum was notified by Exxon that Exxon intended to comply with the subpoena, and the Minister instructed Exxon not to comply because such disclosures would be in violation of Letter 1030/Z (which forms the basis for the protective order in this proceeding). Letter 1030/Z provides for the confidentiality of information pertaining to activities between Aramco and the SAG. In his testimony before the Senate committee, Mr. Garvin expressed his concern about the "security of supply of Saudi oil to the U.S." if the disclosures became public. When the Minister's instruction was not followed by Exxon, and the disclosures were publicized, Minister Yamani assured Mr. Garvin that the disclosures "will not pass without leaving its effect on the relationship of your company with the Government of Saudi Arabia." Exxon and Chevron (the other company involved) were penalized by the SAG by receiving approximately 24,000 barrels per day less crude than they otherwise were entitled to receive. This situation lasted for between 6 and 9 months. While the number of barrels reduced was not a significant amount, petitioners thereafter were concerned that this action was a precedent, and that *687 the Minister would use punitive measures in other similar disclosure situations or in other areas of even more concern to them, such as the pricing of Saudi oil. Pricing restrictions apparently were required by the SAG with companies other than Aramco, and two other similar incidents involving punishment of other companies occurred in 1979. In one of these incidents, the Italian national oil agency, ENI, had signed a contract with Petromin in June 1979 to purchase 100,000 barrels per day of Saudi crude at Saudi OSP for a period of 3 years. Toward the end of 1979, Italian press reports stated that a fee had been paid to a Panama company in connection with the contract, and the SAG suspended the contract in December 1979. A subsequent investigation confirmed that ENI had complied with Saudi pricing requirements and paid Saudi OSP, and the contract was put back into effect in the third quarter of 1981. In another unrelated incident, the SAG suspended crude supplies to Japan in the amount of 140,000 barrels per day for similar violations. These incidents conveyed to petitioners the principle that the SAG requirements were expected to be enforced. Similarly, there was a perception *688 by the Japanese that the SAG could stop the flow of Saudi oil into their country if Saudi pricing requirements were not complied with. Minister Yamani also corresponded with petitioners when in another instance he apparently believed that the 1979 restriction was not being followed. In that situation, the Minister indicated that he had been advised that Texaco was planning to sell Saudi crude in the Philippines at a price in excess of the restricted price. There is no evidence indicating that the Minister's suspicions were justified. On December 30, 1980, Minister Yamani sent a letter to Texaco, indicating as follows: During my recent trip to Philippines I was surprised to learn that you have informed your affiliates that the price of Saudi oil supply will be more than what Saudi Government has established. Should this be true it will certainly be a breach of your commitment to us which will be seriously regarded. Saudi oil should always be delivered at Government established prices and the audit certificate thereof should be submitted to us. Furthermore, we reiterate our established policy that supplies to developing countries should not be decreased at any rate. Strict *689 adherence to these guidelines will help streamline our relationship.
A similar letter describing Minister Yamani's concerns about possible violations by some of the Aramco partners was sent to Exxon. Because of Texaco's high dependence upon Saudi oil, Mr. DeCrane was very concerned that the SAG would reduce crude supplies if it believed that Texaco had failed to comply with the restriction. Texaco promptly advised Minister Yamani that it was not charging, or advising its affiliates to charge, higher prices than the Saudi established prices. Exxon officials also advised Minister Yamani in March 1979 that: "All Aramco crude sold by Exxon this quarter, whether to affiliates or to third parties, has been priced no higher than the * * * [relevant Saudi prices]." On various other occasions during the period at issue Exxon advised the SAG that it was not selling Saudi crude at prices above Saudi OSP. Because of these potential consequences, petitioners took steps to ensure that they complied with the 1979 restriction, and they invoiced their Saudi crude at Saudi OSP. There were a few isolated instances in which petitioners did not do so, but these instances apparently were not *690 a disregard of Saudi requirements and occurred inadvertently. In one incident Texaco sold 129,675 barrels of crude during the period at issue for a price in excess of Saudi OSP. This sale constituted approximately .006 percent of the 2,276 million barrels of Saudi crude disposed of by Texaco during the period at issue. Exxon mispriced one sale to a related entity involving 352,626 barrels of Saudi crude when it used the Saudi established price in effect on the date the loading was completed rather than on the date loading commenced. This sale constituted approximately .016 percent of the 2,273 million barrels of Saudi crude disposed of during the period at issue. There is no evidence indicating Saudi knowledge of, or objection to, these sales. These incidents are so isolated and the number of barrels is so small in relation to petitioners' total sales of Saudi crude that they is insignificant. Supply Needs; Shortages
Every grade of crude oil is different in chemical composition and quality. The relative value of one crude oil versus another is affected by, among other things, its physical and chemical characteristics, locational differences, and the relative prices *691 of the various refined products that can be made from the various crude oils. One common contaminant in crude oil is sulfur. Because sulfur is corrosive, a crude oil with a high sulfur content generally requires more extensive processing than a crude oil with a low sulfur content. In addition, during the years 1979-81, many countries (including the United States) regulated the level of refinery sulfur emissions and/or the sulfur content of or emissions from petroleum products. Another important characteristic of crude oil is its density, or specific gravity, which normally is expressed in American Petroleum Institute (API) degrees. On the API scale, the lower the density of crude oil, the higher the degree of API gravity and the greater the value. Crude oil ranges from "light" crude (approximately 34 degrees specific gravity), which is processed into automobile gasoline, to "medium" crude (approximately 31 degrees), which is processed into home heating oil, to "heavy" crude (approximately 24-31 degrees), which is consumed by large power plants. As reliance upon the automobile increased, the lighter crudes came increasingly into demand in the late 1970s. Shortages were anticipated *692 shortly after the first oil crisis. As early as 1974-75, Exxon had advised its unrelated customers to diversify their crude oil sources and not to rely on Exxon for long-term supply. But subsequent events exacerbated the situation. On February 13, 1978, the SAG issued a directive requiring a reduction in the amount of Arabian Light crude that the shareholders could lift from 75 to 65 percent of their total liftings from the SAG. The reason for such a directive probably was that a high percentage of the SAG reserves was in the heavier grades, and thus the SAG sought to increase its sales of the heavier crudes. The crude oil shortages that had occurred after the first oil crisis became even more acute during the years 1979-81. Middle East and North African daily crude oil production during the years 1978-81 was as follows: DAILY CRUDE OIL PRODUCTION (in thousands of barrels) Country
1978
1979
1980
1981
Saudi Arabia
8,296
9,530
9,926
9,818
Iraq
2,629
3,450
2,646
1,184
Libya
2,096
2,060
1,788
1,180
Kuwait
1,990
2,490
1,675
1,118
Iran
5,197
3,110
1,467
1,114
Abu Dhabi
1,447
1,464
1,350
951
Algeria
1,225
1,116
942
900
Egypt
482
506
585
587
Qatar
485
500
471
405
Dubai
362
360
349
358
Oman
315
295
283
317
Syria
170
160
165
166
Tunisia
100
100
100
118
Bahrain
53
50
49
44
Totals 24,847
25,191
21,796
18,260
*693 As discussed earlier, as Iranian and other Middle East production decreased, there was considerable uncertainty whether supplies might be further disrupted, and petitioners experienced shortages of crude, even in some cases for their own requirements. As a consequence they tried to cut back deliveries to unrelated customers. By early March 1979 Exxon determined that it would not renew its term crude oil supply contracts with unrelated customers, which were scheduled to expire at various times beginning on March 31, 1979. Exxon's sales of Saudi crude to affiliates increased from approximately 69 percent of total Saudi sales in 1978 to 77 percent during the first three quarters of 1979. The volume of subsequent sales of Exxon's Saudi crude to unrelated customers dropped significantly thereafter from 16.5 percent of total sales of Saudi oil in the first quarter of 1979 to 1.1 percent of such sales in the first quarter of 1981. Texaco's system during the 1970s had become "unbalanced" as a result of the trend toward higher sulfur, heavier crude supplies, and changes in demand for lower sulfur products. Most of Texaco's crude supply was high-sulfur Saudi crude. The situation was *694 exacerbated by the losses of Iranian Light crude in late 1978. By 1979, the Texaco system began to correct this imbalance by selling high-sulfur crude and purchasing low-sulfur crude, either outright or through exchanges. At the same time that it was attempting to reduce the system's sulfur content, there was a Texaco management "consideration" to phase out unrelated customer crude supply agreements in 1979. However, during the years 1979-81 Texaco sold Saudi crude to unrelated customers in a generally consistent pattern as before the issuance of the 1979 restriction, in amounts of approximately 15 to 20 percent of its Saudi Arabian liftings. There was a decline of unrelated customer sales under contracts that had been entered into by Texaco prior to 1979, primarily as a result of the end of the terms of these contracts. There also apparently were seven specific instances of substitutions by Texaco of non-Saudi crude for Saudi crude in sales to certain Japanese companies (which collectively were Caltex's largest crude customer). However, Caltex's supply of Saudi crude to those companies remained basically constant during the period at issue, at approximately 200,000 barrels *695 per day. In the face of shortages, the four Aramco shareholders sent a letter to Minister Yamani in May 1980 urging the SAG to increase production. They stated in that letter that they had "relied upon the terms of the present Arrangements as the basis for our relationships with the [Saudi] Government", and that Saudi production volumes were far below their expectations under those Arrangements. Because of these shortages, they indicated, they were not able to meet the needs of their refining facilities and product outlets throughout the world, and they were forced to purchase crude on the spot market to meet their requirements, which was contrary to the SAG stated objectives and policies.
In September 1980, Iraqi forces invaded Iran. The outbreak of the Iran/Iraq war resulted in the loss of crude oil production from Iran and Iraq of approximately 3.9 million barrels per day on average over the fourth quarter of 1980. During the latter part of 1980, Minister Yamani advised petitioners that the SAG had decided to increase production from 9.5 to approximately 10 million barrels per day in order to "close the gap" brought about by the Iran/Iraq crude production losses. Petitioners *696 were further advised that the SAG would designate the specific customers, prices, and volumes for petitioners' sales of Saudi crude. The countries that were to be sold crude under these conditions included France, Brazil, Japan, Italy, Greece, Spain, Morocco, and Turkey. These sales came to be known as "designated sales", or "war relief crude sales". Pursuant to this requirement, Textrad and the Exxon offtakers sold approximately 77 million and 61 million barrels, respectively, of "war relief" Saudi crude to unaffiliated entities during 1980 and 1981 combined. Petitioners were not to suffer any economic loss nor derive any economic gain from these sales. The parties were to provide the SAG with certain information demonstrating compliance. Texaco told its auditor to prepare and submitted to the SAG audit certificates regarding designated sales. There is no evidence concerning Exxon's submission of audit materials on designated sales.
The prices of Saudi Arabian Light during the period 1979 through 1981 were as follows:
Date Announced
Date Effective
Price Per Barrel
December 30, 1978
January 1, 1979
$ 13.34
January 23, 1979
January 23, 1979
[13] 14.55
April 1, 1979
April 1, 1979
14.55
July 4, 1979
June 1, 1979
18.00
December 12, 1979
November 1, 1979
24.00
January 26, 1980
January 1, 1980
26.00
May 13, 1980
April 1, 1980
28.00
September 21, 1980
August 1, 1980
30.00
December 14, 1980
November 1, 1980
32.00
November 1, 1981
October 1, 1981
34.00
*697 As discussed earlier, as dramatic as this rise in Saudi prices was, these prices of Saudi Light were exceeded by the prices of comparable crudes from the other OPEC members during the years at issue until October 29, 1981. Other Saudi crudes (including Berri, Medium, and Heavy) also were priced below other Middle Eastern crudes of similar density during the period at issue. At a December 1980 OPEC meeting in Bali, Indonesia, the OPEC ministers again agreed to raise crude oil prices. OPEC price unification was finally obtained at an OPEC meeting in Geneva, Switzerland, on October 29, 1981, when Saudi Arabia agreed to raise the price for Saudi Arabian Light crude from $ 32 to $ 34 per barrel. This constituted the end of the period during which Saudi crude was sold at prices below other comparable crudes *698 and thus the end of the so-called "Advantage" period.
By 1982, Saudi crude was more expensive than other similar crudes, and this period came to be called the "Disadvantage" period. In contrast to the 1978-79 period when there were world-wide crude shortages, during 1982-83 demand for crude generally was reduced because crude supplies were readily available. During 1981, when there began to be a reduction in demand, Exxon reduced its purchases of Saudi oil from approximately 2 million to 1 million barrels a day. Exxon's Saudi liftings in 1983 were approximately 600,000 barrels a day. Textrad dispositions of Saudi crude decreased from almost 2 million barrels a day in 1981 to under 1 million in 1982.
U.S. Government Actions and Statements
During the period 1975 through 1981, officials of the U.S. Government undertook numerous diplomatic efforts to affect or moderate OPEC crude oil price increases, urging the SAG as well as other OPEC Governments to moderate crude oil prices and to increase crude oil production. Officials of the U.S. Government met with representatives of the SAG on several occasions during the period at issue and conveyed their appreciation for Saudi efforts *699 towards moderation in price as well as its continued maintenance of high production levels. Prominent U.S. officials believed that the SAG's price moderation policies were designed to obtain the defense and foreign policy support of the United States and to meet the need for stability in the world economy. In August 1973, the U.S. Government had issued refined petroleum product price controls on motor gasoline and propane. These price controls were in effect until January 27, 1981. The U.S. Government also issued a regulation concerning crude transfer pricing standards that refiners were to use to establish the cost of imported crude purchased in transactions between affiliated entities. That regulation was in effect from October 25, 1974, through January 27, 1981. After the 1979 restriction was issued, official U.S. policy was strongly in favor of enforcing the restriction and seeing that the Saudi policy toward moderation was carried out. Minister Yamani had a reputation with U.S. officials of being influential in developing and implementing Saudi oil policy. He also had a reputation as a careful and cautious individual who would not attempt to implement a policy unless *700 it was authorized by the SAG. In his personal dealings with Crown Prince Fahd prior to the years at issue, Richard Cooper, the Under Secretary of State for Economic Affairs under President Carter, was led to believe by Crown Prince Fahd that Minister Yamani's position presented at the Doha conference in late 1976 (establishing the 1977 restriction) represented the official SAG position. U.S. officials believed that the 1979 restriction was mandatory, that it was essentially a replay of the 1977 restriction, and that in exchanges Saudi crude was required to be sold at Saudi OSP. There was a perception among U.S. officials that, because the SAG's ability to market oil directly through Petromin was increasing during this period, the SAG could feasibly cut off supplies to the Aramco shareholders if they did not comply with the restriction. A violation of the restriction would have been reported by U.S. officials to the U.S. Department of Energy.
Consuming Country Oil Market Information Systems
As producing country governments preempted more and more of the functions of the private oil companies, some of the consuming country governments became more involved in the oil industry's *701 refining, marketing, and distribution activities, initiating a variety of controls on usage, imports, and prices. After the 1973 Arab oil embargo, a mechanism was established whereby accurate data on the actual prices being charged for crude oil and petroleum products were collected, in order to provide better information on the situation in the international petroleum market. The foreign ministers of the major consuming countries met in Washington, D.C., during February 1974 at what came to be called the Washington Energy Conference. This Conference led to an Agreement on an International Energy Program (IEP), which set forth such objectives as promoting secure oil supplies on reasonable and equitable terms, creating an international oil market information system, creating an emergency oil-sharing plan, restraining demand for oil, achieving long-term cooperation on energy matters, and developing constructive relationships with oil-producing countries. The IEP, among other things, authorized the formation of the International Energy Agency (IEA). By the end of 1974, the IEA was formed as a 16-nation autonomous body within the Organization for Economic Cooperation and Development. *702 Its members were Austria, Belgium, Canada, Denmark, the Federal Republic of Germany, Ireland, Italy, Japan, Luxembourg, the Netherlands, Spain, Sweden, Switzerland, Turkey, the United Kingdom, and the United States. New Zealand joined the IEA in 1975. Norway subsequently participated in the IEA pursuant to a 1975 agreement. Greece joined the IEA in 1976, Australia in May 1979, and Portugal in July 1981. During the 1974-81 period, the Governing Board of the IEA, which is composed of delegates from each participating country, oversaw the activities of four standing groups, one of which was entrusted with the responsibility of overseeing the development of a crude oil market information system. The IEA crude oil market information system was designed to promote fairness in the overall distribution of crude oil by providing participating countries with greater information on the conditions in the international oil market, to moderate prices (particularly spot market prices, which were of concern to U.S. officials), and to reduce suspicion among the member countries by means of the "transparency" of the system. The participating countries agreed to provide oil market information *703 requested by the Secretariat of the IEA. The U.S. Department of Energy, together with the Department of State, supported the creation of the IEA crude oil information system. In January 1977, the European Community (EC) established its own crude oil price information system. The following countries were members of the EC throughout the years 1975-1981: Belgium, Denmark, the Federal Republic of Germany, France, Ireland, Italy, Luxembourg, the Netherlands, and the United Kingdom. Greece joined the EC in January 1981.
In June 1979, the heads of state of the seven largest industrialized countries met in Tokyo for an economic summit meeting (Tokyo Summit). On the first day of the Tokyo Summit, OPEC announced significant crude price increases, which were officially deplored by the Tokyo Summit participants. The Saudi price moderation policy was discussed at the Tokyo Summit and praised by the various heads of state. It was the understanding of Dr. Schlesinger, who attended the Tokyo Summit with President Carter, that the 1979 restriction fulfilled the common U.S. and SAG objectives to have the lower-priced Saudi crude reach the consuming countries at the lower price. Officials of *704 the Governments of the United Kingdom, Italy, the Federal Republic of Germany, the Netherlands, and France understood the Saudi objective to be the same. It was Dr. Schlesinger's understanding that the leaders of the countries participating in the Tokyo Summit believed that the 1979 restriction was applicable in all of their countries and applied to all sales of Saudi crude, including sales to petitioners' affiliates in those countries. He believed that the United States and SAG objectives would not have been met if the restriction had not applied to affiliate sales. He also believed that this was the view of Minister Yamani. One of the actions taken by the participating countries at the Tokyo Summit was to agree to set up a register of international crude transactions to bring the workings of oil markets more into the open. During the period 1979 through 1981 agencies of the Governments of Canada, the Federal Republic of Germany, France, Greece, Ireland, Italy, Japan, the Netherlands, Norway, Sweden, the United Kingdom, and the United States had knowledge of or were aware of the prices at which Saudi crude oils were imported into their respective countries either through their *705 own government's crude oil information system, or through information obtained from the IEA or the EC. The transparency created by the information-sharing was important in ascertaining compliance with the restriction. This transparency ensured that all consuming member countries were being treated the same.
Some countries, such as France and the Netherlands, controlled petroleum product prices and directly monitored the prices of imported crude oil. [14] *707 The same was true in Japan. [15] During the period at issue, Italy's system established that Saudi crude was to be imported at Saudi OSP. [16] *708 The German Government encouraged the Saudis to pursue their moderate policies and was fully aware of Saudi pricing policies during the years at issue. [17] The United Kingdom also monitored the flow of crude into the country. [18] In the course of this monitoring, officials from all of these governments were aware of the 1979 restriction and did not find any violations. A violation of the restriction would have been known to these officials, and they would have required compliance with it, either through informal pressure in the press and political arena (thereby informing the SAG of such violation), *706 or by more formal legal means, such as the withholding of permits and licenses, formal investigations, the initiation of legislative measures, or the assertion of certain emergency powers. Officials of these countries and of the United States were under the impression that the restriction applied to all sales of Saudi oil into their countries. Petitioners had refining affiliates located in each of these countries. *709 At various times during the period 1979-81, the IEA and the EC expressed public concern or interest with respect to: (1) Crude oil prices and the rapid escalation of such prices; (2) the refined product prices of their respective member countries; and (3) assuring an adequate supply of crude oils to all participating countries and an equitable distribution of that crude oil supply. Exchanges
Reciprocal purchase/sale agreements, or exchanges, [19] were mechanisms by which oil companies exchanged oil with one another to accomplish one (or more) of three purposes: To save transportation costs (a location exchange), to save storage costs (a timing exchange), and to solve refinery operating problems or improve crude quality (a quality exchange). Sometimes exchanges were used to obtain specific crudes necessary to meet contractual commitments. *710 The intracorporate economic decision whether to engage in an exchange transaction is based upon whether the internal values of the crude oils involved result in benefits to both parties to the transaction. The internal value is the value to each particular company of the refined products that could be produced from the crude in question. [20] One crude oil may be worth more to one company than another simply because it has refinery capability that the other does not. Accordingly, the market price for each crude oil in an exchange is irrelevant to the economics of the exchange. What matters is the value to the company on each side of the exchange of the finished products that could be produced from that crude by that company. Companies tend to divide the difference in value through negotiation of a "differential" that is within the range of the difference between the refined values of the two crudes for each of the parties. The refined value to each exchanging party of the crude received necessarily is higher than the refined value of the crude given up, or the exchange would not be entered into because it would not be beneficial to that party. *711 Because the differential between the internal values of the two crudes was the focal point of the exchange transaction (not the differential between the OSP's or market prices of the crudes being exchanged), it was not uncommon for petitioners' ledgers to reflect that petitioners obtained non-Saudi oil in an exchange at a price that was less than that crude's OSP, which respondent has characterized as a "discount". This "discount" occurred because the internal value differential in an exchange during the period when the 1979 restriction was in effect was different from the OSP differential between the crude oils involved; consequently, because the Saudi oil was required to be invoiced at Saudi OSP, the non-Saudi oil received in an exchange was purchased by petitioners at a price lower than its OSP. Nor was it uncommon for petitioners' records to reflect special credit notes or memoranda or adjustments in credit terms, [21] *713 freight terms, and the like received by petitioners in exchange transactions, since these forms of consideration reflected the differentials in refined values between the crude given up and the crude received in an exchange transaction. The relative values *712 of each crude to each exchanging party were also affected by other factors, including the volume ratios, [22] the percentage of Arabian Light in the total Saudi exchange pool at any one time, payment term variations, transportation costs, and package exchanges. [23]
Exxon guidelines *714 had been devised for exchanges during the period of the 1977 restriction. These guidelines had provided that there were three basic objectives for engaging in exchanges: To correct grade imbalances, to reposition crudes geographically, and to resolve timing problems. With the 1977 two-tier pricing system, Exxon guidelines indicated that Exxon should continue in its historical types and volumes of exchanges, continuing to value them in terms of internal values, with reference to the Saudi crude price. There was seen "no reason to view continuation of these same practices as a contravention of Saudi Arabian directives." The 1977 Exxon guidelines were supplied to Exxon affiliates. Exxon's exchange practices under the 1977 guidelines were discussed with the Saudis. At a meeting between Exxon officials and a Petromin representative on July 20, 1977, the Petromin representative wanted to know why the SAG had been receiving audit certificates in four different formats and covering different aspects of the 1977 restriction and why the independent auditors had not consulted with each other. He also indicated that he wanted to "take away with him" certain materials from Exxon, including *715 a copy of their interpretations of the 1977 restriction provided to affiliates, and that he had made the same request of Texaco. A similar meeting between Petromin and Texaco officials apparently occurred on the same day, and one of the questions raised by the Petromin representative was "how exchanges had been handled". The parties have directed the Court to no evidence that the SAG objected to Exxon's or Texaco's 1977 exchange policies. During 1979-81, Exxon updated its exchange guidelines to govern its transactions involving Saudi crude oil during that period in a manner very consistent with the earlier guidelines. In setting out the guidelines for exchanges during the period of the 1979 restriction, the corporate instructions were that "The directives are essentially the same as those received from the Saudi Arab Government during the two tier pricing environment of 1977." Mr. Garvin again instructed the Exxon offtakers not to make any arrangements that had not been made before the 1979 restriction. Exxon's 1979 exchange guidelines provided that all Saudi oil given up in an exchange was to be priced at the Saudi OSP; that exchange volumes were to remain at historical volumes; *716 that exchanges usually were to be for quality, volume, timing or location reasons; and that exchanges were preferably not to be made with companies that were primarily traders (who would be more likely to violate the restriction by reselling the Saudi oil at higher prices on the spot market). Exxon's exchange guidelines also stated that corporate economics should be improved by Exxon exchanges, and there was an Exxon policy issued in September 1979 to obtain non-Saudi crude in an exchange at a discount. Exxon also continued the policy of permitting exchanges where necessary to meet particular commitments. Exxon officials discussed with the SAG why exchanges were necessary and that the Exxon offtakers would continue to engage in exchanges during the period of the 1979 restriction. The Exxon guidelines were followed during the years at issue. In almost every Exxon exchange transaction, there was a business reason, a specific operational purpose, for the exchange. There was, in other words, a reason for every exchange unrelated to a potential to capture the profit from the low cost of the Saudi crude. In one apparently exceptional case, Exxon engaged in an exchange for the express *717 purpose of obtaining the non-Saudi crude for resale to an unrelated party to meet a contractual commitment. The number of barrels of Saudi crude exchanged out in the course of this transaction constituted less than 1 percent of Exxon's total Saudi dispositions during the period at issue. Exxon's offtakers transferred 132 million barrels of Saudi crude to unrelated customers as part of exchanges. In each of these transactions, Exxon invoiced the Saudi crude at prices no higher than the prevailing official selling prices set by the SAG (plus transportation and other applicable costs associated with the movement of crude). If non-Saudi oil received by Exxon in an exchange was reflected in Exxon's ledgers as being sold to a unrelated party at a profit, that profit was reported for U.S. income tax purposes. Exxon told its purchasers about the restriction and monitored sales of its Saudi oil to see if any Saudi oil that it sold or exchanged was being resold in the spot market at higher prices. Exxon was satisfied that its exchange practices did not violate the 1979 restriction because it followed its historical internal guidelines, which required that all Saudi oil be invoiced at *718 OSP, and because it kept its exchange levels at historical volumes. [24] For example, in September 1980, EIC did not participate in an exchange of Saudi Light for Tapis crude owned by a company called Petronas because of a concern that the arrangement could yield a price in excess of Saudi OSP. The idea of a noninvoicing exchange was opposed by Esso Middle East because Saudi crude was involved and because this mechanism had not been "the historical means of doing business with the crudes involved." During 1977, Exxon's liftings of Arabian Light were almost 74 percent of total Saudi liftings. As discussed earlier, in February 1978, the SAG reduced to 65 percent of Saudi liftings the amount of Arabian Light available to Exxon. Thus, after this time Exxon needed to obtain lighter *719 grades of oil to satisfy the requirements of its affiliates, and it accomplished this in part through an increase in exchanges of the heavier grades of Saudi oil for lighter grades of non-Saudi oil. Exxon also had lost significant sources of low sulfur ("sweeter") crudes by the beginning of 1979. The Iranian Revolution in late 1978 further complicated Exxon's supply situation by cutting off a significant production source at a time when demand was increasing. Despite this need for increasing amounts of lighter and sweeter grade crudes, the amount of Saudi crude given up by Exxon in exchange transactions did not increase during the years at issue compared to the preceding 2 years. Over the 5-year period 1977-81 Exxon transferred Saudi crude oil to unrelated customers as part of crude oil exchanges in the following amounts expressed in millions of barrels: Exxon's Saudi Crude Oil Exchange Transactions
Saudi Crude
Saudi Crude
Net Saudi Crude
Given Up Received Given Up Year
MB MB MB 1977
46.9
12.4
34.5
1978
77.5
7.8
69.7
1979
56.3
7.6
48.7
1980
41.3
7.3
34.0
1981
34.8
13.4
21.4
The net amount of Saudi crude given up by Exxon in exchanges *720 expressed as a percentage of total Saudi crude dispositions during these same years is as follows: Year
Percentage
1977
4.2
1978
9.2
1979
6.1
1980
4.5
1981
3.0
Crude oil exchanges also were a longstanding business practice of Texaco. Textrad was responsible for balancing crude oil and product supply and demand for the Texaco system by engaging in international trading activities. It was Textrad's responsibility to review the requirements of the various subsidiaries and affiliates, to arrange for transportation and acquisition of crude oils to meet the system's requirements, to buy products when needed to supplement the refining activities, and to sell products when products were surplus to Texaco requirements. Approximately three-quarters of Textrad's crude sales and exchanges over the period 1973 to 1982 involved Saudi crude. As discussed earlier, during the 1970s the Texaco system had become "unbalanced" as a result of the Saudi trend toward high sulfur "heavier" sources in supply, [25] changes in the demand for refined products, the losses of Iranian exports, and changes in product specifications, particularly sulfur content. In 1977 Textrad estimated that its *721 shortage of low sulfur crude was about 400,000 barrels per day. Textrad needed Arabian Light purchased from the SAG for its system requirements. Accordingly, the largest portion of Textrad's exchanges was quality exchanges. Textrad's exchange practices during the years immediately preceding the years at issue involved efforts to exchange some of the heavier grades of Saudi crude for the light, lower sulfur crudes needed in the Texaco system. By early 1979, Textrad tried to lighten the overall quality of its crude supplies through outright purchases of low-sulfur crude, outright sales of high-sulfur crude, and exchanges of heavier (usually Saudi) crude for lighter crude. Textrad increased the percentage of Arab Medium and Heavy to total Saudi crude disposed of by exchanges from an average of 20 percent over the period 1973 to 1978 to an average of 39 percent over the period at issue. *722 Textrad's general exchange policy instruction was to adhere to the 1979 restriction by engaging in exchanges only in the ordinary course of business. Textrad's exchanges during the years at issue were handled in much the same manner as they had been handled during the 1977 restriction period, with careful periodic review to ensure that the number of exchanges remained consistent with historical levels and were generally for operational system needs. Textrad followed a procedure whereby the numbers of exchanges were reviewed and examined to be sure that they were for specific needs for particular refineries in the Texaco system. Occasionally, both before and during the period at issue, non-Saudi crude received in exchanges also was resold to unrelated purchasers. Texaco officials discussed Textrad's exchange policies with the SAG, and advised the Saudis that Textrad intended to continue to engage in exchanges in the ordinary course of business. There is no evidence indicating Saudi dissatisfaction with Textrad's exchange practices. Pursuant to exchanges, Textrad disposed of 139,780,564, 105,034,926, and 100,382,961 barrels of Saudi crude oil, in the aggregate, [26] to unaffiliated *723 entities in 1979, 1980, and 1981, respectively. In each invoiced exchange transaction during the years 1979-81 in which Textrad disposed of Saudi crude oil, the invoiced price of the Saudi crude oil specified in the contract was the official selling price set by the SAG. The non-Saudi crude oil received by Textrad in exchange transactions was invoiced at a price specified in the contract. As with Exxon, in negotiating the price of the crude received for purposes of an exchange, Textrad determined the value of each crude in the exchange based on the value of the products that could be refined from those crudes. Textrad's exchanges involving Saudi crude were essentially consistent during the period 1979-81 with historical levels. They constituted approximately 15 to 17 percent of Textrad's total sales of Saudi crude over the period 1973 to 1982, *724 and 17 percent over the period at issue. The same consistency is present with regard to non-Saudi crude received by Textrad in exchanges and disposed of in outright sales to third parties instead of to affiliates for operational purposes. From 1973 to 1982, Textrad transferred to unrelated entities 7 percent of the non-Saudi crude acquired in exchange for Saudi crude. Over the years 1979-81, Textrad resold to unrelated entities 8 percent of such crude. This constituted less than 1 percent of the amount of Saudi crude disposed of by Textrad during the same period. In those situations where Textrad disposed of oil received in an exchange, it sold the oil at its market price. Although the 1979 restriction itself did not expressly address exchanges, Texaco officials were satisfied, after discussions with the Saudis, that Textrad's exchange practices did not violate the restriction. As discussed, in Textrad exchanges the differentials between the exchanged crudes were computed so as to represent the differences between internal refined values. In addition, in one transaction a differential originally negotiated was adjusted to reflect a particular change in circumstances. In that *725 transaction an exchange differential of $ 3.75, originally negotiated by Texaco with Koch Industries (Koch), later was adjusted to $ 3.57. However, it appears that Koch purchased from Textrad an additional 320,000 barrels of Arab Heavy crude after the original exchange transaction was negotiated. The differential adjustment may have been to account for a change in the price of the Arabian Heavy crude during the period between the original negotiation of the contract and the purchase of the additional barrels. There is some indication that Koch may have resold the Saudi oil received from Textrad at a profit, but a Koch official also was aware that petitioners were required to sell the Saudi oil at OSP. Internal Texaco documents indicate that various methods were recognized by Textrad as being useful to adjust the differences in official prices in order properly to reflect the refined values in Textrad exchange transactions. These documents contain the following language: As we have discussed, a significant pricing disparity currently exists when comparing Saudi Arabian crude official prices to official prices of crudes marketed by other producing countries. In our exchange *726 arrangement negotiations, we have minimized this disparity through a combination of approaches such as reducing exchange ratios, reducing the percentage of Arabian Light in the total Arabian exchange pool, payment term adjustments and negotiating discounts from the official price of low sulfur crudes acquired thereby directly reducing Texaco acquisition costs.
This "disparity" language was repeated in subsequent Texaco documents. In a transaction with Gulf summarized in a typical document containing the above language, the terms of the exchange were described by a Texaco official as follows: An advantage to Texaco under this arrangement will be achieved through a combination of the following factors: (1) An Overall exchange ratio of 1 BBL Arabian crude to 1 BBL of low sulfur crude. The Arabian crude volume will consist of 65% Arabian Light. (2) A discount of $ 0.35 per barrel from the official Cabinda and Zaire selling prices of $ 17.50 and 17.40 per barrel, respectively. (3) Gulf will deliver the Cabinda and Zaire crudes to Texaco refining locations, and absorb the freight costs associated therewith (about $ 1.00 per barrel less the discount in (2) above). *727 (4) Payment terms for all of the low sulfur crudes will be 60 days compared to 30 days on the Arabian crudes.
This transaction and the language quoted above were consistent with the normal methods of invoicing exchange transactions, with exchange ratios, discounts on non-Saudi oil received, freight costs, and payment terms used to take into account the differences in the relative internal values of the crudes exchanged. In addition, there were certain transactions in which some of Textrad's exchange contracts had "overlift penalties." Overlifts were quantities of crude lifted that were in excess of the amount agreed upon in the exchange contract. Overlift penalties were contained in approximately 6 percent of Textrad's exchange contracts during the years 1979-81. These penalties provided that, if excess Saudi oil were inadvertently lifted by the purchaser of the Saudi oil in an exchange, the excess crude would be priced at a level that contained a penalty over and above Saudi OSP. The penalties were included in contracts during the period at issue because it was not possible for loading equipment to lift exactly the precise amount of oil intended in the exchange contract. *728 They were not necessary when there was no multitier pricing system in effect, since the unified OPEC price would then be used to price the barrels overlifted. Without these penalties, the exchanging partner obviously would have had an incentive repeatedly to overlift and be charged the lower Saudi OSP on a larger percentage of the exchange transaction, which would have changed the economics of the exchange. These overlift penalties did not constitute prices in excess of Saudi OSP but were necessary deterrents occasionally used by Textrad to discourage overlifts. There is no evidence of SAG dissatisfaction with the overlift penalties used by Textrad in these contracts. Processing Agreements
In furtherance of its role of balancing system requirements, Textrad as far back as the 1960s entered into processing agreements with Texaco affiliates. These processing agreements allowed Texaco to concentrate international product trading in Textrad, which is consistent with Textrad's charter. In almost all cases, the processing agreements were entered into to serve the needs of the refining affiliates. During the period January 1, 1977, through December 31, 1982, Textrad entered *729 into processing agreements with five affiliated refining entities, which used their excess refining capacity for the processing of crude oil, some of which included Saudi oil. By means of these processing agreements, Textrad retained title to the crude, paid a fee to the refining entity that was consistent with fees paid by unrelated entities, and sold the resulting products for their market value to affiliates in almost all cases. Textrad sold the products that had been refined under these processing agreements to Texaco marketing affiliates for marketing and distribution outside of the country in which the processing refinery was located and to unaffiliated entities. Textrad realized the full value of the refined products resulting from these processing agreements. Any profits earned by Textrad on sales of products refined from Saudi crude pursuant to processing agreements with affiliates during the years at issue were reported for U.S. income tax purposes. [27] The following crude amounts were delivered for Textrad's account under processing agreements over the period 1977-82, expressed in yearly averages of thousands of barrels per day: Textrad Processing (Yearly Averages)
Year
Saudi
Non-Saudi
1977
220
320
1978
150
230
1979
200
265
1980
220
260
1981
160
200
1982
45
175
*730 The following total barrels of crude were processed for Textrad at refineries pursuant to processing agreements over the same period: Textrad Processing (Total Barrels)
Year
Total Barrels
1977
6,505,255
1978
8,315,384
1979
12,878,616
1980
5,662,980
1981
6,657,871
1982
2,585,642
Over the period 1977-82, an average *731 of approximately 233,000 barrels per day of Saudi and non-Saudi crude were processed for Textrad. Over the period 1979-81, an average of approximately 242,000 barrels per day of Saudi and non-Saudi crude were processed for Textrad. These volumes constituted less than 10 percent of the total crude moved by Textrad during each of these periods. Although there were fluctuations from year to year, the overall volume of crude processed by Textrad pursuant to processing agreements during the years at issue was consistent with Textrad's historical practices, and Textrad's level of processing of Saudi crude did not increase significantly during the period at issue. The Exxon offtakers did not engage in any processing agreements with refining and marketing affiliates during the years at issue, but they did supply Saudi crude to five Exxon affiliates that participated in such agreements. For example, during the years at issue Exxon's offtakers sold more than 75,000 barrels of Saudi crude per day to Esso Eastern Products and Trading Company (EEPTC), and this crude was processed at an affiliated refinery. EEPTC's processing agreement with the refinery affiliate contained a negotiated processing *732 fee, and the agreement dated back to 1971. The resulting products were sold at market prices, earning profits for EEPTC. Four other Exxon affiliates that received Saudi crude from Exxon offtakers did not have refining affiliates, and they participated in processing agreements with other entities. Two of these processing agreements had been entered into several years prior to the years at issue. There is no evidence that these arrangements were out of the ordinary course of business for these affiliates. Nor is there any evidence that the SAG objected to these processing agreements or that they were in violation of the 1979 restriction. Spot Market Purchases
It came to Exxon's attention during 1979 that a company by the name of Ultramar, one of Exxon's crude customers under a long-term contract, had been selling Saudi crude (purchased at OSP from Exxon) on the spot market at prices in excess of Saudi OSP. Because it was experiencing severe shortages at that time, in August of that year Exxon purchased at a price in excess of Saudi OSP Saudi crude that it had sold to Ultramar at Saudi OSP. This crude was then offered for resale by Exxon to an Exxon affiliate at a price *733 in excess of OSP. This transaction was approved by Exxon officials on the basis that it was "in effect buying out of our commitment to sell the crude to Ultramar". There may have been other isolated instances of such purchases of Saudi crude by Exxon affiliates from the open market at prices in excess of OSP, and these purchases were explained as being necessary in the face of severe shortages. There is no evidence indicating the actual price at which this crude was sold, or any Saudi objection to these purchases. Exxon did not profit from this Ultramar transaction or other similar purchases or otherwise benefit from the shortage situation other than to obtain crude that it needed for supply reasons. Sales to Canadian Affiliates
Texaco maintained books and records in the ordinary course of its business regarding all dispositions of Saudi and non-Saudi crude oil by Textrad. Prior to and during the years 1979-81, Texaco maintained a ledger that reflected information regarding each disposition of crude oil by Textrad, including, among other things, the name of the purchaser, the contract reference, the volume and type of crude, the sale date, the revenue from crude dispositions, *734 the cost of crude disposed of, and miscellaneous adjustments. Textrad's Crude Oil Sales Ledgers originally supplied to respondent showed that in 1979 Textrad sold 5,831,255 barrels of Saudi crude to Texaco's Canadian affiliate at prices in excess of Saudi OSP. At trial, Texaco supplied the Court and respondent with revised summaries of these ledgers, indicating that the earlier figures were in error because they erroneously had treated marine revenue (freight) as an element of crude revenue, thereby making it appear that Textrad had charged the affiliate a higher price than was actually charged. Respondent's counsel indicated at trial that, while he was willing to accept the revised summary as an accurate summary of Textrad's records, he would not agree that they contained accurate data. Respondent's counsel was given an opportunity to verify the accuracy of the revised summaries, and he did not thereafter present any evidence that they were inaccurate. Profits Earned by Petitioners From the Low Cost of Saudi Oil
There are two types of profits that have been discussed by the parties as relevant to the issues before us, and these have been referred to in the record as downstream *735 and upstream profits. Downstream profits for purposes of this proceeding are those profits which are earned by petitioners' processing subsidiaries at least in part upon the sale of products produced from crude oil. The parties have stipulated that profits were realized by one or more of petitioners' subsidiaries and that such profits reflected the benefit of the below-market purchase price of the oil from Saudi Arabia. Petitioners have indicated a willingness to make the admission that these profits earned by their subsidiaries were substantial. Some of the profits of petitioners' processing affiliates were beyond the reach of U.S. taxes. Consequently, respondent in the notices of deficiency at issue has allocated a portion of these profits to petitioners' offtakers, which were U.S. taxable entities. As discussed earlier, Minister Yamani had been quoted in the press as saying that he did not believe that downstream profits such as those involved here were within the scope of Saudi power as far as the 1979 restriction was concerned. Press reports indicated that Minister Yamani had stated publicly in late March 1979 that in enforcing the 1979 restriction the SAG intended to *736 "follow the barrel of Saudi crude until it lands at a certain refinery." Press reports further indicated that Minister Yamani had stated that the SAG had control over the price of its oil up to the refinery, but that it could not interfere in sales of refined products produced from Saudi oil even though they were sold at a price which enabled one refiner to earn higher profits than others. The regulation of product prices, he had stated, was up to the consuming country governments themselves. In May 1980, Minister Yamani was quoted in a newspaper as stating that the SAG decision to increase Saudi crude prices by $ 2 per barrel was an attempt to take back some of the profits being realized by the oil companies, since once the oil was delivered to the refineries, it was beyond Saudi jurisdiction. Thus, Minister Yamani was believed to be of the opinion that petitioners' downstream profits or earnings were not within the reach of Saudi control by means of the 1979 restriction or otherwise. There is no indication in the record that Minister Yamani objected to these statements in the press. Upstream profits are those profits which were earned up the chain by petitioners' offtakers before *737 the Saudi crude was processed. Profits earned by the offtakers from exchanges came about when non-Saudi oil received in exchange for Saudi oil was sold for its fair market value, which was higher than the purchase price of the Saudi oil exchanged. We have instructed the parties that at the present time we are not interested in precisely quantifying the profits earned by petitioners' offtakers, except that they may be used by respondent to show that they were so extensive that the 1979 restriction was superficial. See Exxon Corp. v. Commissioner, T.C. Memo. 1992-92. To the extent that any profit figures are referred to in this opinion, they are for this purpose alone and are not intended to be precise. The Exxon and Texaco offtakers experienced significant profits during the years at issue as a consequence of the lower Saudi price. One aspect of these profits came about as a result of processing agreements, which we have already discussed. [28] Another portion of petitioners' offtakers' profits arose upon the sale of non-Saudi crude received in exchanges. Exxon's approximate profits from these sales during the period 1977-81 are summarized in the *738 following table: Year
Profits
1977
$ 5,500,000
1978
2,800,000
1979
14,000,000
1980
53,000,000
1981
27,000,000
During the years immediately preceding and following the years 1979-81, Textrad experienced losses from sales of non-Saudi crude received in its exchange transactions. During the period 1979-81, Textrad experienced profits in excess of $ 500 million from the sale of non-Saudi crude received in exchanges. [29] Total sales of Saudi crude to affiliates resulted in losses to Textrad of more than $ 2 million during the years 1979-81. *739 Although there is some indication in the record that petitioners were concerned that the SAG might not be pleased with the magnitude of petitioners' profits during the period of the 1979 restriction, there is no evidence that the SAG indicated to anyone that such profits violated the restriction. Moreover, the Saudis apparently were aware of the publicity concerning these profits. The Saudi price moderation policies during the period at issue did not keep crude oil or product prices from rising, which led to considerable consumer outrage against both OPEC and the oil companies. Esso Middle East's President, Charles Hedlund, sent to Minister Yamani in March and April 1979 two letters acknowledging press reports about increased profits earned by the major oil companies and explaining that these increases were not a result of any violations of the restriction. [30] There is no evidence indicating that Minister Yamani or any other representative of the SAG responded to these letters or other reports about profits in any fashion which would indicate a Saudi belief that these increased oil company profits during the years 1979-81 violated the 1979 restriction. *740 Returns, Notices of Deficiency, Petitions
Texaco timely filed consolidated corporate income tax returns on behalf of itself and the Texaco petitioners for the taxable years ended December 31, 1979, 1980, 1981, and 1982, with the Internal Revenue Service Center, Austin, Texas. A notice of deficiency for the years 1979, 1980, 1981, and 1982 was issued by the District Director, Internal Revenue Service, Houston, Texas, and was timely mailed to Texaco on July 21, 1989. In the July 21, 1989, Texaco notice of deficiency, respondent increased the income of Textrad in the amounts of $ 402,974,246, $ 982,635,616, and $ 382,457,742 for the years 1979, 1980, and 1981, respectively, stating that respondent was doing so "In accordance with the provisions of Section 482, and/or Section 61 of the Internal Revenue Code, * * * in order to properly reflect the substance of the transactions between Texaco International Trader Inc. (Textrad)" and certain listed Texaco subsidiaries "and in order to prevent the evasion of tax and/or to clearly reflect the income of Textrad." [31] This allocation from the refinery to the offtaker level is based upon the theory that, as articulated in respondent's *741 trial memorandum, the offtakers "were the entities in the controlled group that exercised the ultimate direction and control over the earning of the ARAMCO Advantage profits" and that the offtakers transferred the Saudi crude to their foreign affiliates at artificially low prices so that the profits obtained as a result of the lower Saudi price were earned by entities outside the U.S. tax system. Texaco timely filed a petition with this Court on October 16, 1989, contesting the deficiencies in tax proposed by the respondent for the taxable years 1979 through 1982, asserting, inter alia, that respondent's determinations were erroneous because (i) *742 Texaco and its affiliated and related companies were subject to pricing restrictions which prevented them from having the power or control necessary to establish or determine the transfer prices of the Saudi Arabian crude oil; (ii) Textrad sold the Saudi Arabian crude oil at arm's-length prices; and (iii) Textrad did not earn the income attributed to it by the Commissioner.
Exxon timely filed consolidated corporate income tax returns for the affiliated group's taxable years ended 1979, 1980, 1981, and 1982 with the Internal Revenue Service Center in New York, New York. A notice of deficiency for the year 1979, dated June 29, 1989, was issued by the District Director, Internal Revenue Service, New York, New York, and was timely mailed to Exxon. In the June 29, 1989, notice of deficiency, respondent increased the 1979 income of Exxon's offtaker MEDSTAN by $ 30,363,146 and increased the 1979 income of Exxon's offtaker EITCO in the amount of $ 1,118,439,323, under the authority of sections 61 and 482, stating that respondent was doing so "to clearly reflect the income of the entities due to the Aramco Price Advantage". A notice of deficiency for the years 1980, 1981, and 1982 dated *743 July 16, 1990, was issued by the District Director, Internal Revenue Service, Houston, Texas, and was timely mailed. Also under the authority of sections 61 and 482, in the July 16, 1990, notice of deficiency, respondent increased the income of EITCO in the amounts of $ 2,435,730,020 and $ 876,421,474 for the years 1980 and 1981, respectively, and increased the income of Exxon's offtaker EISAI in the amount of $ 2,465,661 for the year 1981. Exxon filed timely petitions with the U.S. Tax Court on July 26, 1989, with respect to the 1979 tax year, and on August 16, 1990 with respect to the 1980, 1981, and 1982 tax years. In both petitions, Exxon stated that respondent's "Aramco" adjustments under sections 61 and 482 were in error because the Saudi Arabian government required Exxon and Exxon's affiliated and related companies to sell Saudi Arabian crude oil[s] to related and unrelated third parties at the Official Selling Price[s] ("OSP['s]") established by the Saudi Arabian Government. Exxon's and its affiliated and related companies' transactions were in compliance with these restrictions and were not undertaken for the evasion of taxes.
A trial was commenced on April 1, *744 1991, on the limited questions raised in the petitions of whether the 1979 restriction existed and was complied with, and, if so, whether the 1979 restriction precludes respondent from allocating the income in question to petitioners' offtakers. After receipt of more than 30 boxes of exhibits, 3,854 pages of transcript, and 1,399 stipulations of fact, the trial was adjourned on May 3, 1991. On February 13, 1992, this Court issued an opinion on various evidentiary matters raised on cross-motions by the parties. Briefs were filed by the parties thereafter, on March 16, May 15, and June 25, 1992, concerning the issues addressed in this opinion. OPINION There are many factual disagreements involved at this phase of the proceeding, as well as disagreements concerning the scope of the issues to be tried at the present time. The Court determined, however, that the scope of the instant "Aramco Advantage" trial was to be limited to the questions enumerated in our Order of January 7, 1991, quoted earlier. In section 482 proceedings taxpayers bear the burden of proving that the Commissioner's section 482 allocations are arbitrary, capricious, or unreasonable. Sundstrand Corp. v. Commissioner, 96 T.C. 226, 353 (1991); *745 Bausch & Lomb, Inc. v. Commissioner, 92 T.C. 525, 582 (1989), affd. 933 F.2d 1084 (2d Cir. 1991). In this phase of the proceeding, petitioners' burden involves essentially three questions: (1) Whether the rule of Commissioner v. First Security Bank, 405 U.S. 394 (1972), its assignment of income predecessors, and its progeny is appropriately applied to the instant cases; (2) if so, whether the 1979 restriction prohibited the sale of Saudi crude for an amount in excess of the Saudi OSP; and, (3) if so, whether petitioners complied with the 1979 restriction. For the reasons discussed later in this opinion, this case is controlled by our holding in Procter & Gamble Co. v. Commissioner, 95 T.C. 323 (1990), and by the Court of Appeals opinion affirming our holding, 961 F.2d 1255 (6th Cir. 1992). I. Law To Be Applied
We begin by discussing the law that is to be applied to the questions before us. With respect to respondent's allocation under section 482, petitioners contend that the legal principle espoused in the Supreme Court case *746 of Commissioner v. First Security Bank, supra, and the cases that follow it, applies to the facts at issue herein. Specifically, petitioners urge us to conclude that the 1979 restriction prohibited the sale of Saudi crude for an amount in excess of Saudi OSP and, consequently, that respondent's reallocation of income under section 482 from the affiliates to the offtakers is inappropriate. Respondent argues both that the legal principle of First Security should not, as a policy matter, be applied in this context and also that the facts of this case do not fall within its scope. We first discuss respondent's legal argument. Respondent's regulations provide that the purpose of section 482 -- is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable *747 income from the property and business of each of the controlled taxpayers. * * * The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.
Sec. 1.482-1(b), Income Tax Regs. In a case under the predecessor to section 482, this Court stated that the Commissioner has "no authority to attribute to * * * [taxpayers] income which they could not have received." L.E. Shunk Latex Prods., Inc. v. Commissioner, 18 T.C. 940, 961 (1952). In that case manufacturers of prophylactics sold their products to a distributor that was held under common control with the manufacturers. The distributor raised the prices of its products (earning substantial profits therefrom) but the manufacturers did not; we recognized that, if there had been no ties of common control between them, it was reasonable to believe that the manufacturers would have raised their prices to the distributor. Id. at 958. When World War II broke out, the U.S. Government retroactively prohibited the manufacturers but not the distributors from instituting price increases. Id. at 959. *748 We held that, because of this prohibition, an allocation by the Commissioner of profits from the distributor to the manufacturers under the predecessor to section 482 was improper, stating: There is no basis in the record for believing that * * * [the manufacturers] would have raised their prices to * * * [the distributor] in the absence of these regulations, and we can only infer that the respective prices of the controlled entities, in relation to each other, would not have been any different even if the price regulations had never come into being. To say, therefore, that because of the price regulations an improper shift of income is to be insulated from the corrective provisions of the statute [the predecessor to section 482], is to permit * * * [the manufacturers] to enjoy an unexpected piece of good fortune in reduction of their taxes. But we can see no logical basis on which * * * [the manufacturers] can be denied this windfall, in view of the uncontroverted effect of those regulations in prohibiting * * * [the manufacturers] from receiving the very income sought to be attributed to them. We think that the Commissioner had no authority to attribute to * * * [the *749 manufacturers] income which they could not have received.
Id. at 960-961 (emphasis added). Subsequently, the Supreme Court addressed a very similar issue. In Commissioner v. First Security Bank, supra, certain affiliated banks referred their customers to an independent insurance company for purposes of obtaining credit life insurance. Credit life insurance policies were written by the independent insurance company, which then reinsured the policies with an affiliate of the banks pursuant to a "treaty of reinsurance". The independent insurance company retained 15 percent of the premiums for providing actuarial and accounting services, and the affiliated insurance company retained 85 percent of the premiums for assuming the risk under the policies. No sales commissions or referral fees were paid to the affiliated banks. These banks could not legally receive such commissions pursuant to a Federal law which prohibited banks from acting as insurance agents in locations with a population in excess of 5,000 inhabitants. During the years at issue, 85 percent of the premiums paid by the customers were reported *750 by the affiliated life insurance company on its tax returns. The Commissioner allocated 40 percent of the affiliated life insurance company's net premium income to the banks as compensation for originating and processing the credit life insurance. The Tax Court upheld the Commissioner's allocation, [32] but the Court of Appeals for the Tenth Circuit reversed.[33] The Supreme Court affirmed the Court of Appeals on the ground that, since the banks could not legally receive the commissions under Federal law, the Commissioner could not reallocate them to the banks. The Court stated that it had never found a taxpayer to have income "that he did not receive and that he was prohibited from receiving" and premised this on the underlying assumption that, "in order to be taxed for income, a taxpayer must have complete dominion over it." Commissioner v. First Security Bank, 405 U.S. at 403. The Court further observed that one of the Commissioner's regulations under section 482 also recognized the concept that "income implies dominion or control" by providing: "The interests controlling a group of controlled taxpayers are assumed to have complete power *751 to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers."
Id. *752 at 404 (emphasis added) (quoting sec. 1.482-1(b)(1), Income Tax Regs.). The Court concluded therefrom that the parent holding company must have 'complete power' to shift income among its subsidiaries. It is only where this power exists, and has been exercised in such a way that the 'true taxable income' of a subsidiary has been understated, that the Commissioner is authorized to reallocate under § 482. But Holding Company had no such power unless it acted in violation of federal banking laws. The 'complete power' referred to in the regulations hardly includes the power to force a subsidiary to violate the law. [34] *753 Id. at 404-405. Thus, the Supreme Court has indicated that, where the receipt of income is prohibited by law, the Commissioner is prohibited from allocating such income pursuant to section 482. The most recent pronouncement in this area came from the case of Procter & Gamble Co. v. Commissioner, 95 T.C. 323 (1990), affd. 961 F.2d 1255 (6th Cir. 1992). In Procter & Gamble, this Court took the holding of First Security and applied it in the context of a foreign -- as opposed to a domestic Federal or State -- law. In that case, Procter & Gamble A.G. (AG) was engaged in marketing the consumer and industrial products of the Procter & Gamble Co. (P & G) in certain countries where P & G did not have a marketing subsidiary or affiliate. AG was a Swiss corporation and at all relevant times was a wholly owned subsidiary of P & G. During the years at issue, AG and P & G were parties to a License and Services Agreement under which AG paid royalties to P & G for use of P & G's patents, trademarks, knowledge, research, and marketing and distribution assistance. In early 1968, P & G received *754 approval from the Spanish Government to operate a 100-percent-owned company, Espana. The approval letter expressly provided, however, that Espana could not pay any amounts for royalties or technical assistance. It was then determined that AG would own Espana, rather than P & G. On its tax return AG did not report any royalty income from Espana. Pursuant to section 482, the Commissioner allocated to AG a royalty of 2 percent of Espana's net sales for the years at issue, which in turn increased P & G's subpart F income. P & G argued under First Security that, because Spanish law prohibited royalty payments from Espana to AG, section 482 did not apply. In holding for the taxpayer, we stated our understanding of the law to be that "section 482 simply does not apply where restrictions imposed by law, and not the actions of the controlling interest, serve to distort income among the controlled group." Procter & Gamble Co. v. Commissioner, supra at 336. Finding that Spanish law prohibited the royalty payments at issue, thereby depriving P & G of the requisite power to shift income among its subsidiaries, we concluded that the Commissioner's allocation *755 under section 482 was inappropriate. In a motion for reconsideration in Procter & Gamble, on the issue of the materiality of foreign law, the Commissioner cited United States v. Goodyear Tire & Rubber Co., 493 U.S. 132, 145 (1989), for the proposition that "tax provisions should generally be read to incorporate domestic tax concepts absent a clear congressional expression that foreign concepts control." In denying the Commissioner's motion, we indicated that our earlier ruling was premised upon the important domestic tax concept, as espoused by the Supreme Court in First Security, that a section 482 allocation cannot be made when receipt of the income at issue is prohibited by law. We saw no sound basis for refusing to apply this principle where receipt of the income in question was precluded by foreign as opposed to domestic law. Procter & Gamble Co. v. Commissioner, T.C. Memo. 1990-638. On appeal, the Court of Appeals for the Sixth Circuit affirmed, agreeing with the Tax Court that there is no reason not to apply the First Security analysis in the context of a foreign law. Procter & Gamble Co. v. Commissioner, 961 F.2d 1255 (6th Cir. 1992). *756 The Court of Appeals noted that, in order for the Commissioner to have authority to make a section 482 allocation, the Commissioner's regulations and the Supreme Court in First Security had focused on whether the controlling interests used their control to distort income. Id. at 1258-1259. There was no reason, they indicated, to alter this analysis because foreign law was involved. Id. at 1259. In applying this analysis, the Court of Appeals noted that there was no evidence that P & G or AG used its control over Espana to manipulate or shift income. To the contrary, the Court stated that "Because Spanish law prohibited royalty payments, P & G could not exercise the control that section 482 contemplates, and allocation under section 482 is inappropriate." Id.
Respondent attempts to distinguish Procter & Gamble from the facts of this case or otherwise convince the Court not to follow it here by means of several arguments. Respondent first attempts to distinguish the two cases by citing the existence of a statute in Procter & Gamble, the Spanish Law of Monetary Crimes, which could have exposed the parent *757 and the subsidiary to criminal prosecution, whereas in the case before us there was no enabling legislation, operative statute, or other formal statutory provision under which the restriction was issued and under which criminal penalties could have been imposed. This, however, is merely a formal rather than a substantive distinction. If we find that, under the Saudi legal system, the 1979 restriction was the virtual equivalent of law notwithstanding the absence of a specific statute authorizing its promulgation, the Procter & Gamble requirement will have been satisfied. In Procter & Gamble, in response to the Commissioner's argument that the approval letters did not constitute adequate "law" or "legislation" for application of the First Security holding, we stated as follows: In light of the consistency with which the royalty prohibition was applied, there is no need to identify a specific constitutional or statutory provision codifying the prohibition in order to treat the prohibition as law. See U.S. Padding Corp. v. Commissioner, 88 T.C. 177, 187-188 (1987), affd. 865 F.2d 750 (6th Cir. 1989) * * *.
*758 Procter & Gamble Co. v. Commissioner, 95 T.C. at 337. In our opinion in U.S. Padding Corp. v. Commissioner, 88 T.C. 177 (1987), we made a similar judgment on the relevance of informal general practice in contrast to formally codified law. There we were presented with the question of whether a Canadian corporation was eligible to file a consolidated return with a U.S. company under section 1504(d). Under that subsection, consolidated returns with foreign corporations were permitted where the foreign corporation was a subsidiary organized and maintained solely for the purpose of complying with foreign law. U.S. Padding Corp. organized a Canadian corporation in order to expedite the receipt of approval from the relevant Canadian agency for the Canadian company to do business. It was thought by members of the Canadian bar at the time that, although there was no statutory or regulatory requirement that a business incorporate in order to do business in Canada, the agency was more likely to recommend approval if the enterprise was incorporated. Id. at 180-181. Canadian counsel's advice *759 to incorporate was merely "in line with the general practice at that time." Id. at 180. Finding no legislative history indicating that the "foreign law" referred to in subsection 1504(d) had to be limited to a statutory or constitutional provision as contended by the Commissioner, we interpreted it to include "any existing practice or policy" of the foreign government. Id. at 187-188. Later in this opinion we discuss the consistency with which the 1979 restriction was or was not applied as well as its mandatory nature. As with our holding in U.S. Padding Corp., we see no reason here not to acknowledge the restriction solely because it was not a formally issued law. As petitioners correctly point out in their brief, the proper focus of this Court should not be upon the semantic question of whether the restriction constituted a "law", but upon whether petitioners had sufficient power or control to warrant a section 482 allocation. Commissioner v. First Security Bank, 405 U.S. 394, 405-406 (1972). Therefore, if the evidence shows that the Saudi system constituted a system whereby petitioners *760 lacked such control because they were required by the Saudi Government to comply with Saudi requirements or suffer the dire consequences of reduced supplies or worse, then the holding of Procter & Gamble is appropriately applied in this case. Respondent makes the additional argument that, because the requirement at issue here was mandated by a foreign government, we should refuse to apply the rule of Procter & Gamble to the facts of this case. Petitioners state that it is irrelevant whether the restriction is imposed by the U.S. Government or some other government. They cite in support thereof Salyersville Natl. Bank v. United States, 613 F.2d 650, 655-656 (6th Cir. 1980) (involving a Kentucky law barring the taxpayer's receipt of credit life insurance commissions); Bank of Winnfield & Trust Co. v. United States, 540 F. Supp. 219, 220-221 (W.D. La. 1982) (same under Louisiana law), and the Supreme Court's holding in Commissioner v. First Security Bank, 405 U.S. at 406 n.22, that Local Finance Corp. v. Commissioner, 407 F.2d 629, 633 (7th Cir. 1969), *761 was erroneously decided. These cases stand for the proposition, discussed above, that "in order to be taxed for income, a taxpayer must have complete dominion over it." Commissioner v. First Security Bank, supra at 403. They do not involve the application of the doctrine to situations involving foreign law, and there are no cases other than Procter & Gamble that do. However, we see no reason not to follow Procter & Gamble here unless respondent provides us with cogent reasons to conclude that Procter & Gamble was wrongly decided. Respondent attempts to do so by means of three arguments: The legislative history of section 482, the difficulty of applying foreign law, and the policy argument that foreign governments should not dictate U.S. tax policy. Respondent first contends that the predecessors to sections 482 and 1504(d) were enacted at the same time, and that section 1504(d) has a specific reference to foreign law, whereas section 482 does not. From this respondent infers that Congress did not intend for foreign law to affect proposed allocations under section 482. Other than a reference by respondent to Senate testimony in *762 connection with section 1504(d) expressing concerns about U.S. tax officials having to become experts in foreign law, there is no evidence that would indicate that Congress directly considered the question and intended to preclude a foreign law from affecting proposed reallocations under section 482. We therefore see no foundation for respondent's argument. Respondent further argues that the rule set forth in First Security should not be applied to the situation before us because of the difficulty in determining foreign law. Citing concerns about the subjective manner in which the determination of foreign law is made, as well as "historical judicial standards of reliability and trustworthiness", respondent argues that domestic and foreign law should not be treated as "of equal stature". We agree in part with respondent's argument. The Court of Appeals in Procter & Gamble indicated that, particularly in light of the possibility that the taxpayer might be responsible for the restriction on payment, a "heightened scrutiny" of the evidence might be required. Procter & Gamble Co. v. Commissioner, 961 F.2d at 1259. We will continue to take great *763 pains to analyze the evidence of the 1979 restriction in this case carefully before relying upon it. However, this does not mean, as respondent would have us believe, that the restriction at issue here is an "inappropriate barrier to respondent's allocation" under section 482. Respondent also contends that foreign governments should not be permitted to dictate U.S. law. We remind respondent, however, that the Supreme Court in First Security concluded that, if a taxpayer is prohibited by law from allocating income among controlled affiliates, then respondent is prohibited from reallocating such income pursuant to section 482. Therefore, while foreign law may be relevant for purposes of determining whether a legal prohibition exists and, ultimately, for purposes of determining whether section 482 is applicable in a particular instance, such determinations are made in accordance with, and in furtherance of, the Supreme Court's decision in First Security. Consequently, we look to foreign law as a means of implementing U.S. law, not as a means of usurping it. [35]
*764 In a related point, respondent discusses the potential for collusion, presumably concluding that, where such potential exists, the element of power is present and the rule of First Security does not apply. Respondent asserts on brief that "Indiscriminate deference to foreign law would open the door to wide-scale collusion between taxpayers and foreign sovereigns engaged in commercial activity." However, despite respondent's expressed fears, there is no evidence of such collusion in this case. [36] There also is sufficient evidence in the record of Saudi self-interest in issuing the restriction -- particularly in terms of its close relationship with the U.S. Government, which encouraged price moderation at the time -- that we are unable to conclude that the SAG issued the restriction as a result of pressure from petitioners. *765 We note that respondent also states on brief: "Foreign law is at most one of many factors to be considered in determining whether a taxpayer acted at arm's length." We find respondent's focus upon "foreign" versus "domestic" law to be inappropriate. Accordingly, having examined and dismissed all of respondent's arguments against doing so, we see no reason not to apply the First Security doctrine to the facts of this case in the context of a foreign restriction, as we did in Procter & Gamble. Respondent also allocated the income in question pursuant to section 61, a section under which has developed the established principle that "'income must be taxed to him who earns it.'" United States v. Basye, 410 U.S. 441, 449 (1973) (quoting Commissioner v. Culbertson, 337 U.S. 733, 739-740 (1949)). In applying the "assignment of income" doctrine, however, the Supreme Court has consistently distinguished between taxpayers who voluntarily relinquish the right to receive income and taxpayers who are denied the right to receive income by operation of law. In Lucas v. Earl, 281 U.S. 111 (1930), *766 the taxpayer entered into a contract with his wife whereby she was entitled to one-half of any income he might earn. The Supreme Court held that the entire amount was taxable to the taxpayer, because "the tax could not be escaped by anticipatory arrangements and contracts however skillfully devised to prevent the salary when paid from vesting even for a second in the man who earned it." Id. at 115. Shortly thereafter, the Supreme Court decided Poe v. Seaborn, 282 U.S. 101 (1930), in which the taxpayer was held to be taxable on only one-half of his earnings because, under the community property laws of the State in which he and his wife resided, the wife had a vested property right in the community property, which included all property acquired by either spouse after marriage. The Court noted that in Seaborn the earnings were never the property of the husband (as in Earl) but that of the community. Id. at 117. The Court reached a different result from Seaborn in Commissioner v. Harmon, 323 U.S. 44 (1944). In that case, the facts were similar *767 to those in Seaborn, except that the community property law in Harmon was consensual, operative only if the husband and wife elected irrevocably to avail themselves of its provisions (which they did). Id. at 45-46. The Court found the case to be controlled by Lucas v. Earl, supra, because the community system merely permitted spouses by contract "to alter the status which they would otherwise have". Id. at 47. Thus it was not a system that was dictated by the State. Id. at 48. The Supreme Court also has recognized that a legal prohibition against a taxpayer's receipt of income precludes an assignment of such income to the taxpayer by the Commissioner. In First Security (a section 482 case), the Court discussed the interplay between section 482 and the assignment of income cases as follows: We know of no decision of this Court wherein a person has been found to have taxable income that he did not receive and that he was prohibited from receiving. In cases dealing with the concept of income, it has been assumed that the person to whom the income was attributed could have received it. The *768 underlying assumption always has been that in order to be taxed for income, a taxpayer must have complete dominion over it.
Commissioner v. First Security Bank, 405 U.S. 394, 403 (1972). Thus, according to the above-quoted language, a taxpayer who is legally prohibited from receiving income and who does not in fact receive such income, cannot be said to have "earned" the income under a section 61 analysis. A similar conclusion was reached by this Court in Lehman v. Commissioner, 25 T.C. 629 (1955). In Lehman, the taxpayer was a shareholder of a corporation whose wholly owned subsidiary offered warrants to the shareholders of its parent corporation entitling each recipient to purchase six cases of whiskey per share owned. The price that the shareholders were required to pay for the whiskey was the maximum price at which the subsidiary was then allowed to sell the whiskey under the rules of the U.S. Office of Price Administration (O.P.A.). The taxpayer exercised his warrants and executed whiskey purchase agreements to purchase all the whiskey he was entitled to. The maximum price the taxpayer could charge *769 for the assignment of his whiskey purchase agreements was fixed by the O.P.A. at $ 3.46 per case. Subsequently, the taxpayer sold his whiskey purchase agreements to retail liquor dealers at the ceiling price established by the O.P.A. Id. at 631-632. The Commissioner contended that the transaction constituted an anticipatory assignment of income by the parent company and that the profits realized by its stockholders upon their sales of the whiskey purchase agreements were, in effect, dividends taxable to them as ordinary income. In holding for the taxpayer, we stated as follows: We can see no basis, however, for viewing the instant transaction as an anticipatory assignment of income. The anticipatory assignment of income doctrine presupposes the ability of the assignor to earn the income at issue and an intent to escape the tax burden thereon by transferring the right to such income prior to its actual receipt. Here, however, the * * * [subsidiary] charged the stockholders of its parent Company the maximum price it could lawfully obtain. * * * Clearly, there was no assignment of income here since the * * * [subsidiary] realized every bit of profit *770 it was legally permitted to. It was unable legally to sell its inventory at its appreciated value and transfer profits which might be realized in this manner to its parent corporation.
Id. at 633-634. Thus, both the Supreme Court in First Security and this Court in Lehman have recognized that, when resorting to the assignment of income doctrine, the Commissioner cannot allocate income to a taxpayer who is legally prohibited from receiving it. What these cases demonstrate is that, under sections 61 and 482, the Saudi restriction is to be considered by this Court in determining the offtaker's right to receive income. If the 1979 restriction prohibited the sale of Saudi crude for an amount in excess of Saudi OSP, and petitioners' offtakers complied with it, then (1) the offtakers did not "earn" the income occasioned by the low cost of the Saudi crude within the meaning of section 61 because they did not receive it and were prohibited from receiving it; and (2) petitioners were deprived of the requisite power to control the location of income, and respondent's allocation under section 482 is not warranted. II. The Restriction
Having *771 determined that First Security and Procter & Gamble are applicable precedent, we now must determine whether the 1979 restriction constituted a valid and binding prohibition imposed by the SAG against the sale of Saudi crude oil for an amount in excess of Saudi OSP. To make this determination, we must consider (1) whether the restriction was authorized by the King; (2) whether the restriction was consistently applied; (3) whether compliance with the restriction was mandatory; and (4) whether the restriction was in effect during the period at issue. If these questions are answered in the affirmative, and the restriction thereby is found to be the virtual equivalent of a Saudi law, then the 1979 restriction would constitute a valid and binding prohibition which, if complied with, would preclude respondent's proposed adjustments pursuant to sections 61 and 482. A. Authorized by the King
Petitioners argue that the 1979 restriction was a valid Saudi prohibition because it was issued by an authorized representative of the King and pursuant to the King's wishes. They assert that, during the period at issue King Khalid and Crown Price Fahd ultimately determined Saudi oil *772 policy, and Minister Yamani was executing the policies of the King and Crown Prince when he sent Letter 103/Z to petitioners. Although respondent during trial appeared to take the position that there is no evidence that Minister Yamani acted on behalf of the King and Crown Prince when he informed petitioners of the restriction, respondent on brief appears to have stepped back from this view. Respondent now takes the position that, while Minister Yamani closely advised the King and Crown Prince on petroleum-related matters, individual ministers did not have the authority to enact laws in Saudi Arabia. Accordingly, respondent argues that Letter 103/Z was not a validly issued law. There is substantial testimony and expert report material in evidence in this case on the question of how law is promulgated in Saudi Arabia. The evidence indicates that, subject to the higher authority of Islamic law, the role of the King was that of a paramount authority and that executive authority for affairs of State (including oil policy) had been delegated by the King to Crown Prince Fahd, who dealt with foreign officials on behalf of the SAG. It also shows that there was a large element of informality *773 in dealing with this Government. Respondent stresses the importance of the formality of Saudi law and argues that, because the issuance of Letter 103/Z did not comply with those formalities, it did not constitute a "law". While it may very well be true that there are procedural formalities in the promulgation of legislation in Saudi Arabia, the evidence shows that the King and Crown Prince possessed the ultimate legal authority in Saudi Arabia. We conclude that this is an important characteristic of the Saudi system and that, if Letter 103/Z was authorized by the King or his representative, its lack of formality is not an impediment to our treating it as a valid and binding prohibition for purposes of this proceeding. Accordingly, we must determine whether Letter 103/Z was authorized by the King. The record does not contain any direct evidence of the King's or Crown Prince's intent. However, Minister Yamani was the SAG official responsible for consulting with the King or Crown Prince on oil-related matters. There was a perception on the part of many government and oil industry officials that Minister Yamani spoke for the SAG on policy matters concerning oil and that he would *774 not implement a policy unless it had been approved by the SAG leadership. There also was a widely held understanding that the Crown Prince and Minister Yamani consulted regularly and that Minister Yamani regularly received instructions on Petroleum Ministry matters and would never have issued the restriction without royal approval. Many of these individuals who presented this evidence undoubtedly did not have access to the inner workings of the Saudi Government; however, Government officials apparently dealt with Minister Yamani as though he spoke for the Government. It also is clear on this record that Minister Yamani had regularly held himself out as representing the Saudi Government in an official capacity for several years, and his actions had been affirmed by the Crown Prince. The restriction was widely publicized during the period at issue, and press interviews with Minister Yamani about the restriction were published regularly. [37] The evidence also shows that ministerial directives were controlling unless overridden by a Royal decree, order, or resolution by the Saudi Council of Ministers. From the absence of such action we conclude that the King and Crown Prince were *775 aware that the restriction had been issued and intended it to be mandatory. Moreover, the SAG had characteristically come forward and immediately drawn attention to matters that had not been in conformity with Saudi policies or that incorrectly attributed a statement to one of its officers. There was no evidence of such action in this case. In view of the large degree of publicity that the restriction and Minister Yamani's statements apparently received at the time, we believe that, if Minister Yamani had been overstepping his bounds when he sent Letter 103/Z to Aramco, the King or Crown Prince would have so indicated publicly. We conclude therefrom that the 1979 restriction was authorized by the King. *776 B. Applicability to Affiliates
In our opinion in Procter & Gamble, we concluded that, in light of the consistency of application of the prohibition in question, there did not have to be a specific constitutional or statutory provision codifying the prohibition in order to conclude that it was imposed by law. Procter & Gamble Co. v. Commissioner, 95 T.C. 323, 337 (1990). The essence of the provision that made it appropriate to be treated as a law even outside the context of a traditional piece of legislation was the consistency with which it was applied. [38] There does not appear to be any doubt that on its face the pricing restriction set forth in Letter 103/Z applied to the offtakers of all four Aramco shareholders. The 1979 restriction was not structured to apply to some of them but not to others; at the very least it was expected to be applied by all of the Aramco shareholders in their sales of Saudi crude. There is also evidence that Saudi crude was required by the SAG to be sold at Saudi OSP even when it originated directly from Petromin; consequently, a restriction like paragraph 5 of Letter 103/Z apparently was imposed upon other *777 than the Aramco shareholders, and there is no evidence that certain purchasers were not required to resell Saudi crude at Saudi OSP. Thus, consistency from the standpoint of who was required to follow the restriction is evident. *778 With regard to which sales were covered by the restriction, respondent contends that the restriction applied only to unrelated third parties and not to affiliates. We note that in press statements by Minister Yamani, he indicated that the 1979 restriction was essentially the same as the 1977 restriction, which had encompassed affiliate sales. Petitioners also support their position that it applied to all sales of Saudi crude with live and deposition testimony from various government officials involved in the implementation of the restriction while it was in effect. Petitioners presented several witnesses, including dignitaries of some of the Saudi crude consuming countries and corporate executives, as well as other contemporaries, who stated that it was generally understood by all during the period at issue that the restriction applied to all sales of Saudi crude. Dr. Schlesinger indicated his understanding that the 1979 restriction fulfilled the common U.S. and SAG objectives of having the lower-priced Saudi crude reach the consuming countries at the lower price, and that this objective could not have been met if the restriction did not apply to affiliate sales (the majority *779 of Saudi crude sales by petitioners). Officials of the Governments of the United Kingdom, Italy, the Federal Republic of Germany, the Netherlands, and France indicated in their depositions the same understanding of the Saudi objective to benefit the consuming countries. Former German Chancellor Helmut Schmidt, for example, indicated the opinion that the Saudi pricing policy was designed to reduce the impact of the oil crisis on the economies of the consuming countries. Mr. Jean-Pierre Capron, Director of the French Hydrocarbons Administration during the period at issue, indicated that France had urged Saudi moderation because it wanted to "limit the impact of the oil price increases on the balance of payment." The consuming country officials further indicated that they would not have hesitated to report any violations of the restriction, if they had become aware of any. We note that refining affiliates of at least one of petitioners were located in each of these countries. Former Chancellor Schmidt also made it clear that, if there had been any violations of the restriction in the Federal Republic of Germany, he would have exerted pressure upon the executives of the local affiliate *780 corporations, and thus the international corporations "did not, therefore, have any alternative but to supply Saudi crude into the Federal Republic at Saudi official selling prices." Such language apparently was intended to indicate that the restriction included sales of Saudi crude to petitioners' affiliates. In view of the above expressed policies, it would not have made sense for refining affiliate sales not to be included within the scope of the restriction. In addition, many of these dignitaries met with Minister Yamani or other Saudi officials on several occasions, and this perception of the scope of the restriction was based upon their knowledge gained in the course of their official duties. These officials further indicated that they observed carefully the prices at which Saudi crude was imported into their countries and found those prices to be in compliance with the restriction. They also indicated that, had they found otherwise, they would have reported any violations immediately. We find such statements to be credible, particularly since many of these countries encouraged the SAG to pursue moderate crude pricing policies. Accordingly, we conclude that these several *781 government officials correctly understood that the restriction applied to all sales of Saudi crude by petitioners. We find it significant that consuming country government officials believed that the restriction applied to all sales of Saudi crude. While the perceptions of government officials are not necessarily determinative of Saudi intent, in the absence of contemporaneous direct written pronouncements from the SAG, [39] they are helpful in ascertaining such intent because they indicate the manner in which it was manifested to various individuals who dealt with the SAG on matters pertaining to crude pricing during the years at issue. *782 Petitioners also support their position by contending that their behavior is further evidence of the scope of the restriction. They assert that they in fact sold all Saudi crude at Saudi prices after the restriction was issued, which shows that they believed it applied to all sales of Saudi crude and that this belief was reasonable under the circumstances. [40] Petitioners indicate that they reasonably believed, based upon public statements by Minister Yamani and others, that the 1979 restriction was a replay of the 1977 restriction and was similarly applicable to all sales of Saudi oil. Respondent contends that petitioners' interpretation of the restriction is irrelevant to our inquiry. We do not agree. If petitioners had interpreted the scope of the restriction in an unreasonable manner, such an interpretation might lend support to respondent's position that petitioners were attempting to exert control over the situation by "molding" the facts to their liking in a fashion that was contrary to Saudi intent. That petitioners responded reasonably and consistently with the evidence of Saudi intent tends to refute this position. Accordingly, evidence of petitioners' consistent *783 treatment of the restriction as applicable to all sales of Saudi crude is relevant at least to this question. *784 In contending that the restriction applied only to petitioners' sales of Saudi crude to unaffiliated "third parties", respondent cites the language of Letter 103/Z itself, as well as a subsequent letter about 2 months later from the Petroleum Ministry to Aramco setting forth audit certification requirements, both of which contain the "third party" language. Respondent also cites Minister Yamani's U.S. education to argue that he knew the English language and chose his words carefully and that the language in Letter 103/Z was in sharp contrast to the language used in the 1977 restriction. Respondent argues that Minister Yamani certainly knew how to state resale conditions that applied to affiliates as well as third parties, since the 1977 restriction had applied to "all" crude oil lifted by the Aramco shareholders from the SAG. We do not believe that the use of the words "third party" in the translation is indicative of Saudi intent to include within the scope of the restriction only unrelated party sales. From our review of all the evidence, we conclude that the use of the "third party" language in the translation of Letter 103/Z was merely a translation deficiency. Exxon's controller *785 during the years at issue testified that he believed that Letter 103/Z was "either suffering from translation or just imprecision in language." The evidence shows that the words used in Letter 103/Z for third party, "taraf thalith", while commonly translated to mean "third party", actually mean "any other natural or juridical person that exists." This translation, provided for the Court without contradiction by a Saudi native who is also a practicing Saudi attorney and who trained in the United States, contains a scope far broader than the "third party" language used by the translator of Letter 103/Z. Therefore, we do not believe that it was intended by Minister Yamani to limit the scope of the restriction to sales of Saudi crude to unaffiliated entities. Although this "third party" language is also contained in the translation of a subsequent document containing the audit requirement, it is not surprising for the later correspondence to mirror the same translated language as used previously in Letter 103/Z, since it was referencing the earlier letter. Nor are we persuaded that Minister Yamani's American education and his facility with English are relevant to a document that was *786 apparently translated by another person. In addition, the existence of different language in the 1977 restriction -- which we note was written in English, unlike the 1979 restriction which was written in Arabic and translated after it was received by Aramco -- does not persuade us that Letter 103/Z was intended to be a materially different restriction from the earlier one. The evidence indicates to us that the SAG intended the words of the 1979 restriction to take on the gloss of the previous restriction, and therefore the translation of the words "taraf thalith" as "third party" was misleading. We also find several significant pieces of correspondence in the record from the SAG to petitioners subsequent to Letter 103/Z which, in referring to the restriction, do not contain the limiting "third party" language. For example, in a June 1979 letter, Minister Yamani instructed Aramco to ensure that Caltex (owned by Texaco and Chevron) supplied South Korea with its full contractual quantities of Saudi crude and that Caltex's sales to South Korea were to be made, "just like other sales, at the prices set for You by the state." (Emphasis added.) Perhaps most revealing is a letter *787 from Minister Yamani to Texaco dated December 30, 1980, concerning his belief that Texaco was about to sell to its Philippine affiliate (in an LDC country) at prices higher than the Saudi-established price. In that letter, Minister Yamani stated that "Saudi oil should always be delivered at Government established prices and the audit certificate thereof should be submitted to us." We note that this was a sale to an affiliate, not an unrelated entity. While respondent contends that these communications dealt only with LDC sales and thus Minister Yamani's broad statement should be interpreted to apply only in this limited context, we believe that it demonstrates a broad applicability of the 1979 restriction. A very similar letter was sent by Minister Yamani on the same date to Mr. Garvin of Exxon, stating as follows: It has come to our knowledge that some of the four majors (Aramco partners) have notified their customers that the price for Saudi oil will be other than that established by the Saudi Government. We hereby would like to reiterate our established policy which calls for delivery of Saudi oil at Government established prices and the audit certificate be provided thereof.
*788 This paragraph was apparently intended for general application. The letter does not contain reference to LDC's until after the language quoted above. It does not contain any "third party" or other limiting language. The reference to an "audit certificate" despite the fact that the SAG was not generally requiring them at this time except for LDC sales does not, in our view, alter its broad application of the "Government established prices" language. As additional support for the argument that the restriction only applied to nonaffiliated "third parties", respondent also directs the Court's attention to the content of the audit certificates supplied for the first quarter of 1979. Respondent points out that the stated objective in both petitioners" and the other shareholders' audit certificates was to certify compliance with the restriction on sales to "third parties", excluding affiliates from the definition of this term. Respondent asserts that audit certifications supplied by Texaco and certain other companies for the first quarter of 1979 encompassed only sales to nonaffiliated companies; certifications supplied by Exxon, on the other hand, while containing the same statement *789 of purpose, included information on sales both to unaffiliated entities and to affiliates, which, according to respondent, liwent beyond the expectations of the Saudi Government, as there is no evidence that the Saudi Government expressed dissatisfaction with the certificates of Texaco, Mobil, and SOCAL." Petitioners do not dispute the facts and explain that "Texaco interpreted the audit certification requirement to apply only to sales to unrelated parties based on the term "third party" in the English version of the June 1979 letter containing the audit requirement. This interpretation did not change Texaco's understanding that the resale price restriction applied to all sales of Saudi crude oil. The evidence shows that there was considerable confusion about the "third party" language in the translation of Letter 103/Z and its subsequent use in the audit requirement letter. The translation error apparently created different initial impressions in the minds'of petitioners' executives reading these documents as to the scope of the certification requirement. However, their subsequent behavior and their testimony at trial indicate that the executives of both petitioners understood *790 the scope of the restriction, regardless of the audit requirement, to encompass all sales of Saudi oil. There is no evidence that the SAG required Texaco to amend its first quarter 1979 certificate or petitioners to supply certifications thereafter. However, petitioners continued to monitor compliance with the restriction in order to be able to prove compliance in all sales if asked. From this we conclude that Texaco's failure to include affiliate sales on its certification for the first quarter of 1979 is insignificant and does not demonstrate that the restriction applied only to sales of Saudi crude to nonaffiliated entities. We conclude from our analysis of the above arguments that the 1979 restriction was applicable to sales of Saudi crude to affiliates as well as to unrelated entities. It applied to all sales of Saudi crude. C. Mandatory
Next, with regard to the issue of whether the 1979 restriction constituted a valid and binding prohibition, we discuss its mandatory nature. We agree with respondent that, if the restriction was a mere contract term, negotiated by petitioners in the context of a commercial relationship, then the facts in First Security *791 and Procter & Gamble would be distinguishable from the facts in this case. In such a circumstance, the restriction would not have deprived petitioners of the power to control the location of income, and the rule of First Security and subsequent cases would not apply. If, on the other hand, the restriction required petitioners to price Saudi crude as they did, then respondent's allocation cannot stand. Under an assignment of income analysis, if the restriction and the consequent deflection of income to petitioners' affiliates were at the election of the offtakers, then the restriction should be disregarded and the income should be taxed to the offtakers; if the restriction was mandatory, however, and it prohibited the receipt of an amount in excess of Saudi OSP, then the restriction should control. Compare United States v. Basye, 410 U.S. 441, 452 (1973), Commissioner v. Harmon, 323 U.S. 44, 48 (1944) and Lucas v. Earl, 281 U.S. 111, 114-115 (1930) with Poe v. Seaborn, 282 U.S. 101, 110-111, 117 (1930). Petitioners support their view of the mandatory *792 nature of the restriction by urging that there was a very real concern on their part that, if the restriction had not been complied with, there would have been serious repercussions from the Saudis. They base this conclusion upon the overall historical relationship between Aramco and the SAG, three specific examples of Saudi enforcement, and the ultimate power that the Saudis had to nationalize Aramco's interests or to refuse to do business with Aramco and its shareholders. They also discuss in detail the monitoring of crude sales by consuming countries that occurred during the years at issue. Respondent contends that petitioners" fears of reprisal were unfounded, and that the monitoring occurring during this time was irrelevant to the mandatory nature of the restriction. Respondent also urges us that the nature of the relationship between petitioners and the Saudis was a commercial one, and that the restriction was a mere contract term that was consented to by petitioners in the context of that commercial relationship. There is some contemporaneous direct evidence in the record of Saudi intent with regard to the mandatory nature of the 1979 restriction. [41] Minister Yamani was *793 quoted in the press as saying that he intended to see that it was followed. We also note the existence of indirect evidence to the same effect. There were numerous instances in which the SAG had imposed similar requirements upon the Aramco shareholders. There had been a lengthy period of time during which the SAG had sold crude oil to Aramco, and there were negotiations occurring prior to, during, and following the years at issue to continue that relationship. There had been a history prior to the years at issue of various SAG requirements, including numerous pricing requirements and the 1977 restriction, but as shortages in supplies of crude became particularly acute toward the end of 1978, the SAG power to make demands upon the Aramco companies increased. Thereafter, the SAG issued the 1979 restriction, established the requirement that petitioners continue to supply lesser developed countries, and imposed the so-called war relief requirement that petitioners deliver crude to designated countries during the Iran/Iraq war. Petitioners contend that, based upon past experience, they had ample reason to believe that failure to comply with these Saudi requirements could have serious *794 consequences for them. They direct our attention to three incidents in which the SAG penalized them or others for violations of Saudi requirements, none of which is particularly serious individually, but which together further set a mandatory tone. Respondent contends that such instances were so de minimis that they do not provide a foundation for petitioners' fears, since in one instance the SAG reduced Exxon's allotment by a mere 12,400 barrels per day, which was hardly more than a slap on the wrist in the context of Exxon's overall allotments. However, we agree with petitioners that these incidents, when viewed in the context of the evidence overall, operated as a potential threat to petitioners for violation of the 1979 restriction. Respondent attempts to minimize the threat of Saudi sanctions by arguing that the cases which recognize *795 the threat of sanctions all involve the prospect of legal sanctions, not harm to economic interests such as is present here, and that petitioners' concerns here are the sort of concerns that exist in every business relationship. Respondent discusses at length the view that the restriction was merely a commercial term consented to in the context of a commercial relationship. Respondent asserts that commercial transactions are not accorded special treatment simply because they are with foreign governments. [42] *797 Respondent also describes the history of crude oil sales between petitioners and the SAG and concludes that the overall relationship "was a buyer-seller relationship, not a sovereign-subject relationship." This commercial relationship was confirmed, respondent contends, in a lecture given by Minister Yamani in which he explained why "participation" was preferred by the Saudis to "nationalization". Respondent states on brief that Minister Yamani also made the following observation in that lecture: "I am sure that when the majors [oil companies] come to realize the gravity of the situation they are facing, they will recognize the wisdom of doing business with us". [43] (Emphasis *796 supplied by respondent.) Respondent also discusses the negotiations between Aramco and the SAG during the period of the so-called New Arrangements as additional evidence of the contractual nature of the relationship. There is no law interpreting the term "commercial" in a context such as the one before us. However, Congress and the Supreme Court have provided certain guidance for the meaning of the term "commercial" in the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. secs. 1602-1611 (Supp. 1993) (the Act), which is helpful in understanding the scope of this term here. The Act provides for an exception to the general rule of foreign sovereign immunity in any case "in which the action is based upon a commercial activity carried on in the United States by the foreign state". 28 U.S.C. sec. 1605(a)(2). The Act defines "commercial activity" as "either a regular course of commercial conduct or a particular *798 commercial transaction or act", and states that the "commercial character of an activity shall be determined by reference to" its "nature", rather than its "purpose." 28 U.S.C. sec. 1603(d). In interpreting the meaning of the term "commercial" in the Act, the Supreme Court has recently indicated: a state engages in commercial activity * * * where it exercises "'only those powers that can also be exercised by private citizens,'" as distinct from those "'powers peculiar to sovereigns.'" Put differently, a foreign state engages in commercial activity for purposes of the restrictive theory only where it acts "in the manner of a private player within" the market. * * * * * * 'the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.'"
Saudi Arabia v. Nelson, 507 U.S.    , 113 S. Ct. 1471, 1479 (1993) *799 (quoting Republic of Argentina v. Weltover, Inc., 504 U.S.    , 112 S. Ct. 2160, 2166 (1992)). [Emphasis supplied by the Court in Weltover.] Thus, under the Supreme Court's interpretation of the term "commercial" in the Act, the proper focus is upon whether the sovereign's particular acts at issue were those which could have been performed by private citizens as opposed to being acts of a governmental nature. In a price fixing case against OPEC decided in 1979, the U.S. District Court for the Central District of California shed light on the question of how this "commercial activity" exception to sovereign immunity should be interpreted when applied to OPEC's power over the production and pricing of crude oil. International Association of Machinists and Aerospace Workers v. OPEC, 477 F. Supp. 553 (C.D. Cal. 1979), affd. on other grounds 649 F.2d 1354 (9th Cir. 1981). The plaintiff labor union contended that the OPEC members' alleged fixing of crude oil prices was in violation of the Sherman Anti-Trust Act, 15 U.S.C. sec. 1 (1973). In discussing sovereign *800 immunity, the District Court first stated as a factual matter that the evidence before it had indicated that the nature of the activity engaged in by the OPEC countries was "the establishment by a sovereign state of the terms and conditions for the removal of a prime natural source -- to wit, crude oil -- from its territory." International Association of Machinists and Aerospace Workers v. OPEC, supra at 567. In its legal analysis, the court then examined the standards under international law and U.S. domestic law to conclude: The control over a nation's natural resources stems from the nature of sovereignty. By necessity and by traditional recognition, each nation is its own master in respect to its physical attributes. The defendants' [OPEC members'] control over their oil resources is an especially sovereign function because oil, as their primary, if not sole, revenue-producing resource, is crucial to the welfare of their nations' peoples.
Id. at 568. The broad sweep of the court's interpretation of sovereignty was then tempered in response to a contention by the plaintiff, similar to respondent's contention *801 here, that, because the OPEC member nations had a proprietary interest in the companies that were extracting oil in their territories, the price fixing activities were inherently commercial in nature. The court's response to this argument is particularly apt here: a clear distinction must be drawn between the activities each government engages in by virtue of its proprietary interests and the activities in which it engages by virtue of its status as a sovereign. The activities of which plaintiff complains are clearly governmental. * * * * * * Prior to any proprietary interest in any oil extracting company, each defendant nation set the terms of the withdrawal of its resources, through the mediums of taxation and royalties. Thus the defendants were engaging in this governmental conduct setting terms for crude production long before they obtained any ownership in any production companies. It necessarily follows that these activities are engaged in by virtue of each defendant's status as a sovereign -- because these activities preceded any proprietary interest. Therefore, the essential nature of the activity is governmental.
Id. at 569 n.14. *802 We find this last pronouncement to be particularly relevant here. [44] Regardless of the obvious commercial aspects to the interests of the SAG in its dealings with petitioners prior to and during the years at issue, the SAG power to control pricing of its crude existed prior to its financial arrangements with Aramco. We note, for example, as one of respondent's proposed findings indicates, that under the original concession agreement, Saudi crude, once extracted, belonged to Socal, subject to the payment of taxes and royalties to the SAG. The levels of these taxes and royalties were directly related to -- and constituted the first means by which the Saudis exerted control over -- the pricing of Saudi crude. This initial setting of the terms of withdrawal of its resources was inherently "governmental conduct", engaged in by virtue of the SAG's status as a sovereign. Since this sovereign power to tax and charge royalties on the crude contained within its borders existed prior to any financial interest, this power was unrelated to and not contingent upon its subsequent financial interest. Consequently, the Saudi power over the pricing of its crude was sovereign in nature from the *803 inception of its relationship with petitioners. In addition, the subsequent takeover of Aramco by the SAG was another exercise of the SAG's sovereign power, since there is every indication that it was forced upon the Aramco shareholders against their will. The record indicates that there was a very understandable concern on the part of the Aramco shareholders that, if they did not comply with Saudi requirements, the SAG possessed the ultimate weapon of nationalization. If petitioners had disregarded or refused to comply with Saudi requirements during this period, they would have *804 placed their assets in Saudi Arabia at risk of being completely nationalized and/or their critical source of supply could have been significantly reduced or cut off. Most of petitioners' crude supplies were obtained from the SAG. The precedent of nationalization on the part of many other oil-rich countries in the preceding years had a strong impact on the relationship between petitioners and the SAG at the time the restriction was in force. [45] *806 In numerous pieces of correspondence, Minister Yamani and other Saudi officials made it clear that, while there was a friendly and cooperative relationship between Aramco and the SAG, cutbacks in crude supplies and nationalization were always available options if it became necessary to use them. This potential was not the type of threat that would have existed in a normal contractual relationship between private parties. See Saudi Arabia v. Nelson, 507 U.S.    , 113 S. Ct. 1471 (1993). There was an aspect of control by the Saudis here that went far beyond a private party's contractual power to negotiate and enforce a contract term. An examination of the historical relationship and of the specific facts *805 leading up to the 1979 pricing restriction at issue here has convinced us that, while the relationship between petitioners and the SAG was in part commercial in nature in the sense that it involved the purchase and sale of crude oil, the 1979 restriction was not commercial in nature. [46]
*807 Respondent also argues that petitioners had considerable influence and power of their own, which the evidence certainly shows up to a point. The existence of such influence does not, however, demonstrate to us that in connection with the 1979 restriction there existed the type of relationship that exists between two private parties engaging in commercial conduct. Respondent urges a sense of equality by stating that, in the course of this commercial relationship, petitioners "obtained preferential access to valuable crude oil (which contributed greatly to their profits) while the Saudis received expertise and an assured market that generated considerable revenue". However, as discussed, the evidence indicates that the restriction was not a negotiated contract term that petitioners had the option of taking or leaving; the Saudis issued the restriction without discussion or negotiation. [47] Respondent also contends that the commercial nature of the relationship is confirmed by the fact that the SAG needed petitioners as purchasers of its crude as much as petitioners needed the source of supply, which tended to even out the balance in the relationship. The evidence indicates, however, *808 that the SAG's ability to market its own crude through Petromin was increasing, making the Saudis less reliant upon Aramco. In addition, particularly during the early portion of the period at issue when there were severe shortages, alternative purchasers for Saudi crude were readily available, as evidenced by the implication in Minister Yamani's statement that he hoped that the shareholders would recognize the "wisdom" of doing business with the SAG. Respondent further attempts to demonstrate petitioners' power by alleging that Exxon "obtained an exception" from the Saudi LDC requirement to supply crude to a Spanish company when it did not wish to comply with that requirement. The documents cited, however, indicate that Exxon merely wished to narrow the definition of LDC's and that Minister Yamani subsequently excluded Spain from the *809 classification as an LDC. They do not support the allegation that Exxon exercised the control over the SAG necessary to "obtain an exception" from the LDC requirement. We find, in much of the correspondence between Minister Yamani and Aramco, a tone of politeness, but at the same time superiority, as well as an underlying warning that failure to comply with Saudi requirements would have serious repercussions. We conclude from the evidence overall that the SAG possessed the ultimate authority over the relationship. Moreover, the very language of paragraph 5 of the restriction exhibited a mandatory tone: "The companies are to pledge that they will not sell to a third party at prices in excess of what we have specified herein." (Emphasis supplied.) This is language of a mandatory, nonnegotiable, admonishing nature. The trend in the course of the ongoing negotiations on the "New Arrangements" (which did not culminate in executed agreements) also was in the direction of more Saudi control over its resources, which petitioners were powerless to prevent. This indicates additional evidence of the SAG ability to control the relationship. Respondent also attempts to refute the *810 mandatory nature of the 1979 restriction by contending that petitioners consented to the restriction. Respondent discusses the "assignment of income" line of cases leading up to the First Security doctrine and points out that the Supreme Court had established the clear rule that a voluntary restriction deflecting income would be disregarded, whereas a compulsory law deflecting income would be respected. Commissioner v. Harmon, 323 U.S. 44 (1944); Poe v. Seaborn, 282 U.S. 101 (1930); Lucas v. Earl, 281 U.S. 111 (1930). Respondent's argument is that, because petitioners "were not compelled to purchase Saudi crude on the terms and conditions sought by the Saudis", but only purchased the oil when it was in their economic interest to do so, the restriction did not have to be complied with. Respondent thus contends that, because petitioners were able to earn substantial profits while complying with the restriction, their "compliance" was merely voluntary. There was much more to petitioners' relationship with the Saudis than an economic "interest" in Saudi oil. That relationship went to *811 the very heart of petitioners' livelihood as international marketers of crude oil to third parties and to their refining affiliates. To jeopardize that relationship by refusing to comply with the restriction was not the type of behavior that would have been consistent with their business survival. That petitioners earned profits even while they were complying does not answer the question before us and is, as we discuss below, irrelevant. We also note that the examples cited by respondent in respondent's brief as evidence of consent to the restriction demonstrate to us that the Saudis had the ultimate power. For example, compliance with the LDC requirements was not a "business decision", as respondent suggests. Because of shortages during 1979, one Exxon executive apparently considered the possibility of reducing supplies to certain LDC's in order to maintain affiliate supplies. After Exxon notified the SAG of its intention to cut back on supplies to the LDC's, petitioners received a clear statement from the SAG that all companies transporting Saudi oil were to continue supplying LDC's with their contracted allotments so that "we will not be compelled to reduce the quantity of *812 Saudi oil supplied to any company not observing this strictly by the amount of contracted oil withheld from any developing country." The Saudi LDC requirements were in fact followed, for to do otherwise could have had serious negative repercussions for petitioners. What was made very clear by such a letter, however, was that the SAG possessed the ultimate power over its crude oil. We see no distinction between respondent's "consent" position and the argument that Espana, the Spanish subsidiary in Procter & Gamble, could have simply "chosen" not to do business in Spain. Petitioners did not have such a "choice", for to choose to cut off a significant percentage of their crude supply was not a realistic option. Thus, respondent's assertion that petitioners' fears were not well founded is without merit. Respondent also correctly points out that Letter 103/Z was issued after a series of meetings on January 15-16, 1979, in which petitioners asked the Saudis to increase production. Respondent concludes therefrom that it was not beyond petitioners' power to negotiate with the Saudis about the price restriction contained in Letter 103/Z but that they did not so choose because the *813 restriction did not limit their power to earn profits. However, there is no evidence that would support respondent's claim that the price restriction was a product of voluntary negotiations between petitioners and the SAG. To the contrary, the evidence appears to demonstrate that, while there apparently were discussions about volume output, and there was some discussion about price, there was none about a resale price restriction. We are aware of no document indicating that petitioners possessed the "power to negotiate with the Saudis with regard to paragraph 5" of the restriction prior to issuance of Letter 103/Z. Petitioners and the U.S. Government had urged the SAG to continue its moderate pricing policies, but we do not consider these urgings to constitute the type of power called for here. There certainly is no evidence that petitioners urged the SAG to issue the resale price restriction at issue here. Nor is there any evidence that the restriction was issued as a result of anyone's influence or, even if it was, whose influence. The pronouncement was made by the Saudis in Letter 103/Z that Saudi crude was to be sold at certain prices. This was not a "commercial" contract *814 pricing term in which petitioners made a negotiated, calculated concession. Respondent also indicates that petitioners' consent to the restriction is evidenced by their reduced levels of Saudi crude purchases between 1981 and 1983. Respondent states that petitioners were not compelled to purchase Saudi crude and that their reductions during the "Disadvantage" period (when the price of Saudi crude exceeded that of other comparable crudes) demonstrate their ability to purchase from the SAG when and to the extent they deemed it to be in their best interests to do so. Petitioners do not dispute the reduction in their purchases of Saudi crude or their ability to so reduce their purchases. Rather, they assert that the reduction was due to a diminution of demand, partly because of worldwide conservation efforts, and partly because supplies by that time had increased. Petitioners also indicate that the reduction was in part due to the higher relative price of Saudi crude. Respondent's factual assertion does not, in our view, demonstrate consent by petitioners to the restriction; an exercise of business judgment in response to market demand cannot be equated with control over the relationship *815 in general or over this particular aspect of the relationship. The business decisions to cut back on Saudi purchases when, as the evidence shows, supplies were plentiful and Saudi prices began to exceed the prices of other producers, does not demonstrate to us that petitioners willingly acquiesced to the pricing restriction when it was in effect. It merely evidences sound business judgment to purchase crude in the quantities and at the prices that were in petitioners' best interests. Respondent also asserts that petitioners could have challenged the restriction and that their failure to attempt such a challenge evidences acquiescence. One of respondent's experts alleged in his report that the basis for such a challenge would have been that the restriction interfered with the contractual rights that the shareholders were entitled to under the draft COSA to dispose of their Saudi crude once it was purchased in any manner they wished. Respondent does not discuss this particular detail on brief except that at one point respondent proposes a finding of fact that the restriction was in accordance with the draft COSA. Thus, it is not clear what position respondent actually takes at *816 this time with respect to the alleged inconsistency. Petitioners assert in response to this argument that the draft COSA terms were not then (and in fact never were) adopted, and thus did not have any legal significance. They further indicate in a more general sense that a legal challenge to the restriction could have subjected them to potential harm by jeopardizing a crucial source of crude supply. For several reasons we do not agree with respondent's argument that petitioners' failure to challenge the restriction is evidence of their consent. First, whether or not it has been abandoned, we have serious reservations about respondent's theory that the restriction could have been argued to be invalid because it interfered with petitioners' rights under the draft COSA. Respondent's expert who set forth this theory admitted on cross-examination that he was unaware of the existence of the earlier 1977 restriction, which also had been issued as the negotiations on the draft agreements in the "New Arrangements" were being prepared. The absence of knowledge about the 1977 restriction causes us to question whether this expert possessed a realistic appreciation of the circumstances under *817 which the 1979 restriction was issued. Issuance of a pricing restriction in 1977 in the midst of negotiations indicates that the SAG apparently did not find anything inconsistent between those negotiations and a resale price restriction. Such a challenge to the 1979 restriction quite probably would have been futile under such circumstances. Moreover, the significant fact that the New Arrangements never were formally executed leads us to conclude that it is likely that the draft terms would not or could not have been legally enforced even if petitioners and the SAG were following some of their terms in practice. Second, we note that, in Procter & Gamble Co. v. Commissioner, 95 T.C. 323, 337 (1990), we attached no significance to the fact that Espana did not file a formal appeal or application to have the prohibition at issue lifted where such an appeal might have put that company in jeopardy. See L.E. Shunk Latex Prods., Inc. v. Commissioner, 18 T.C. 940, 960 (Court refused to speculate on whether exemption from regulation could have been obtained). The record contains ample evidence, some of which we already have *818 discussed, of such potential jeopardy. Lastly, the record is unclear as to whether petitioners even had a forum within which to challenge the restriction. Although the Saudi system of government contained a body called the Board of Grievances to hear disputes between private parties and the SAG, it is unclear from the record whether actions by Minister Yamani such as the restriction at issue could have been challenged there. Accordingly, we attach no significance to petitioners' lack of a challenge to the restriction here. Petitioners additionally describe in their brief the elaborate system of monitoring by the companies themselves as well as by consuming countries, which they assert created an environment of required compliance. Respondent does not appear to dispute the existence of monitoring in the consuming countries. Respondent contends instead that petitioners' evidence concerning the existence of monitoring is irrelevant, asserting that the only matter for our consideration is actual Saudi intent with regard to the restriction itself, not the perception of it in the consuming countries. We do not agree with respondent's assertion. It is our duty to examine all evidence *819 that might give us an understanding of the nature of the restriction, and this particularly includes the extent of its mandatory nature. Therefore, we look at the surrounding circumstances, including the world behavior and the SAG reaction or lack of reaction to it, to fathom its scope. Accordingly, we hold that this evidence is relevant to our determination. Petitioners contend that the existence of monitoring had a strong impact upon the potential for enforcement of the restriction. As petitioners discuss in their brief, the evidence shows that U.S. Government officials had strongly encouraged the SAG to be moderate in its crude pricing prior to and during the period at issue. [48] *821 In view of their interests in maintaining low crude prices, the United States and other consuming countries had an incentive to notify the SAG if Saudi prices were not being followed by petitioners, and this incentive clearly was known to petitioners. The record shows that this U.S. goal of crude price moderation was capable of being met in part by the existence of an elaborate system which monitored the prices at which crude was bought and sold. Consuming countries throughout the world monitored *820 the prices of Saudi crude. Respondent contends that, because the monitoring countries did not have crude price controls, they could not have enforced compliance with the restriction, so that the existence of monitoring proves nothing. [49] Enforcement of the restriction in the event of a violation would not have been implemented by the monitoring countries; it would have been implemented by the SAG reduction of crude supplies to the violating party. The role of consuming countries in such a situation thus was not to act as enforcer, but as an information source. Petitioners were aware of monitoring and of the possibility that, if the restriction were not followed, even if it could not be enforced by the consuming countries, such information could be passed along to the SAG. We conclude that this monitoring tended to create an environment whereby the restriction had to be enforced. Accordingly, the answer to question (4) of our Order of January 7, 1991, is in the affirmative. In light of all the above evidence, we conclude that petitioners' failure to comply with the restriction would have brought on serious consequences for the Aramco shareholders, particularly *822 because of the extent to which they relied upon the SAG for their source of oil in a market where supplies were dwindling. The restriction was, in other words, mandatory. Accordingly, the answer to question (5) of our Order of January 7, 1991, is in the affirmative. D. Duration of the Restriction
Respondent raises an additional question concerning the duration of the restriction. Respondent argues as an alternative to the other arguments that, if it was valid at all, the restriction applied only to sales during the first quarter of 1979 and not thereafter. Respondent first supports this statement with the observation that the paragraphs of Letter 103/Z which precede paragraph 5 pertain only to the first quarter of 1979, and that the inevitable conclusion is that the duration of the restriction in paragraph 5 is the same. Respondent also states that no subsequent letters restated the existence of the restriction. Petitioners point to certain subsequent documents indicating that the restriction was not so limited and was intended to still be in effect after the first quarter of 1979. These documents previously were admitted into evidence under Rule 146, despite hearsay *823 objections by respondent. Exxon Corp. v. Commissioner, T.C. Memo. 1992-92. We indicated in our evidentiary opinion that we expected to see discussion by the parties about the inherent reliability of these and other materials admitted under Rule 146. Petitioners assert that these documents are reliable because they are consistent with one another and with other evidence, and because they are identical in all material respects to other documents containing the same language, from which respondent's hearsay objections were withdrawn. Respondent continues to press a hearsay objection. With regard to Exhibits 184 and 275, respondent's hearsay objections in one of the stipulations were withdrawn during trial. We see no distinction between these documents and the almost identical Exhibits 185 and 274, for which the objections were not withdrawn. Consequently, it is appropriate to admit these materials for all purposes. With regard to Exhibits 183 and 195, respondent has given us no reason to question their reliability, and we see no reason why they are any less reliable than the countless other similar -- and, as petitioners indicate, consistent -- *824 letters and telexes from the SAG to petitioners in the record. In addition, these documents are not being used by petitioners for the truth of the matters asserted; they are being used to show Saudi intent with regard to the duration of the restriction. Therefore, we find respondent's alleged "hearsay" problems with these documents to be without merit. See supra note 37. One of these letters from the Saudis in May 1979 contains the reminder that "the selling prices of said quantities [to LDC's] are to be the same as other sales made at the prices fixed for you by the State." A June 1979 letter from the SAG asked Aramco to see to it that South Korea (an LDC) received the quantitites of Saudi crude to which it was entitled and also to "see that sales to it are made, just like other sales, at the prices set for you by the state." (Emphasis added.) This language evidences to us a much broader scope of the restriction than apparently envisioned by respondent. The letters from the SAG to Aramco and petitioners in 1980, discussed previously in our analysis of the "third party" language, also indicate that the Saudis did not issue the restriction for the first quarter of 1979 *825 only. Respondent makes the additional argument that these documents are ambiguous and thus should be disregarded. We find their language to be sufficiently clear in light of all the evidence to indicate that the restriction generally was in effect after the first quarter of 1979. We also note that the depositions of consuming country dignitaries indicate that petitioners were required to import Saudi crude into their countries at Saudi OSP during the years 1979 through 1981, which further indicates the public awareness of the duration of the restriction. In support of the argument that the restriction no longer was binding after the first quarter of 1979, respondent also asserts that there were no audit certificates supplied by petitioners after that time. Respondent points out that, with regard to the 1977 restriction, "the certification period was coextensive with the term of the underlying requirement." The record supports respondent's statement that petitioners did not supply the Saudis with audit certificates after the first quarter of 1979, and petitioners assert in their reply brief that this was because the Saudis never requested them. There is no evidence to the contrary. *826 We note that the SAG had required corrections of petitioners when their certifications with regard to the 1977 restriction were insufficient. From the absence of such required corrections, the evidence indicates that the Saudis were satisfied that petitioners were complying with the 1979 restriction. Petitioners speculate that the monitoring by consuming countries announced in late June 1979 (when petitioners were filing their first quarter 1979 certificates) may explain the Saudi lack of request for certifications from petitioners. This is an explanation which we believe is possible but about which we can do no more than speculate. [50] The existence of alternative methods of policing adherence to the restriction in the general world community certainly would justify reduced Saudi expectations of petitioners' proof of compliance. We do not feel compelled, however, to decide the actual Saudi reasons for failing to require certifications. It is sufficient for purposes of the issues before us to state that certifications were not requested and therefore were not supplied. Accordingly, in the context of these facts, petitioners' failure to supply audit certificates after the first *827 quarter of 1979 did not demonstrate that the restriction had lapsed. We conclude that the restriction continued in effect after the first quarter of 1979. For all of the above reasons, we conclude that the Saudi restriction was the virtual equivalent of law and constituted a valid and binding prohibition against the sale of Saudi crude for an amount in excess of Saudi OSP. Thus, as embodied in Letter 103/Z, the 1979 restriction was the type of requirement referred to in First Security and Procter *828 & Gamble, which, if adhered to, would have precluded respondent's allocation because it was approved by the King, consistently applied, mandatory, and in effect during the period at issue. III. Compliance With the Restriction
Notwithstanding the nature of the 1979 restriction as being the virtual equivalent of law, if petitioners ignored or circumvented the restriction without consequence, then the rule of First Security would not apply. Commissioner v. First Security Bank, 405 U.S. 394, 405 (1972). Petitioners contend that, as the restriction required them to do, they complied with the restriction in all material respects and thus were deprived of the "complete power to shift income among their subsidiaries." Respondent indicates that in several respects petitioners circumvented the restriction both in spirit and in fact, and thus that they were not deprived of power. The parties have stipulated that petitioners consistently invoiced the Saudi oil sold by them at Saudi OSP, and respondent does not appear to dispute this fact, with a few minor exceptions that will be discussed presently. Rather, respondent's arguments essentially are *829 based upon the view that petitioners employed various devices to obtain huge profits in spite of the restriction. Nor does respondent appear to dispute the fact that petitioners properly reported these profits for U.S. income tax purposes. Respondent's objection is that the restriction would only be relevant where it deprived petitioners of the power to receive income, and, since petitioners were able to earn such enormous profits during the period of the restriction, they were not so deprived. Accordingly, respondent contends, the restriction did not deprive respondent of the authority to make the section 482 allocation at issue. In a related vein, respondent also alleges that petitioners violated the restriction by means of various mechanisms in their exchange transactions, certain processing agreements, and in some of their sales of crude to unrelated third parties, enabling the offtakers to earn substantial profits from these mechanisms. Respondent further alleges that petitioners violated the restriction by dealing with third parties differently than with their affiliates, which constitutes additional evidence of petitioners' attempts to exert power to control the location *830 of their profits. A. Downstream Profits
We make a preliminary observation about respondent's argument concerning the enormity of petitioners' profits. The existence of petitioners' huge profits during the years at issue, respondent contends, is evidence that the restriction was a mere "invoicing" provision, or that it did not really exist in substance. Respondent has consumed a good deal of the Court's time before, during, and after the trial on the issue of profits. Although respondent's brief expressly refers only to those profits earned by petitioners' offtakers ("upstream" profits), it is obvious that a significant portion of respondent's disagreement with petitioners in this case has been due to petitioners' profits earned "downstream" in the face of Saudi attempts to moderate prices during the period at issue. [51] Respondent's unhappiness with petitioners' downstream profits is an expression of the concern that the restriction did not accomplish the goal of price moderation at the product level. Thus, respondent asks the Court to ignore the existence of the restriction because it did not achieve this goal. *831 There is no dispute that petitioners' refining affiliates earned substantial profits during the period at issue as a consequence of their access to the lower-priced Saudi crude during the years at issue. Indeed, petitioners have conceded: Substantial profits were realized downstream by one or more of petitioners' refining/marketing subsidiaries, and such profits reflected the benefit of the below-market purchase price of the oil from Saudi Arabia.
Nor is there any dispute that the restriction did not apply to products that were produced from Saudi oil. On its face, the restriction applied only to Saudi crude. It was silent about profits earned by companies that purchased Saudi crude, refined it, and sold it for a profit. In fact, Minister Yamani admitted on several occasions that he could not control product prices. In addition, we note that the evidence shows that the SAG was aware of the magnitude of petitioners' profits. In two letters to Minister Yamani from Esso Middle East's President in March and April 1979, Exxon discussed press reports about Exxon's overall profits and assured him that even in the context of such profits Exxon was complying with the restriction. *832 The SAG had demonstrated on various occasions a willingness to deal strongly with petitioners when Saudi requirements were not met. Had Minister Yamani found the existence of such profits to be in violation of the restriction, we are convinced that he would have said so, and apparently he did not. To the contrary, the record shows some frustration expressed by Minister Yamani at his inability to control product prices and oil company profits, but inherent in that frustration was the recognition that the SAG had no power to address these profits because petitioners were complying with the Saudi requirements. For us to disregard the 1979 restriction at issue here because it did not fully achieve product price moderation is unacceptable in a legal system such as ours that is designed to follow rules of law until they are modified or repealed, regardless of whether they accomplish the goals of consumers. The earning of profits by petitioners' downstream affiliates because of their purchase from petitioners of the low-priced Saudi crude does not permit us to disregard those rules. See L.E. Shunk Latex Prods., Inc. v. Commissioner, 18 T.C. 940, 960-961 (1952). *833 Consequently, the existence of substantial downstream profits earned by petitioners' refining subsidiaries is irrelevant to the question of whether the restriction was adhered to. B. Exchanges
Respondent additionally argues, however, that huge profits were also earned by petitioners' offtakers ("upstream" profits) in a manner which violated the restriction. Respondent contends that the existence of these profits demonstrates petitioners' power to control the location of income even in the face of the restriction. Most of the upstream profits discussed by respondent arose as a result of exchanges with unrelated parties. [52] Respondent alleges that petitioners effectively treated exchanges as exempt from the scope of the restriction, and that exchanges were not exempt. Respondent also alleges that petitioners exerted control over the location of their profits in exchange transactions in the following manner: Petitioners exchanged Saudi crude for non-Saudi crude, invoicing the Saudi crude sold at Saudi OSP but obtaining some sort of "advantage" or hidden lower price for the non-Saudi crude in the course of the exchange so that, when the non-Saudi crude received was sold *834 to third parties, the offtakers were able to earn substantial profits. Although there is no dispute that the offtakers reported these profits for tax purposes as required, respondent alleges that their very existence proves that the offtakers violated the restriction or that, if such maneuvers were not in violation, the restriction was so impotent that it should not even be taken into consideration as a mandatory requirement. Various methods were alleged by respondent to have been used by petitioners to obtain this advantage, including the invoicing of the non-Saudi crude received at a price that was below that crude's market value (thereby effectively enabling petitioners to receive an amount in excess of Saudi OSP for the Saudi crude), the altering of exchange differentials or exchange ratios to increase petitioners' profits, the use of "overlift penalties", credit memoranda and the adjustment of credit and freight terms as additional consideration received, and the substitution of lower quality for higher quality Saudi crude exchanged out. *835 Petitioners on brief indicate that they did not behave as though exchanges were exempt from the restriction but in fact took substantial steps to comply with it in their exchange transactions. They do not dispute the existence of substantial profits earned by their offtakers, although they apparently disagree as to the amount. [53] Petitioners assert, however, that the method of calculating differentials and other terms in exchanges was handled consistently before, during, and after the period of the restriction. They also indicate that, based upon their past and contemporary experience with the SAG, the profits earned under that methodology were permissible under the restriction. Petitioners also contend that offtaker profits from exchanges arose because they sold the non-Saudi oil received at a profit, not that they were mispricing the crude received in exchanges. *836 The evidence shows that an exchange differed from an outright sale in that the latter was an exchange of crude for cash, whereas in an exchange each party to the arrangement converted its crude into another crude to save transportation or storage costs, or to acquire a specific quality of crude for refining or for contractual commitments. Exchanges were an important method by which petitioners balanced out particular needs of the companies, allowing them to save money on storage or transportation, or by obtaining a certain weight crude needed for a particular refinery in exchange for one that is owned and not needed. In effecting the exchange, each party determined the refined (or finished) value to its system for the crudes it intended to give up and receive. The differences between these two figures for each party negotiating the transaction then became the starting point for the negotiations between the two parties. The "differential" constituted the result of these negotiations and was the agreed difference in value of the refined products that could be produced by each company from the two crudes. The relative market values of the crudes had little to do with the relative *837 refined values of those crudes to the systems (since, for example, one company, which might have excess refinery capacity for a "heavy" oil would find the "heavy" oil to be of relatively greater refined value to it than to the other exchange partner). In the appendix to respondent's brief respondent attempts to explain that the pricing of crudes in an exchange is totally unrelated to the value of the oil and can be used to manipulate an exchange transaction to reap huge profits. We understand that this is a possibility. However, what could have been done is not necessarily what was done, and we are unwilling to presume that such manipulation occurred in the absence of evidence to that effect. The evidence shows that in computing the exchange differential petitioners did not use the differential between the market values of the crudes in question, as respondent's appendix apparently contends; rather they used the internal refined values discussed above. In invoicing the exchange, Saudi crude consistently was invoiced at Saudi OSP, and, where there was a discrepancy between the differential between the two OSP's and the agreed differential in an exchange (based upon internal refined *838 value), various methods were used by petitioners to bring the exchange back into balance so that the negotiated understanding between the parties was met. Respondent does not appear to agree with petitioners' testimony that exchanges were negotiated on the basis of each exchanging partner's calculation of the internal refined value of each crude, not their market values on the open market as in the context of an outright sale. Respondent has not disproven petitioners' evidence that this was the procedure employed. [54] To the contrary, the record contains testimony by one of respondent's witnesses concerning a disagreement between American Agip Co., Inc. (Agip) and Texaco over who had to bear retroactive price increases in Saudi oil after an exchange had been negotiated. The witness indicated that, in calculating the exchange differential, the parties tried to calculate "what would have been the difference in value of each crude, in respect of the yields of refined products." (Emphasis added.) Thus, even according to respondent's witness, the internal refined value was the essential component of the exchange differential. Accordingly, we accept as correct petitioners' evidence *839 to that effect. *840 Respondent makes the point that, even if the SAG were aware of (and accepted) petitioners' need for exchanges generally, this did not mean that the SAG approved of the level of petitioners' profits from exchanges during the period at issue. Respondent contends, in other words, that a continuation of the general practice of engaging in exchanges did not necessarily violate the restriction, but that the earning of profits from those transactions did. We cannot determine from this record the Saudi level of understanding of petitioners' method of calculating exchanges or the profits earned therefrom, since the evidence refers to communications with the Saudis about exchanges in general terms. [55] Because we understandably have little direct expression in the record of actual Saudi intent with respect to this aspect of exchanges, we are forced to infer a reasonable interpretation of the restriction in the context of all the evidence. *841 The consistency with which exchanges were handled is crucial to reaching an understanding of this question. In our opinion in Procter & Gamble Co. v. Commissioner, 95 T.C. 323, 338-339 (1990), we found it important that there was a valid business purpose for the taxpayer seeking to retain 100 percent ownership of Espana, and that the taxpayer was not motivated to avoid taxes. We observed that the taxpayer could have structured its arrangements so that royalties could have been paid legally, but that it was not obligated to do so. We acknowledged the well-established principle that "a taxpayer need not arrange its affairs so as to maximize its taxes as long as the transaction in question has substance." Id. Such substance similarly is important here in ascertaining whether petitioners complied with the restriction. If during the years at issue petitioners' offtakers suddenly had participated in activities that were without business purpose, materially different from their historical behavior, and that had generated substantial profits for petitioners, there might be some significance to these activities as evidence of attempts to exert power *842 to take "advantage" of the low cost of the Saudi crude. These attempts might have been viewed by the Saudis as a violation of the restriction. Where, however, petitioners continued in their normal historical pattern of behavior in purchasing and selling crude oil in exchanges, and continued to calculate exchange differentials by the same procedure as had been used previously, this consistency with historical behavior demonstrates that there were valid business purposes in continuing these procedures, and therefore the requirements of the restriction were satisfied. The evidence shows that in 1977 petitioners had engaged in an internal examination of their procedures in exchanges and had concluded that maintaining their historical practices would be consistent with the intent of the 1977 restriction. The evidence also shows that Exxon had performed an examination shortly after it had received material from the SAG with respect to the 1977 restriction and in its 1977 guidelines had stated that maintaining historical practices would be consistent with the 1977 restriction. There is evidence that the SAG had requested a copy of petitioners' instructions to affiliates, which included *843 the instructions that exchanges were to be consistent with historical practices and for operational purposes. There is no evidence in the record of Saudi dissatisfaction at that time with petitioners' 1977 exchange practices. In 1979, Exxon reinstituted the same guidelines as before. These guidelines essentially stated the same two requirements: The outflow of Saudi crude in exchanges was to be limited to the historical average, and exchanges were to be for operational purposes only. The evidence shows that Texaco also employed contract review procedures that were designed to ensure consistency with historical levels. The evidence also indicates that exchanges were a standard business practice before the period at issue, and that petitioners' exchanges were consistent with historical practices and kept to historical levels. The evidence also shows that exchange levels were deliberately held at historical levels because of the Saudi restriction. Respondent alleges that petitioners "deviated from historical practices in the manner in which the exchanges were invoiced." However, the record shows to the contrary that petitioners were quite careful to maintain consistency in order *844 to avoid even the appearance of any violation of the restriction. There is testimony that petitioners advised the Saudis about a continuation of their historical exchange practices during the period of the 1979 restriction, and there is no evidence indicating Saudi dissatisfaction with these practices. The consistency discussed above and the Saudi silence lead us to conclude that petitioners' profits from exchange transactions during periods in which Saudi crude was priced below other similar crudes did not violate the restriction. The Exxon 1977 and 1979 guidelines, in addition to requiring historical consistency, also stated that exchanges were to be only for operational purposes. Respondent contends that not all exchanges were for operational purposes, as evidenced by a number of instances in which petitioners resold non-Saudi crude received in exchanges. However, the amount of non-Saudi crude sold in the transactions cited by respondent constituted less than one percent of the Saudi crude disposed of by petitioners' offtakers during the period at issue. Respondent also alleges that in approximately 17 percent of Texaco's exchanges, Texaco received non-Saudi crude which it *845 sold to third parties for a substantial profit. But, as with exchanges generally, Textrad's resales of non-Saudi crude received in exchanges remained consistent with historical levels of such resales. Respondent additionally alleges that Exxon sold non-Saudi crude received in an exchange to entities outside its system. The evidence shows, however, that, while Exxon's receipt of this crude was in order to meet a contractual commitment to sell it to another company, exchanges historically had been used in order to meet commitments. Thus this transaction was not designed to take advantage of the low price of the Saudi crude. The evidence also shows that the Exxon offtakers made every effort to adhere to historical practices and procedures. Accordingly, because of both consistency and adherence to historical practice, we do not find these resales to be of significance. Respondent also contends that even some Exxon officials believed that exchanges violated the restriction. In support of this point, respondent directs our attention to a document in which Exxon refused to enter into an exchange that might yield prices in excess of Saudi OSP. [56] A noninvoiced exchange was considered *846 and dismissed as improper because it had not been used historically in that context. Rather than supporting the view that exchanges violated the restriction, as contended by respondent, this document further convinces us that Exxon was taking every precaution to avoid even the appearance of a violation by continuing in its historical pattern. To the extent that there were any deviations from this historical pattern, there were clear, unrelated business reasons why the pattern changed outside *847 the existence of the restriction. For example, respondent raised a question concerning a change in petitioners' behavior in the reduction of their sales of Saudi crude to unrelated entities except allegedly when those entities were willing to participate in profitable exchanges. Petitioners allegedly were saving Saudi crude for their own affiliates, where profits could be earned downstream after the crude was refined. This, respondent contends, demonstrates that petitioners treated third parties differently than affiliates, and thus makes this a particularly apt situation for a section 482 allocation. However, the evidence shows that there were reasons wholly unrelated to profit potential for petitioners' failure to renew contracts. As we have discussed, there was no significant increase in exchanges during this period, so that petitioners' continued use of this procedure does not support respondent's theory. Moreover, the evidence shows that petitioners began to reduce their sales of crude to third parties long before the period at issue, because of shortages occasioned by the Iranian crisis, inter alia. These reductions of such sales were not related to the restriction. *848 In addition, the SAG decision in February 1978 to cut back production of lighter crude in order to increase sales of heavier crudes (of which there were more ample supplies) also played a role. There was evidence that petitioners (and particularly Textrad) made serious efforts to "lighten" their overall crude slates to match refinery needs during the period at issue, particularly in view of increasing environmental demands placed upon the system. Shortages also required the Exxon offtakers to consider their affiliate supply needs first. [57] Placing these practical needs in a historical context, we conclude that these contract modifications were not manipulations by petitioners to treat affiliates differently in order to capture more profits from the low cost of the Saudi oil but were merely justifiable attempts to meet the needs of their corporate families. *849 Another deviation from normal procedure that respondent has brought to our attention was Textrad's use of "overlift penalties" during the period at issue, which respondent alleges demonstrated another example of petitioners' obtaining consideration in excess of Saudi OSP in certain exchanges. By means of these penalties, if an exchanging partner lifted more Saudi oil than was agreed to in the original exchange agreement, the exchanging partner was required to pay Textrad a price for the overlifted amount that was in excess of Saudi OSP. The Exxon offtakers apparently did not use overlift penalties. Petitioners explain that these penalties were not used to increase profits but were used to discourage exchange partners from deliberately overlifting Saudi crude and thereby obtaining more of the low-cost Saudi crude than was bargained for. We do not view these penalties as violations of the restriction. The penalties simply operated as a necessary deterrent to Textrad's exchange partners who otherwise would have had an incentive to lift more than the agreed amount. Nor do we find it significant that these penalties were only used during the period of the restriction. Such penalties *850 were not necessary except during periods when Saudi crude was priced below other similar crudes, since at other times the Saudi OSP could have been used to compute the price of overlifted amounts and the original understanding under the exchange agreement would have been satisfied. Subsequent to the years at issue, a Texaco subsidiary filed a tax lawsuit in the Federal Republic of Germany in which the German Texaco affiliate, attempting to convince the German tax authorities that the low Saudi crude prices during the years at issue did not lead to a disguised capital contribution, stated in a 1987 letter to the German Revenue Office that "The industry of course found ways and means to circumvent the price limit of the Saudi Government." The letter went on to state that "there was little compliance with the Saudi Government's directive not to profit from the price advantage by reselling the crude" and described various methods by means of which profits were earned in exchanges, processing agreements, and other arrangements, all of which have been argued by respondent to be examples in which petitioners violated the restriction in this case. There is no evidence that this particular *851 letter was known to or endorsed by petitioners, and all the material contained in that letter which describes the methods whereby Texaco obtained "Realization of the Saudi advantage" apparently is based upon speculation contained in press reports obtained by the writer of the letter. Respondent alleges that petitioners' receipt of supplemental consideration in exchanges is "underscored" by the statements made by the Texaco affiliate in this letter. Petitioners assert that this material should not be relied upon because it contains newspaper reports which are "not reliable, trustworthy, or probative evidence and are contradicted by all of the evidence in this case." The material referenced by respondent with regard to Texaco's German tax claim does not convince us that petitioners violated the restriction. First, the alleged admissions contained in a letter from the attorneys of Texaco's German affiliate do not state any facts that are inconsistent with the statements of petitioners here. For example, petitioners do not appear to dispute that they earned profits in exchanges or processing agreements; however, they do dispute the conclusions contained therein that "there was little *852 compliance with the Saudi Government's directive not to profit from the price advantage by reselling the crude." The latter is not a statement of fact but is a two-pronged argument (1) that the Saudi directive was "not to profit", and (2) that "there was little compliance" with the Saudi directive. These are not statements of fact upon which we can appropriately make a finding; they are conclusions which are within the domain of this Court and which we have already addressed. Second, the conclusions contained therein were all based upon conclusory statements made by the press, and there is no evidence that those statements are correct statements. Accordingly, we find this material to be of little significance to this case. In addition to reliance upon the material in the German lawsuit, respondent cites to a purportedly "telling" Texaco memorandum dated April 18, 1979, in support of the argument that petitioners disregarded Letter 103/Z in their exchange transactions. That memorandum provides as follows: As we have discussed, a significant pricing disparity currently exists when comparing Saudi Arabian crude official prices to official prices of crudes marketed by other *853 producing countries. In our exchange arrangement negotiations, we have minimized this disparity through a combination of approaches such as reducing exchange ratios, reducing the percentage of Arabian Light in the total Arabian exchange pool, payment term adjustments and negotiating discounts from the official price of low sulfur crudes acquired thereby directly reducing Texaco acquisition costs.
The language of this memorandum was repeated in several subsequent internal memoranda. Respondent contends that these memoranda confirm that petitioners used these techniques to disguise their manipulation of the consideration received in exchange for the Saudi oil given up, thereby receiving consideration in excess of Saudi OSP and violating the restriction. Petitioners explain that, when these memoranda are read in the context of the exchange transactions they were directed toward, the "minimizing this disparity" language takes on a different connotation than that understood by respondent. They explain again that the language of the above-quoted memorandum must be interpreted in light of the fact that differences between internal refined values of the exchanged crudes required *854 adjustments to market values in exchange transactions. We note that the above memorandum was a Texaco memorandum and had no relevance to Exxon. Accordingly, to the extent it is considered by the Court, it is in reference to Texaco alone. When read in the context of the method of conducting exchanges, we believe that this memorandum was merely explaining that the market values of the Saudi crude and the crude on the other side of the exchange needed to be adjusted in order for the exchanges to reflect the different refined values. Use of refined values caused the transactions to be skewed because of the depressed Saudi price. To balance out these values, it was necessary to adjust other terms. Petitioners' explanations through their experts of the reasons why these variations in terms in exchange contracts occurred are reasonable. Accordingly, we conclude that the reference to these terms in the Texaco memoranda did not constitute evidence that Textrad violated the restriction. C. Processing Agreements
Respondent's allegations with respect to petitioners' use of processing agreements is another subject which must be examined in the light of petitioners' historical behavior. *855 In certain circumstances, Textrad purchased Saudi crude, transported that crude to a Texaco affiliate for refining, and sold the resulting products for their full value, realizing a profit. There is evidence that Textrad had participated in processing agreements prior to and after the period at issue, and that the overall volume of Saudi crude processed under these processing agreements during the years at issue was generally consistent with Textrad's historical levels. [58] *856 Therefore, there does not appear to be an attempt on Textrad's part to increase its profits by increasing the amount of Saudi crude processed through processing agreements during the overall period at issue. [59]Textrad continued in its normal pattern of behavior. In addition, the evidence shows that there was excess Texaco refinery capacity, and that it was Textrad's role to coordinate the most efficient use of that capacity. Processing agreements accomplished that efficiency. As with exchanges, we hold that Textrad's normal business activities as evidenced by its regular functions in the context of historical behavior did not violate the restriction. The same reasoning applies to the allegations in Respondent's Offer of Proof Regarding Texaco Overseas (Bermuda) Limited (TOBL)(Offer of Proof). The Court excluded at trial a box of documents pertaining to TOBL and alleged profits earned by it during the period at issue because we deemed this material to be irrelevant to the issues at hand. Respondent was permitted to present an Offer of Proof in connection with this material, in which respondent alleged that TOBL, a corporation 100 percent owned by Textrad, purchased Saudi crude from Textrad, had it processed, and sold the resulting products for a profit. In two footnotes of respondent's brief, [60] respondent asserts that TOBL is an example of the opportunity *857 possessed by petitioners to exercise control over the location of their profits notwithstanding the existence of the restriction and to show that petitioners could have elected to earn even greater income than they received by means of additional processing agreements with their affiliates. After further review of the Offer of Proof, we reject respondent's argument. First, TOBL's existence is not an example of Textrad's ability to control the location of profits as they relate to the period of the Saudi restriction. The alleged arrangement with TOBL, according to the Offer of Proof, commenced on September 1, 1976, and thus for obvious reasons it was not established in order to capture the benefit of the low Saudi crude price that commenced in January 1979. The evidence also shows that Textrad's overall levels of processing agreements *858 during the years at issue remained generally consistent with historical levels. [61] We believe that the overall consistency was not due to Textrad's "choice" to forgo additional profits as alleged by respondent, but was due to the mandatory nature of the restriction. Thus TOBL's existence does not demonstrate, as respondent alleges, that, because Textrad owned one company to purchase Saudi crude and have it processed, it possessed the power to engage in such processing transactions at will without incurring the wrath of the SAG. The overall evidence has convinced us to the contrary that consistent behavior was acceptable, but that deviations from historical behavior would have been objected to by the Saudis. Second, this material is yet another attempt by respondent to bring in the issue of profits earned upon the sale of refined products. As we have indicated previously, the profits earned from the sale of products refined from Saudi crude did not violate the restriction. Particularly in view of the absence of any indication in the record that Textrad, through TOBL or otherwise, took advantage of the low cost of Saudi crude by significantly increasing the amount of processing *859 that already occurred, the profits earned by TOBL were not an example of Textrad's power. Third, the Offer of Proof contains irrelevant material on the economic substance of TOBL. Whether this company constituted a "shell corporation" or was participating in "sham" transactions is a question to be addressed on a full record at another time, as we have indicated to respondent in our correspondence. For these reasons, we conclude that the Offer of Proof does not demonstrate that Textrad possessed sufficient control to remove this factual situation from the scope of First Security and Procter & Gamble. With regard to the Exxon offtakers, the record indicates that there were no processing agreements. Despite respondent's attempt to ignore the offtaker level and look further down the chain to the activities of some of the offtakers' purchasers, we once again must *860 remind respondent that the restriction did not apply to those of petitioners' affiliates who processed the Saudi crude and sold the resulting products at a profit. Once again consistency and historical behavior are relevant. The evidence also shows that three of Exxon's processing agreements were entered into significantly prior to the initiation of the 1979 restriction. Thus these agreements were merely a continuation of existing relationships, and they demonstrate that processing agreements were part of the normal operation of Exxon's business. Accordingly, we do not consider respondent's arguments with respect to processing agreements persuasive. Respondent also contends that petitioners possessed the power to earn even more profits by virtue of the low Saudi prices than they in fact earned and that "The only reason the offtakers did not realize more of the income is that they chose to exercise their power only in limited circumstances." One of the methods by which petitioners could have earned this additional consideration, respondent contends, was by entering into more processing agreements with their affiliates. We find respondent's reasoning with regard to this allegation *861 to be somewhat circular. We already have explained that the offtakers did not substantially increase the levels of their processing agreements because to do so could have been viewed by the SAG as a violation of the restriction. Accordingly, there was no such power to increase processing agreements. See Commissioner v. First Security Bank, 405 U.S. 394, 405 (1972) (power at issue under section 482 does not include the power to force a subsidiary to violate the law). Moreover, we are unwilling to accept respondent's theory that petitioners "chose to exercise their power only in limited circumstances" and thereby exercised their power at will. Such an "exercise" would have been completely at odds with the function of a profit-making organization, and, absent the 1979 restriction, there is no evidence of a reason for it here. D. Other Sales
Respondent also alleges that there were sales by Textrad of Saudi oil at prices higher than OSP, and that these sales were sufficiently significant that they were "neither inadvertent nor isolated violations." In the first set of transactions cited, respondent alleges that there was a pattern of violations *862 on the part of Texaco's Canadian affiliate, whereby Textrad realized more than $ 5,934,000 in profits in 1979. The Textrad crude oil ledgers originally submitted to respondent would appear to support such a perception. However, at trial Texaco submitted revised ledgers, which were received into evidence, showing that there were no such profits. Texaco explained that these revised figures were based upon its expert's review of the relevant materials and the belief that the earlier figures had erroneously treated marine revenue (freight) as an element of crude revenue. Respondent has not indicated to the Court that these revised figures are in error. Rather, respondent attempts to disregard the importance of the amended figures and to dwell instead on the fact that the SAG did not object to Textrad's apparent earning of such large profits on the sale of Saudi oil. Given the subsequent discovery that these figures were erroneous, we are not inclined to give weight to this. The Saudi failure to address these erroneous figures is unexplained by the record, but we assume that it was mere inadvertence, and we do not attach much significance to it. We note, moreover, that audit certificates *863 were no longer being requested by the Saudis after the first quarter of 1979. The record does not indicate whether the Canadian sales data were supplied to the SAG through the Canadian crude oil information system. Thus there is no evidence whether the erroneous figures were in fact available to the SAG. The important fact is that the figures were incorrect and that the violations did not occur. Accordingly, we are unable to attach any significance to them. Respondent cites two other transactions as evidence of Textrad's failure to comply with the restriction. In one of them, Textrad allegedly received "supplemental consideration" in the form of free storage from Motor Oil Hellas, and in the other an allegedly mysterious credit appeared in the course of an exchange transaction from Motor Oil Hellas to Textrad in the purchase of jet fuel. However, petitioners put forth a possible explanation for these transactions which, while not clearly proof of the actual events, at least raises the possibility that these transactions were legitimate and in accordance with the restriction. [62] Regardless of the validity of this explanation, however, we do not agree with respondent that these *864 transactions constitute part of a pattern of avoidance of the restriction. With regard to Exxon, respondent directs the Court's attention to one sale of Saudi crude at a price in excess of Saudi OSP. Petitioners in their *865 reply brief acknowledge that there was one cargo of 352,626 barrels of Saudi crude that was priced at $ 25.46 rather than $ 23.56. We believe that this one cargo was not sufficiently significant or a part of a pattern to constitute a violation. While this amount certainly is more than negligible on its face (this translates, by our calculation, to an overcharge of $ 669,989), when viewed in the context of the several billions of dollars of sales of Saudi oil during the period of the restriction, we conclude that it does not constitute a sufficient violation to support a finding that petitioner Exxon "violated" the restriction. Respondent further alleges that Exxon sold Saudi oil that had been held in storage at the prevailing price at the time of sale, rather than the lower price the offtaker had paid. Petitioners respond that the sale of the stored oil was in compliance with company guidelines. The evidence shows that the sale was in compliance and that, in issuing the guidelines, Exxon was simply attempting to comply with the restriction and be able to provide audit information indicating such compliance in the event that the SAG requested further audit materials. We conclude *866 that these sales of stored oil at the higher time-of-sale Saudi price, particularly since they were in compliance with the amended guidelines, likewise do not seem to us to be sufficiently noteworthy to constitute a violation. Accordingly, we see nothing in the documents cited by respondent that would lead us to the conclusion that either petitioner violated the restriction in its outright sales of Saudi crude. E. Special Treatment of Affiliates
Respondent also attempts to show the necessity for application of the section 482 allocation in this case by alleging that petitioners treated affiliates differently from unrelated entities. Respondent supports this allegation by stating that the offtakers earned profits from their overall sales to unrelated entities, and experienced losses in their overall sales to affiliates during the period at issue. Respondent contends that, if the restriction had deprived petitioners of the power they claim they lacked, the offtakers would have obtained the same "supplemental consideration" from affiliates (and thereby earned the same profits) as they did in their transactions with third parties. The problem with respondent's argument is *867 that most of the alleged "supplemental consideration" about which respondent has expressed concern in this case was received by petitioners as a function of the method by which exchanges were calculated. Once again, consistency is the determining factor. In virtually all of the offtakers' outright sales to affiliates, the offtakers complied with the restriction by invoicing Saudi crude at Saudi OSP, as they were required to do. As we have discussed, in those exchanges that occurred during the period at issue, Saudi crude was invoiced at Saudi OSP, as required, and the other terms of the exchange (the price of the crude received, the exchange ratio, etc.) were computed by reference to the negotiated internal refined values, as they always had been. But, unlike outright sales, all of petitioners' exchanges involved transactions with nonaffiliated companies. Since exchanges were not engaged in with affiliates, profits from exchanges with affiliates did not arise and could not have arisen. Accordingly, there was no parallel opportunity for petitioners to earn the profits that came about in exchanges. Therefore, respondent's assertion that petitioners "should have transacted with *868 affiliates for the proper amount of consideration" is without merit because the evidence shows that they did. Accordingly, based upon all the evidence and our rulings with respect to the parties' arguments, we conclude that petitioners complied with the restriction in all material respects and that the answers to questions (2), (3), and (6) of our Order of January 7, 1991, are in the affirmative. IV. Conclusion
Under the rule of Commissioner v. First Security Bank, 405 U.S. 394 (1972), its assignment of income predecessors, and its progeny, we hold that the 1979 restriction precluded a section 61 or section 482 adjustment to the income of petitioners' offtakers in this case. Accordingly, the answer to question (7) of our Order of January 7, 1991, is in the affirmative. An appropriate order will be issued. Footnotes
1. On Jan. 7, 1991, Exxon Corp. and Affiliated Companies (docket No. 18432-90), and Texaco, Inc., and Subsidiaries (docket No. 24855-89) were consolidated herewith for purposes of trial, briefing, and opinion of the Aramco Advantage issue, which is defined infra p. 3. ↩
2. As defined in our evidentiary opinion, Exxon Corp. v. Commissioner, T.C. Memo. 1992-92↩, an offtaker is the person or company that physically loads oil obtained under a concession, contract, or other arrangement.
3. Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. Petitioners contend that they purchased the Saudi Arabian crude oil from Aramco. Respondent contends that Aramco served as a conduit for the Saudi Arabian crude oil and that petitioners purchased the crude oil from the Saudi Arabian Government with Aramco acting as an agent. For purposes of this opinion, use of the phrase "via Aramco" is intended to be neutral as to this issue, which we need not decide at the present time.↩
5. Internationally traded crude oil is crude oil that is exported from the country where it was produced. The 50 percent Exxon figure referred to in the text would be somewhat lower if Exxon's indigenous production were included in the calculation.↩
6. As discussed infra↩, the period during which the official selling price of Saudi crude was lower than that of other comparable crudes began in January 1979 and ended on Oct. 29, 1981. However, the notices of deficiency deal with the tax years 1979 through 1982, and much of the evidence deals with a time frame that includes all of 1981. For purposes of our holding here, we do not consider this discrepancy to be critical, and we treat the period at issue in this opinion as including all of 1979, 1980, and 1981.
7. See supra↩ note 5.
8. These amounts represent dispositions of Saudi crude acquired by Textrad from all sources, including sources other than Aramco.↩
9. When OPEC met to discuss pricing, since Saudi Arabian Light was the crude with the largest volume moving in the international market, that crude was used as the "marker" or "benchmark" curde, or the crude to which others were compared for the purpose of determining price.↩
10. A "lifting" is the physical act of loading a quantity of oil obtained under a concession, contract, or other arrangement.↩
11. At a subsequent OPEC conference in March 1979, however, the October base price of Saudi Arabian Light marker crude was instituted early on Apr. 1, 1979.↩
12. In our evidentiary opinion, we admitted the first and second Nazer letters into evidence under Rule 146, reserving judgment on the weight to be accorded to them. Exxon Corp. v. Commissioner, T.C Memo. 1992-92. We discuss this matter infra↩ note 39.
13. Letter 103/Z indicates that this price applied only to additional production received by Aramco in excess of the first 7 million barrels of daily production received by Aramco out of total crude oil production.↩
14. France had domestic product price controls on certain refined products, which were fixed by reference to the official selling prices of a "basket" of crude oils, in which every crude entered in direct proportion to its share in the supply of French refineries. While it did not have crude price controls, France took a very active part in monitoring the prices of imported crude oil. France did not separately control exchanges. A portion of the 1979 income attributed to the Exxon offtakers was from a French Exxon affiliate. The Netherlands had product price controls and closely monitored crude prices. It did not separately monitor exchange transactions because these transactions historically had been occurring regularly for logistical and supply purposes, and there was no indication that they were occurring for other reasons during the period at issue. A portion of the income attributed to the Exxon offtakers was from a Dutch Exxon affiliate.↩
15. It was common knowledge among the Japanese people that the SAG had established lower crude selling prices than other OPEC countries. Japan had a product control system, the Ceiling Price System, in effect during the years at issue, which would not have permitted Japanese affiliates of Aramco shareholders to charge product prices that reflected import costs of Saudi crude above Saudi OSP. The Japanese Government monitored the quantities and prices of all imports of petroleum into Japan. Saudi crude constituted almost one-third of Japan's total oil imports in the years 1979-81, and, because of the importance of Saudi crude to Japan, higher prices would not have been permitted under the Ceiling Price System.↩
16. A close watch was kept by Italy on imports of Saudi crude because that crude amounted to approximately one-third of Italy's aggregate imports. Italian officials knew that Saudi crude was selling for less than other crudes and that petitioners had been instructed by the Saudis to sell it at OSP. Italy required oil importers to submit monthly reports on each crude shipment, its quantity, origin, price, and terms of payment. This monitoring was intended to keep crude import prices as low as possible. In 1980 a system was adopted in Italy whereby all crude was to be based on official selling prices and conformity with this requirement was routinely verified. This system of monitoring in Italy was in addition to the monitoring procedures already in effect by the IEA and the EC. Italy did not monitor separate price information of exchange transactions but simply verified the conformity of all import prices with official prices. A portion of the income attributed to the Exxon offtakers was from an Italian Exxon affiliate.↩
17. Although the German Government did not have official product or crude price controls, it had a Government price information system by which it monitored the prices of crude imported into the Federal Republic of Germany. The Federal Republic of Germany would have intervened had it become aware that petitioners' offtakers were transmitting Saudi crude into the Federal Republic of Germany at prices in excess of Saudi OSP. The Texaco notice of deficiency allocated income from a German Texaco affiliate to Textrad.↩
18. The United Kingdom had no formal controls over crude oil or product prices during the years at issue. It had a basic policy of allowing market forces and prices to work. However, it also sought to discourage or restrain price increases that could not be sustained in the long run and were not justified by the underlying supply and demand trend. There was a perception that the high OPEC prices were artificial and thus not in compliance with free market forces. Therefore, it supported the Saudi price moderation policies. The oil market information system and the crude oil register provided it with an ongoing picture for assessing whether petitioners were selling Saudi crude at the Saudi OSP.↩
19. In a reciprocal purchase/sale agreement there are two "matching" transactions, a sale and a purchase, each subject to a separate legal document, whereas in an exchange there is a single transaction, subject to a single legal document. The two terms are used interchangeably in the industry. For purposes of this opinion, we use the term "exchange" to refer to both exchanges and reciprocal purchase/sale agreements.↩
20. For example, in one transaction involving a disagreement between Texaco and one of its exchanging partners over who had to bear the responsibility for retroactive price increases, the exchanging partner had indicated that the exchange differential had been calculated based upon "the difference in value of each crude, in respect of the yields of refined products."↩
21. For example, in one transaction, the trading partner insisted for its own reasons that its crude had to be invoiced at its own OSP, and a "credit note" was used to balance out the transaction based on the parties' understanding of the profit to be earned from refining each crude. In another situation, a telex from Exxon to an exchange partner during the period of the 1979 restriction provides that the 30 days additional credit Exxon would receive in the negotiation would only partially offset the effect of the low price of the Saudi crude while Algerian was at the maximum official price. The telex goes on to state that: "In evaluating the exchange this point was a significant consideration and thus we would prefer to maintain 60 days credit on the Algerian". This would appear to make it clear that favorable credit terms commonly went into negotiation of the differential. Other documents show similar adjustments of credit periods in order to bring the values of the crudes being exchanged into balance.↩
22. In exchanges, the number of barrels of Saudi crude that Textrad disposed of often was different from the number of barrels received, with the difference referred to as the "exchange ratio" or the "volume ratio". This ratio is defined as the number of barrels disposed of in an exchange transaction as compared with the number of barrels received in the exchange. The evidence indicates that, over the period 1973-1982, on average, 1.36 barrels of Saudi crude were given up by Textrad for 1 barrel of non-Saudi crude. For the years at issue, on average 1.44 barrels of Saudi crude were given up for 1 barrel of non-Saudi crude.↩
23. Package exchanges were employed when Saudi oil was sold with no offsetting exchange barrels received under that contract. In some situations these barrels were sold outright by Textrad and recorded as part of an existing exchange contract, rather than as an outright purchase. There were a variety of legitimate reasons for using this method of recording the sale. The evidence does not indicate whether petitioners took part in such transactions.↩
24. One Exxon executive expressed concern to another in September 1979 that exchanges in which Saudi crude was given up were "risky" because they might damage Exxon's Saudi relationship, but apparently this person's concerns were not pursued.↩
25. Lighter crude generally tends to be "sweet", or to contain lower amounts of sulfur, although there are many exceptions to this tendency.↩
26. These amounts represent dispositions by exchanges of Saudi crude oil acquired by Textrad from all sources, including Saudi crude oil acquired other than via Aramco.↩
27. Respondent alleges that Textrad realized over $ 598 million in "bargain purchase profits" (profits from refining Saudi crude in excess of the profits that would have been realized from refining other comparable crude) from these processing agreements during the years at issue; petitioners assert that the offtaker profits from the sale of products produced pursuant to processing agreements (including the refining profit) were $ 160 million less than that figure. The parties did not present complete information pertaining to profits (as instructed by the Court several times during trial); thus a precise finding is not possible, nor is one necessary, as we explain later in this opinion.↩
28. See supra↩ note 27.
29. A Texaco in-house document indicates that in 1982 Texaco estimated its after-tax earnings on Saudi crude to be in excess of $ 700 million, excluding downstream earnings. We cannot determine the basis for these figures, and therefore are more inclined to rely upon the number admitted to by petitioners, which is quite close to the figure presented by one of respondent's experts.↩
30. Charles Hedlund's letter indicated that much of the improvement in Exxon's earnings was due to unrelated factors, such as the recovery of the dollar, increased sales of natural gas and heating oil, increased demand for chemical products, increased Alaskan pipeline operation, and increased production in new areas.↩
31. As an alternative adjustment in the same paragraph of the notice of deficiency, respondent also stated that "in transactions with Caltex Trading and Transport Corporation (CTTC), Texaco International Trader Inc. (Textrad) failed to charge arms-length prices and/or fair market values". Alternate adjustments pursuant to this theory were also made to Textrad's income.↩
32. First Security Bank v. Commissioner, T.C. Memo. 1967-256. This result was based on the decisions in Local Finance Corp. v. Commissioner, 48 T.C. 773 (1967), affd. 407 F.2d 629 (7th Cir. 1969), which were held to have been "erroneously decided" by the Supreme Court in Commissioner v. First Security Bank, 405 U.S. 394, 406↩ n.22 (1972).
33. First Security Bank v. Commissioner, 436 F.2d 1192 (10th Cir. 1971). The Court of Appeals held the Commissioner's sec. 482 allocations to be arbitrary because the banks at issue had not received, and in all probability never could receive, the income in question. Id.↩ at 1198.
34. We note here that respondent contends that the "power" at issue also constituted the power of the offtakers to earn profits, which in this case, respondent contends, was not affected by the 1979 restriction. This argument incorrectly states the function of sec. 482. The power at issue here is the power artificially to move profits from one entity to another affiliated entity. Commissioner v. First Security Bank, supra↩ at 404. Thus, the earning of profits by the offtakers is not relevant to the issue of power, although it may be relevant to whether the restriction was complied with, as we discuss later in this opinion.
35. Petitioners also point out -- and respondent does not appear to dispute -- that the interests of the SAG and of the U.S. Government during the period under examination were closely aligned. Prior to and during the years at issue, the U.S. Government made repeated requests to the SAG to moderate oil prices. Thus, any efforts by the Saudis to decrease crude oil prices were in line with U.S. interests.↩
36. We note that there were also allegations by respondent, in certain materials submitted on the admissibility of the Nazer letters, of collusion between petitioners and the Saudi Government in the preparation of those letters, but we stated in our evidentiary opinion that "evidence of collusion [was] completely lacking in the record". Exxon Corp. v. Commissioner, T.C. Memo. 1992-92↩.
37. Respondent has retained hearsay objections to certain stipulated documents in the record containing quotes from Minister Yamani's interviews in the Middle East Economic Survey and other similar publications. We received into evidence a number of documents constituting portions of such publications as the Middle East Economic Survey for the limited purpose of showing the basis for expert reports to which they were attached under Rule 143(f). Exxon Corp. v. Commissioner, T.C. Memo. 1992-92. We stated in our evidentiary opinion that they would not be used in this opinion as evidence of the truth of the matters asserted therein. We have quoted from some of these interviews in the factual portion of this opinion above. These quotes from these interviews were included herein to understand the Saudi intent behind the restriction and the basis for the public perception of the restriction, not as evidence of the truth of the matters asserted therein. Thus they do not constitute hearsay. See Weinstein, Evidence Manual, par. 14.02[02], at 12-14 (1990). These interviews apparently were used by Minister Yamani as a means by which he sent his messages. They were widely disseminated during the period at issue and were an important aspect of the public perception of the restriction, and to ignore them would be to disregard important expressions of Saudi intent. Accordingly, we find it appropriate to take into account portions of these quotes herein. In addition, while we normally do not rely upon newspaper articles for their contents, these materials constituted purportedly direct quotes, not subjective analysis. We note also that the editor of Middle East Economic Survey, Ian Seymour, was present at trial and available for cross-examination by respondent as to the accuracy of these quotations. Mr. Seymour was found by the Court to be a credible and reliable witness, and there is no allegation by respondent that Minister Yamani did not make these published statements. We also note that respondent's expert, Dr. Ghadar, relied upon such an interview published in the Middle East Economic Survey as the basis for information contained in his report and that respondent's counsel discussed the content of this interview in his examination of Dr. Ghadar. Other witnesses relied upon similar interviews as well.↩
38. During trial and on brief, respondent also contended that the restriction was not "consistently applied" in that, while the restriction may have been applied by petitioners to some transactions, it was not applied in the context of exchanges and processing agreements. As a result of this inconsistent application, respondent contends, petitioners "realized over a billion dollars of Advantage profits". Petitioners contend that exchanges and processing agreements were employed in the same manner as they had always been, were kept at historical levels and thus did not violate the restriction. Because we view respondent's argument as an aspect of whether petitioners complied with the restriction, rather than whether the restriction was apparently intended to apply in a consistent manner, we address these arguments later in this opinion.↩
39. Petitioners bring to our attention the language of the first Nazer letter, which states that the restriction applied to all sales of Saudi crude. Respondent objects to our use of this letter as evidence in support of the matters stated therein on the grounds that it was prepared significantly after the period at issue, contains inadmissible hearsay (although we note that respondent relies upon the first Nazer letter on page 160 of respondent's brief in support of the factual assertion that exchanges were included within the scope of the restriction), there is no proof that Minister Nazer had any knowledge about the matters at issue, and because there is some concern of bias on the minister's part in favor of petitioners. Respondent further indicates that, even though the Nazer letters have been accepted into evidence under Rule 146, they should be accorded no weight because of their "intrinsic weakness", citing the District Court case of Chadwick v. Arabian American Oil Co., 656 F. Supp. 857, 861 (D. Del. 1987). We believe that the statement of an individual of the prominence of Minister Nazer should be given considerable weight under normal circumstances. However, we note the important points that these letters apparently were prepared significantly after the years at issue in preparation for trial, in the apparent absence of any possibility of cross-examination of Minister Nazer. We continue to believe, as we stated in our evidentiary opinion, that documents prepared for litigation tend to have an air of reliability because the existence of the litigation tends to impress upon the makers of those documents the importance of telling the truth. See Exxon Corp. v. Commissioner, T.C. Memo. 1992-92↩. The absence of an opportunity for respondent to question Minister Nazer, however, causes their probative value to be somewhat less than, for example, that of the foreign depositions in evidence, where at least the statements were made under oath, and respondent had some ability to pose questions to these important witnesses. In our evidentiary opinion in this case, we admonished respondent's counsel that he did not adequately attempt to comply with petitioners' efforts to satisfy respondent about the authenticity of the Nazer letters, and for this reason we were willing to admit them as authentic. We also would note that we do not find respondent's continued questioning of the authenticity of these documents particularly persuasive. However, for the above reasons we do not intend to rely upon the statements made in these letters as the sole support for crucial contested facts in this case. We are willing, however, to accept these letters as further support for conclusions which we base upon other evidence.
40. Petitioners additionally point to testimony regarding a telephone conversation that allegedly took place between Exxon Chairman Mr. Garvin and Minister Yamani shortly after he received the translation of Letter 103/Z. Mr. Garvin indicated that he was puzzled by the "third party" language and telephoned Minister Yamani to clarify the scope of the restriction. Mr. Garvin stated at trial that he understood after this conversation with Minister Yamani that the restriction applied to all sales of Saudi crude whether to affiliates or to unrelated parties and that he issued instructions accordingly. Respondent objects to our reliance upon this conversation because it constitutes inadmissible hearsay, but, as we indicated in our evidentiary opinion, this material is admissible in support of Mr. Garvin's understanding of the scope of the restriction, and it is for this reason alone that we reference it here. The conversation simply explains why petitioners believed that their interpretation of the restriction as applicable to all sales was reasonable. Thus, we do not admit the telephone conversation to prove that the restriction in fact applied to all sales, but merely to show that petitioners' behavior was reasonable because it was based in part upon this conversation. Respondent also urges the Court to disregard this conversation because petitioners did not offer into evidence a follow-up memorandum by Mr. Garvin indicating that this conversation had occurred. While the existence of such a memorandum would support Mr. Garvin's testimony, we found Mr. Garvin's testimony to be credible, and we have no reason to believe that he was not telling the truth. Therefore, the absence of a follow-up memo is not particularly significant. Nor do we agree with respondent's allegation that Mr. Garvin's testimony should not be given much credit, because he allegedly testified falsely that Exxon did not directly profit from the low-priced Saudi crude. Mr. Garvin apparently meant by such a statement that Exxon profited from the resale of non-Saudi crude received in exchanges, not from the sale of Saudi crude.↩
41. The first Nazer letter, which we discuss supra↩ note 39, also contains direct evidence of Saudi intent to enforce the restriction, which confirms our conclusions below.
42. The materials cited by respondent in support thereof all deal with situations where a foreign sovereign is attempting or might attempt to use its sovereign status as a shield, obviously not the case here. These cases and provisions do not stand for the proposition, as asserted by respondent, that there is a "rule that foreign governments engaged in commercial activity are treated the same as private persons engaged in business". Rather, they stand for the more narrow proposition that foreign sovereigns may not hide behind their sovereign status to avoid certain legal requirements when they are engaging in commercial transactions. We will presently discuss the Supreme Court's interpretation of the term "commercial" in the context of the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. secs. 1602-1611 (Supp. 1993)↩. We note here that the sweep of respondent's summary of the law as it relates to foreign sovereigns and their commercial relationships is much broader than the cases cited justify.
43. The underscored portion of this exhibit, while underscored by respondent on brief in support of the argument that the relationship was "business" in nature, demonstrates to us more of a sense of superiority such as would be present in a sovereign/subject relationship than the negotiating quality of a commercial relationship.↩
44. We note that the Court of Appeals for the Ninth Circuit affirmed this case under the Act of State doctrine rather than the Foreign Sovereign Immunities Act. International Association of Machinists and Aerospace Workers v. OPEC, 649 F.2d 1354, 1358-1362↩ (9th Cir. 1981). Nevertheless, we find the District Court's above-quoted language to be correct and helpful to our understanding of the issue before us.
45. For this reason, we believe that respondent's reliance upon Saudi Arabia v. Arabian American Oil Co., 27 I.L.R. 117 (1958), is misplaced. That arbitration case found in 1958 that the Saudi granting of an exclusive right to Aristotle Onassis to ship crude oil from Saudi Arabia was not a "law" but rather was of a "purely contractual nature" because it did not "lay down norms of a general and impersonal application." Id. at 204. The case also found that the Aramco concession was generally commercial in nature. Id↩. at 165. We are not here at the present time to investigate the overall nature of the Saudi/Aramco relationship throughout the history of that relationship; rather we are scrutinizing the nature of a specific pricing restriction that was in effect during a particular period. The nature of that relationship during the period at issue also was considerably changed from the general relationship 20 years earlier. This is due in large part to the series of events that occurred in the Middle East during the decades after the arbitration case was issued, and the fact that the SAG was in the process of taking over ownership of Aramco.
46. We note that respondent has cited documents in the record evidencing other contracts containing resale pricing restrictions similar to the one at issue. However, the documents cited by respondent (including a 1982 General Accounting Office study and a Department of Energy memorandum) indicate that these clauses were required by certain producing countries (sovereigns) in certain contracts with private companies. These clauses were said to be a way that producer countries were extending their control over the market. By virtue of their control over the land containing a commodity that was in short supply, the producing countries had increased ability to enforce the restrictions they required. As we discuss in the text, this power was inherently sovereign in nature since it involved the inherently sovereign function (in this context) of setting crude oil prices by OPEC countries, and also because it could at any time have resulted in the complete takeover of petitioners' property and the exclusion of petitioners from Saudi Arabia. To the extent that there were any contracts with private parties containing similar types of clauses, this similarity of terms does not mean that, as respondent contends, the restriction was voluntarily entered into by petitioners with the SAG in the case of the restriction at issue. We note, for example, that the existence in private contracts of "handling charges" similar to sales taxes does not remove the sovereign aspect of a state's ability to require payment of the sales tax.↩
47. Even one of respondent's experts, a legal adviser to the SAG Petroleum Ministry during the years at issue, indicated that petitioners were required to comply with the restriction.↩
48. There also is some speculation in the record by all parties concerning the Saudi motivation in issuing the restriction and in moderating prices generally. We believe that such motivation is only helpful here if it tends to show whether it was issued with the intent that it be enforced or with the lack of such intent. We note assertions by respondent's expert Mr. Ghadar that the restriction undoubtedly was issued not altruistically but primarily to advance Saudi interests, such as increasing its market share and its ultimate profits at a time when the Iranian crisis created a great deal of uncertainty and potential for gain. However, such self interest, if anything, tends to indicate that the SAG intended for the restriction to be enforced.↩
49. Petitioners also presented evidence through the depositions of representatives from the consuming countries that they could have enforced the restriction themselves by means of threatening to revoke licenses or informal persuasion, also called "jawboning". Respondent contends that license revocations never actually happened and that there was no proof they ever would have happened. Since there is no evidence that Saudi crude was brought by petitioners into the consuming countries at prices in excess of Saudi OSP during the period at issue, it is not surprising that evidence of this threat being carried out has not been brought to our attention. Respondent makes the more persuasive argument, however, that petitioners were the ones with the power to "jawbone" during periods of shortages such as the early portion of the period at issue. Accordingly, the extent of this type of pressure is difficult to determine.↩
50. We also note that the record does indicate that petitioners continued their internal↩ certification procedures for several months after the first quarter of 1979. Subsequently, Exxon explicitly advised its personnel that discontinuance of internal reporting "is not intended as a signal to depart from any crude pricing practices followed during 1979". Thus, from petitioners' standpoint -- which is useful in ascertaining the circumstances -- the restriction was still in effect after the first quarter of 1979.
51. We note that entire chapters of two of respondent's expert reports contain discussions of "Bargain Purchase Profits Earned by Affiliates".↩
52. We note that, if there had been no restriction, petitioners' offtakers quite likely would have been able to earn even higher profits, since they would have been able to charge higher prices for the crude they sold, particularly during 1979 and 1980 when severe shortages would have tended to permit them to do so without losing their market share. Respondent indirectly recognizes this fact in respondent's brief by indicating that petitioners "chose" to not exercise their power to realize more income by charging the restricted price in their sales of crude. Our experience leads us to believe that successful companies do not "choose" to restrict their profits in sales to unrelated parties; if petitioners had had the power to charge higher prices, the impetus of profit maximization would have compelled them to exercise that power. That they did not do so here is further evidence that it was because they were unable to do so.↩
53. Various profits figures were brought to the Court's attention during the hearing and in the parties' briefs. Respondent contends that immediately before and after the period of the restriction, Texaco's offtaker operated at a substantial loss, yet during the years at issue it received approximately $ 738 million in "Advantage profits" from its sales of Saudi crude in exchanges. Respondent additionally contends that Exxon's offtaker received approximately $ 154 million in "Advantage profits" from sales of Saudi crude in exchanges, a sharp increase over previous years. Petitioners' expert witness calculated a considerably smaller figure for Exxon of $ 94 million, but he indicated that this profit figure was as a result of the sale of non-Saudi crude received in exchanges. We instructed the parties at trial that the precision of these profit figures was not the issue presently before us, and we reiterate that instruction here. Since even Exxon's expert witness agreed that substantial profits were earned by Exxon's offtakers as a result of the sale of non-Saudi crude received in exchange transactions during the period at issue, it is not necessary for us to quantify accurately (nor can we on this record) the precise amount of these profits.↩
54. One of respondent's proposed findings of fact states that the differential between two crudes is based upon their market values. This finding, used in the context of exchanges, is misleading at best. The material cited in support thereof certainly does not convince us that petitioners' witnesses were incorrect when they stated that internal refined value was used to calculate the differential. Respondent cites Mr. Seymour's book, OPEC, Instrument of Change, published in 1981. On the cited page, however, the author discusses differentials in the context of the relative values of various OPEC crudes in relation to the marker crude; Mr. Seymour is not discussing exchange differentials. Respondent also cites the general definition of "differential" in a glossary submitted to the Court, which is not in the context of exchanges. In addition respondent cites testimony of a witness who stated that "market" was used in calculating exchanges, but this gentleman was a crude trader who traded for profit, not for system requirements; thus he may not have been discussing the method employed by companies intending not to profit from their exchanges but to refine the crude received. Another witness cited by respondent was a former Exxon trading manager, who stated that the focus in an exchange negotiation was upon "value" and "price", which are extremely ambiguous terms in this context.↩
55. For example, while one of the Nazer letters contains a reference to exchanges, it merely indicates that petitioners were to continue in their normal patterns of behavior, including exchanges, and does not expressly address the issue raised by respondent of the profits earned by petitioners in their exchange transactions.↩
56. Respondent also directs our attention to another document in which one Exxon executive apparently had indicated to another his concern that any exchanges involving the giving up of Saudi crude were "risky". Other Exxon executives apparently reached a different conclusion where historical levels were followed and where exchanges were engaged in to obtain low sulfur crudes to meet Esso Europe needs. One executive's disagreement with this policy does not constitute persuasive evidence that all exchanges violated the restriction.↩
57. Respondent also alleges that Texaco via Caltex substituted non-Saudi crude for Saudi crude in its sales to certain Japanese associates in order to keep the Saudi crude within its own system and thereby maximize its profits. However, the Director of Texaco's Caltex group of companies, Mr. Kinnear, testified that Caltex's sales of Saudi crude remained constant during the period at issue, and this fact was not disputed or disproven by respondent. We see, therefore, no significance to the existence of these substitutions.↩
58. Petitioners allege that, "while fluctuations were normal from year to year, Texaco's overall processing activities from 1977 through 1982 remained constant", citing an expert witness report. Respondent indicates that the figures in graph 15 of that report are inconsistent with Texaco's records in that the graph shows a steadily increasing amount of processing at two particular refineries in early 1978, yet other Texaco documents indicate that no crude was processed at those refineries until September 1979. Respondent did not point out any other errors in this report. While we agree with respondent that there is some apparent inconsistency between those documents and the graph in question, it does not appear to be a sufficiently large amount to undermine the validity of the expert's overall conclusion.↩
59. There was an increase in total processing for Textrad between 1978 and 1979, but we do not put much weight upon figures for that one year, since total processing decreased again during 1980 and 1981, which also are years during which the lower Saudi price was in effect. Thus it is necessary to focus upon the multiyear period in order to obtain an accurate appreciation of this issue.↩
60. We note that in respondent's evidentiary briefs respondent did not object to the Court's ruling in connection with the TOBL evidence excluded or refer to respondent's Offer of Proof.↩
61. The Offer of Proof does not allege that TOBL's levels of processing agreemeents were significantly increased overall during the period at issue.↩
62. Petitioners indicate that, while the record is not clear, it was possible that these two transactions were related in the following manner: Textrad was seeking storage space for 2 million barrels of oil and was told by Motor Oil Hellas that it could use some of its refinery space at no cost because it had excess storage capacity. The two companies had a longstanding business relationship, and therefore such an arrangement was in furtherance of that relationship. Later, when Textrad went to pick up its 2 million barrels, its tanker could not hold the full amount and Textrad was forced to leave approximately 129,000 barrels until a future time. That 129,000 barrels of oil remained in the Motor Oil Hellas facility until it was later used as a credit against a subsequent purchase of jet fuel.↩